MARY CAMPISE - 6/13/2019

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

MARY CAMPISE,                    )
                                 )
            Plaintiff,           )
                                 )
   vs.                           )   No. 1:18-cv-6534
                                 )
CEVA LOGISTICS, LLC,             )
                                 )
            Defendant.           )

        The deposition of MARY CAMPISE, called by

the Defendant for examination taken pursuant to

notice and pursuant to the Federal Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Patricia A. Mache, a Certified

Shorthand Reporter and Notary, at 1901 North

Roselle Road, Suite 800, Schaumburg, Illinois,

on June 13, 2019, at the hour of 9:00 o'clock a.m.

APPEARANCES:

      THE LAW OFFICE OF ANDRE P. GASTON
      MR. ANDRE P. GASTON
      1901 North Roselle Road
      Suite 800
      Schaumburg, Illinois  60195
      630-560-3692

         On behalf of the Plaintiff;

      WEYCER, KAPLAN, PULASKI & ZUBER P.C.
      MR. MARK J. LEVINE
      Eleven Greenway Plaza
      Suite 1400
      Houston, Texas  77046
      713-961-9045

         On behalf of the Defendant.

ALSO PRESENT:

  Kevin Colligan

                    I N D E X
WITNESS                                      PAGE

MARY CAMPISE

   Examination by MR. LEVINE                  4


              E X H I B I T S

EXHIBIT            DESCRIPTION              PAGE

Exhibit 1    Performance Management          69

Exhibit 2    Performance Improvement Plan    70

Exhibit 3    E-mail from Mary Campise        76

Exhibit 4    Complaint                       90

MARY CAMPISE - 6/13/2019

(Witness sworn.)

WHEREUPON:

MARY CAMPISE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LEVINE:

Q. Could you state your name for the record, please.

A. Mary Campise.

Q. Ms. Campise, you understand that I represent Ceva Logistics in the lawsuit that you filed?

A. Yes.

Q. And we're here today to take your deposition in connection with the lawsuit that you filed. There are some general sort of ground rules for depositions.

Am I right to assume this is the first time you've had your deposition taken?

A. Yes.

Q. The first and easiest rule is to make sure you answer questions audible as you already

are doing and not to nod your head and things like this or other noises that can't be transcribed, mm-hmm or uh-huh or things like that that are hard so it's easier for court reporter, okay?

A. Okay.

Q. I will do my best not to interrupt any answer you give, but if I do could we have an understanding that you tell me that you didn't have an opportunity to finish your answer because I want to make sure I get your complete answer.

Does that make sense?

A. Yes.

Q. And I will do my -- if you would try to let me finish my question even if they might be "inartful" at times before you answer, okay?

A. Sure.

Q. And you're doing wonderful job of it already.

Following your termination from Ceva, how long were you unemployed?

A. I think about six months.

Q. What was your first job after Ceva?

A.    First job was with Trans Group, Trans Group.  I was self-employed and then I was also self-employed with another company called Apex Logistics.

Q.    Let's start with the job at Trans Group.  By self-employed, you mean you were on an independent contractor basis?

A.    Yes, commission only.  A percentage, you know, percentage of the sales what the pay was.  No salary, no benefits.

Q.    And how long did you work with Trans Group?

A.    A couple years until just recently.

Q.    Could you give me month and date that you were with Trans Group?

A.    Well, I started -- I started that summer, you know, I signed the contract but I had a noncompete with Ceva so I had to pick customers that were new.  And it, you know, takes awhile, it takes awhile to get your first shipment.

Q.    Do you know how long after your termination you actually signed the contract with Trans Group?

MARY CAMPISE - 6/13/2019

A.    It was that summer, you know.  So I was -- I ended in May so it was that summer.

Q.    Summer of --

A.    July or August.

Q.    2017?

A.    Correct.

Q.    And did you -- is there a Trans Group local office where you went to sign the contract?

A.    Yes, in Addison.

Q.    Illinois?

A.    Yes.

Q.    Do you remember the address for that location?

A.    It's off of Swift.  It's in Addison.  It's the only office in Chicago.

Q.    How did you go about getting that job or that independent relationship?

A.    Called them.

Q.    Why are you -- while you were with Trans Group were you seeking full-time employment also?

A.    That was full-time employment.

Q.    Let me try to distinguish that.  That

MARY CAMPISE - 6/13/2019

was employment -- well, it was work on a 1099 basis, correct?

A.    Correct.

Q.    And so what I'm trying to distinguish did you seek a job where you would be working on a W-2 basis?

A.    Yes, I did.

Q.    While you were with Trans Group?

A.    Yes.

Q.    So I want to get a sense of, and just a list if we could, of places you have applied for work since your termination from Ceva, and if possible if you could try to give me in the sequence in which you applied for them, if you could.

A.    I did give that but I'll tell you.

Q.    Okay.  I don't think I've seen that so not sure --

MR. GASTON:  Just answer his question, provide to him.

THE WITNESS:  Lauffer, I interviewed with Lauffer.  Apex, I joined Apex in 2017 to sell international.  And it was a very -- you know, I thought, you know, it would be like my own

MARY CAMPISE - 6/13/2019

business.  We agreed to 30 percent of the profit and that's pretty darn good.  So anyway, you know, I wanted to give a go to Trans Group and Apex.

Q.   I want to follow-up with that in a minute.  But I was just looking for the list of places you've applied for full-time employment, not on a 1099 basis, on a --

A.   Lauffer was one.

Q.   Lauffer was one.  Anybody else?

A.   That was 2017 and in 2018 I got a job with Purolator in April.

Q.   Can you spell Purolator for me.

A.   P U R O L A T O R, Purolator.

Q.   And when did you interview with the job for Purolator?

A.   I interviewed with the job probably February and March and then I got the job in April of last year.

Q.   So February-March 2018 you interviewed?

A.   Yes.

Q.   And got the job in April?

A.   Yes.

Q.   2018 to be clear?

MARY CAMPISE - 6/13/2019

A.   Yes.

Q.   Is Purolator the first place you've had full-time employment on a W-2 basis since your termination from Ceva?

A.   Yes.

Q.   So before I lose track of Purolator, tell me your salary and benefits there.

A.   The salary was 80,000 and medical and dental and optical plus commission.

Q.   It can be hard to describe commission structure.  Did you earn commissions while you were with Purolator?

A.   No.  You have like three quarters, three quarters to come up to your threshold. And I just recently took a job with Damco and they're in Itasca and I started with them last month, been with them a month, end of April.

Q.   Back up.  So you're at Purolator from April 2018 to what month?

A.   To April 2019.

Q.   Were you terminated or did you quit?

A.   I quit.

Q.   Why did you quit?

A.   Because I couldn't pay my bills.

HANNA & HANNA, INC.
713.840.8484

MARY CAMPISE - 6/13/2019

Q.    Not earning enough you mean?

A.    Yes.  I mean I was, I was about to close two very large accounts and I had increased one account by over half a million dollars but you only got paid commission for 12 months and then you didn't get paid commission on that account anymore.

And so Damco approached me and they have a very lucrative program and so I decided to take that job.

Q.    When did you take the job with Damco?

A.    In April of this year, 2019.

Q.    What is your salary at Damco?

A.    97,000.

Q.    Do you have medical, dental, and the benefits?

A.    Yes.

Q.    By the way, did you have retirement benefits at --

A.    I had 401 --

Q.    -- Purolator?

MR. GASTON:  Let me him finish the question completely before you answer.

THE WITNESS:  Is that do you mean 401K, is

that --

BY MR. LEVINE:

    Q.    Yes, any kind of --

    A.    401K.

    Q.    Thank you.  Do you have 401K at Damco?

    A.    Yes.

    Q.    Do you participate in the 401K at Damco?

    A.    Yes.

    Q.    Did you participate in the 401K at Purolator?

    A.    Yes.

    Q.    Do you earn commissions at Damco as well?

    A.    Yes.

    Q.    Is it too early in your employment to have been paid any commissions at Damco?

    A.    Yes.

    Q.    When will you be in a position to start earning commissions?

    A.    Well, you can -- you don't get -- they don't give you any accounts.  You secure the accounts yourself.  I've got a bid right now for half a million dollars so, you know, it's an

MARY CAMPISE - 6/13/2019

Page 13

online bid in two weeks so.

Q. So between May 2017, your termination at Ceva, and your April 2018 job at Purolator, I want to talk about that period of time. So call that 11 months or so, right.

Is that when you were working with Trans Group?

A. I worked with Trans Group. I worked with -- and then I joined Apex and then another job called Cove, Cove Logistics. All three were commission only.

Q. Were you working on an independent contractor basis for each of those companies simultaneously?

A. Yes, and they knew it. They were fine with it. Different products.

Q. So you had those -- what were the different products by the way between the three companies?

A. Trans Group domestic. They do have an international arm. So air and ocean and domestic. And then Apex has its own aircraft in Asia. So mostly Asia imports and exports with Apex. And then Cove is a truck, they do

domestic trucking.

Q.   Could you estimate in the 11-month period that you worked with -- well, did you work with each of those companies during the time period between your termination from Ceva and getting the job at Purolator?

A.   Correct.

Q.   Do you know about how much income you earned from those three companies during that time period?

A.   About 50,000.

Q.   And it would be reflected in 1099s that you received?

A.   Yeah, I sent those in.

Q.   You mean to your lawyer you provided them?

A.   Yes.

Q.   Have you provided all W-2s for income earned by you since your termination to your counsel?

A.   Yes.

Q.   While you with Ceva, did you ever apply for another job?

A.   Yes.

MARY CAMPISE - 6/13/2019

Page 15

Q.    When?

A.    I don't really remember exactly when, but it was probably the year before that, probably 2016.

Q.    You mean the year before the termination?

A.    2016.

Q.    Where did you apply for work?

A.    It was like BTM or -- it's a company that's headquartered in the East Coast.  BTM, BTH, something like that.

Q.    Any other places you applied for work while you were working for Ceva?

A.    Not that I remember.

Q.    Did you get a job offer from BTM?

A.    I did.

Q.    When did you get the job offer?

A.    Sometime in 2016.

Q.    Why did you not take it?

A.    I liked, I liked the friends I had at Ceva.

Q.    Do you remember when in 2016 you got the job offer from BTM?

A.    In the fall, sometime in the fall.

MARY CAMPISE - 6/13/2019

Page 16

Q. What led to you apply for the job at BTM?

A. Just gender and age discrimination.

The other thing was there was a contract; you had to sign a contract too. My husband didn't like the contract for BTM so that was another thing.

Q. What was the pay they were offering you at BTM?

A. 100,000.

Q. Plus commissions?

A. Yes.

Q. Was the commission structure at BTM more attractive than the one at Ceva?

A. Yes, but you had to pay all your expenses. All your expenses came out of your commission first. So I didn't really like that part of it. Your car, your expenses came out first and then you were paid your commission.

Q. Do you make a claim in this suit for emotional distress damages?

A. Could you repeat that.

Q. Do you make a claim in this lawsuit for emotional distress damages?

MARY CAMPISE - 6/13/2019

A.    Yes.

Q.    Describe for me the emotional distress that you claim my client has caused you.

A.    Well, I've been in the industry over 30 years and because of losing the job I had emotional distress.  My sister is a counselor.  She's got a master's in counseling and I talked to her almost daily at first.

It was hard to sleep.  I had depression.  I also, you know, couldn't call on my customers because I had a noncompete for a year so my support system was gone.  I felt embarrassed and humiliated.  And from the people that I knew at Ceva and the customers I knew, you know, it's hard to explain why it happens and I still suffer from that.

Q.    Do you take any medication?

A.    No.

Q.    Have you ever taken any medication for depression or emotional distress related issue?

A.    Yeah, at first I took some, some, you know, something to take the edge off.  I don't now, but I still talk to my sister at least once a week and I don't have to -- I didn't have the

MARY CAMPISE - 6/13/2019

money to pay for a professional so I -- she's,
my sister is very good. She's a counselor at a
high school so.

Q. What's your sister's name?

A. Paula Wilson.

Q. Where does she reside?

A. Rapid City, South Dakota.

Q. You said you took something for awhile.
What did you take?

A. I don't even remember what it was; I
don't know.

Q. What kind of a medication was it?

A. It was an antidepressant. You know,
just it wasn't one of the popular -- I would
have to read the label, but it wasn't a long
time. I pray a lot, you know.

Q. Who prescribed the medication to you?

A. A doctor at the emergency medical
center in Downers Grove.

Q. Say that again?

A. It's an emergency medical center. It's
in Downers Grove on Ogden Avenue.

Q. Do you remember the doctor's name?

A. No. There's several doctors there.

MARY CAMPISE - 6/13/2019

Page 19

Q. Did you see doctors at that clinic more than once?

A. Not for depression.

Q. Got it. Thank you for clarifying.

It's just like an emergency treatment facility, you broke a thumb or something you could go to the emergency clinic, that kind of place?

A. Correct.

Q. Yes?

A. Most of the time it was my sister Paula Wilson that I would talk to.

Q. But your sister can't prescribe medication, correct?

A. No.

Q. How long did you take the antidepressant?

A. I don't remember. Few weeks, a few weeks. Not a long time. I don't like to take medication and I don't like to be -- I don't like to be under the influence of anything. I try to handle things myself.

Q. So I take it you only got the prescription once at the emergency clinic and

MARY CAMPISE - 6/13/2019

Page 20

never got another prescription again?

A.    Right.

Q.    So that prescription probably was for what, 30 days or so, if that?

A.    Maybe.  Yes, it was not longer than that period, no.

Q.    You talked about that the depression caused you -- it has hard to sleep.  When did you start suffering from -- when did you first start suffering from any kind of sleep deprivation?

A.    That same day.

Q.    What day was that?

A.    The day that I was terminated from Ceva.

Q.    Do you still suffer from sleep deprivation?

A.    Yeah.  I still suffer from depression. No, I don't take anything.  I don't want to take anything.

Q.    You haven't seen a medical professional about the sleep deprivation other than talk to your sister I take it?

A.    Correct.

MARY CAMPISE - 6/13/2019

Q. Have you discussed any of these emotional distress related issues with your regular physician?

A. No.

Q. Who is your regular physician or typical treating physician?

A. I don't have one. I just saw a new person yesterday.

Q. Who is that?

A. His name is Joy, Dr. Joy Lynn, Dr. Joy Lynn. But he's a gynecologist so it was just routine --

Q. I understand, thank you.

Did you suffer depression prior to your termination from Ceva?

A. No.

Q. Who was your doctor, not your OB-GYN, but your regular internal medicine?

A. If I have a cold or if I need medicine, I go to the emergency medical center.

Q. So you really don't have a typical treating physician?

A. I'm a very healthy person.

Q. So you don't get annual physicals?

MARY CAMPISE - 6/13/2019

Page 22

A.    Yeah, at the emergency medical if I have to get that.  Or I'll go to my Jewel, the Jewel has a pharmacy there.  I got a physical there one time.

Q.    Okay.

A.    Or a throat culture, I'll go there.

Q.    Did you have -- skipping to a new subject.

Did you have while working for Ceva a particular local H.R. representative who you ever worked with?

A.    I don't remember one; I don't remember one being there.

Q.    Were you familiar with Ceva's ethics hot line complaint line?

A.    No.

Q.    Did you know that Ceva had a hot line, ethics hot line call?

A.    No.

Q.    You never used it then?

A.    I did not use it.

Q.    Did you ever file any kind of internal complaint with human resources at Ceva?

A.    No.

MARY CAMPISE - 6/13/2019

Q.    Did you ever file any kind of internal complaint with Ceva outside of H.R.?

A.    Just Kevin.

Q.    Just to Kevin?

A.    Yes.

Q.    Kevin Colligan?

A.    Yes.

Q.    Did you file any complaints about Kevin Colligan with any other person?

A.    I did not.

Q.    Totally different subject again.  Did you have a particular assigned territory while you worked for Ceva?

A.    We had territories but then if you knew somebody in another territory and you went to Kevin, you could ask him if you could have that account.  So for the most part we sort of did.

Q.    What was your sort of territory?

A.    Western suburbs and then downtown I had some -- kind of the middle corridor of the Chicago suburbs.

Q.    What suburbs would be included in that description?

A.    Downers Grove, Westmont, Carol Stream,

MARY CAMPISE - 6/13/2019

Page 24

parts of Chicago, Hillside, Oak Brook, Lombard, Villa Park, Naperville, Aurora, Bolingbrook. Then if someone else was hired, then they were given other things too.

Q. Were any territories exclusive?

A. It was at Kevin's discretion. So what would happen is sometimes an account that was in my territory would be given to the men and if I wanted an account that's in their territory he would say well, that's in their territory.

And when he hired a younger woman she got part of my territory in the south, Bolingbrook, Aurora, those areas.

Q. Let's pick up with who was the younger woman?

A. Her name is Lori.

Q. What's her last name?

A. Serafini.

Q. Could you spell that one for us.

A. S E R I -- S E R A F I N I, something like that.

Q. When was Lori hired?

A. I think she was hired late 2016 or 2017, early 2017.

MARY CAMPISE - 6/13/2019

Page 25

Q.     What territory did she cover?

A.     The south.

Q.     Was there some particular company that she took that you thought was yours?

A.     Well, when I was let go she was given my accounts, most of them.

And when another rep Sara quit, all her accounts were given to the men.

There was a bid with Walgreens and I asked Kevin if I could take that account and he said let me think about it.  And then there were two bids for Walgreens due and I said we've got to get this in, can I work on this, can I do this, and he said no, give it to Ben.  And then both bid deadlines were missed and Ceva wasn't even part of it.

Again, favoritism towards the men and younger employees.

Q.     Let's go back to my question.  My question was whether Lori was given any particular account that you thought you should have been given?

A.     Not Lori.

Q.     So no is the answer to my question?

MARY CAMPISE - 6/13/2019

A.   Correct.

Q.   You talked about Walgreens a second ago.  So Walgreens will be on the list of this next question, I understand that.

Tell me names of accounts that you think someone was given that you thought should have been given to you?

A.   Well, Patterson Medical was in my territory and was given to Joe.

Q.   Any other accounts that were given to others that you think should have been given to you?

A.   Not to my knowledge but I'm sure there were.

Q.   So you think the Walgreens account should have been given to you?

A.   Yes, yes.

Q.   Do you know that Walgreens requires as a contract term 90 days for payment?

A.   Did I know that?

Q.   Yes.

A.   No.

Q.   Do you know that Ceva strictly precludes working with clients who require such

a condition?

A.    Yes.

Q.    So you know that Ceva will not work with a customer who demands 90 days pay?

A.    Yes.

Q.    And so if it's true that Walgreens requires 90 days pay, you would know that Ceva can't work with Walgreens?

A.    Okay.

Q.    That would be news to you now?

A.    That was not -- that did not come up when the VP called me from Walgreens, he didn't discuss it with me.

Q.    Well, would it surprise you to learn that Ceva didn't do work with Walgreens?

A.    Would that surprise me?  It would.

Q.    Why?  Because it's news to you?

A.    Because it's a large account.  Well, that wasn't -- that wasn't discussed with me which isn't surprising to me.

Q.    But you're not aware of Ceva actually doing work with Walgreens?

A.    Am I aware of it?

Q.    Yes.

A. No, I'm not aware of it. All I know is somebody called me and wanted me to bid.

Q. I understand.

A. Now that should have been explained to me by Kevin, don't you think?

Q. So, the way this process will work easier is if you don't ask questions of me. You can ask them of your lawyer. Your lawyer can ask Kevin those questions in just a little bit and Kevin will explain the whole thing on Walgreens.

MR. GASTON: Just for the record, answer the question. Don't ask him a question.

THE WITNESS: Got it.

BY MR. LEVINE:

Q. Just give me a second.

A. Okay. So let me rephrase that.

MR. GASTON: For the record, only answer the question.

MR. LEVINE: And there's no question pending.

MR. GASTON: There's no question.

BY MR. LEVINE:

Q. So, do you know why -- did Kevin explain to you why he gave Patterson Medical to

MARY CAMPISE - 6/13/2019

Joe?

A.   No.

Q.   What do you recall of your discussion with Kevin about Patterson Medical?

A.   Somebody else told me that he gave it to Joe and it was in my area, you know, like nothing was asked of me.

Q.   So did you ever discuss Patterson Medical with Kevin?

A.   By the time I knew about it, he was already working with them.

Q.   So the answer to my question is no?

A.   Guess so, yes.

Q.   What was your relationship with Patterson Medical?

A.   As I said, I didn't know about it.   It was in my area.

Q.   So you didn't have a relationship with Patterson Medical?

A.   No.

Q.   Sometimes the way I phrase the question sounds like a double negative with the answer. So it's correct to say you did not have a relationship with Patterson Medical?

MARY CAMPISE - 6/13/2019

Page 30

A.   Yes.

Q.   It's not like a prospect you had called on, you hadn't?

A.   I had not, but it was in my area, my territory.

Q.   Where was Patterson Medical, or is Patterson Medical?

A.   I don't know right now.  They could be out of business right now.  This was a long time ago.  Off top of my head I don't know.  Warrenville, I believe.  I believe it's Warrenville but --

Q.   For clarity, are there any other accounts that you think Kevin gave to someone else that should have been given to you that we haven't discussed?

A.   Well, when Sara left I was not given any accounts.  When Steve McGuigan left, he gave all the accounts to Ben and Joe.  I might have gotten one that didn't even do any business or very little in Elk Grove, Topey, but the lion share went to the men.

Q.   How do you know who got which account?

A.   He would make the list.  He would give

MARY CAMPISE - 6/13/2019

Page 31

the list and he would put the name after it.

Q. When did Steve McGuigan -- did I say that wrong?

A. McGuigan.

Q. When did he leave?

A. He left the same year I joined Ceva, the same year I joined Ceva.

Q. So in 2014?

A. Correct.

Q. How soon after you joined Ceva did Steve leave?

A. I don't remember; six months, a year, I don't remember.

Q. And Kevin never discussed with you why he gave Steve's accounts to the people he gave them to?

A. He said seniority. He gave most of the accounts to the men, but he would call it seniority.

Q. He said seniority?

A. Yeah, they've been here longer.

Q. Did Kevin say anything about why he gave Sara's accounts to the people he gave those accounts to?

MARY CAMPISE - 6/13/2019

A.    I think it's a better fit was one of the comments.

Q.    What account was it?

A.    Omron.  That was in St. Charles which was part of my territory.

Q.    Did you and Kevin have any further discussion about Omron?

A.    No.  Once Kevin said it, that was it.

Q.    I want to talk about your expertise in the logistic business and what you do.  When did you first start working in a sales capacity for a logistic company?

A.    1985.

Q.    Who with?

A.    DHL.

Q.    What was your job there?

A.    I was in sales, account executive and senior account executive.

Q.    Have you been in sales associated with logistics work essentially your entire career?

A.    Yes.

Q.    Starting in 1985 up to the current date?

A.    Yes.

MARY CAMPISE - 6/13/2019

Page 33

Q.    How long were you at DHL that first stint beginning in 1985?

A.    13 years.

Q.    What was your final pay at DHL if you can recall?

A.    80 something.

Q.    Why did you leave DHL?

A.    I had two children and one on the way and I wanted to spend sometime with them.

Q.    How old are your kids?

A.    Now?

Q.    Yes, ma'am.

A.    28, 26, 22.

Q.    So did you stay out of the work force for a period of time?

A.    I took a job with a company for a year where I worked four days a week and it was out of the industry.  And then I started the next year with Eagle Global Logistics.

Q.    Just get the dates right.  So do you remember what year you left DHL?

A.    '98.

Q.    And then you were with a company for a year that you did out of the industry.  What

MARY CAMPISE - 6/13/2019

Page 34

company was that?

A. You know, they're in Schaumburg. It was a small company that sold forms and the big account that I sold for them was Hewitt and Associates and they did so well with Hewitt that they moved into a bigger building. But it was in the forms business and I didn't really care for the business and so Mike Lemmer had approached me to work for Eagle Global Logistics and that was really my background so I went to work for Eagle and that's -- Eagle used to be Ceva.

Q. When did you -- do you remember a year when you took the job with Eagle?

A. Well, it had to be '99 or 2000, something like that.

Q. What office did you work out of?

A. I worked in Elk Grove or -- Elk Grove or Bensenville. It was right off of Thorndale, Supreme Drive.

Q. How long did you remain with Eagle?

A. Seven years. I was a Golden Eagle.

Q. Which is an award?

A. Which is an award where you sell a

MARY CAMPISE - 6/13/2019

million dollars of profit in one year.

Q. Why did you leave Eagle?

A. I got an offer to be a director of retail and consumer products with UPS with stock options.

Q. Did you go looking for that or did they come after you?

A. They came after me. I took a -- they gave me a test and they wanted to talk to three of my customers with Eagle. And the man who hired me said of anybody in his entire career -- they had to answer questions, nobody got a perfect score but I got a perfect score, nobody else in his entire career, and he's still in the industry, had ever gotten a perfect score.

Q. So when did you take the job with UPS, what year?

A. I want to say like around 2005. I was there for a year and a half and they had a reorganization and they bought Menlo and then I had a new boss and they were -- my biggest customer that I just sold was Learning Resources and they were not clearing the shipments through customs so they were getting demerge charges.

MARY CAMPISE - 6/13/2019

Page 36

And the manager shut her door and would not answer her door.

And at the same time I was being approached by FedEx and I took a job with FedEx and I was at FedEx for six years as international specialist, one of the top sales reps on the team and I won many awards with FedEx.

MR. GASTON: Mark, I'll let you finish your line of questions, I need to take a short bathroom break.

MR. LEVINE: Yeah, let me just finish up on this experience.

MR. GASTON: Thanks.

BY MR. LEVINE:

Q.   So you joined UPS probably in 2005 and stayed for a year and a half, is that right?

A.   Correct.

Q.   Then you went to work for FedEx?

A.   Correct.

Q.   So what year -- so what year did you join FedEx?

A.   Maybe 2006.

Q.   And --

MARY CAMPISE - 6/13/2019

A.    I don't remember exactly.

Q.    And you stayed there six years?

A.    Yes.

Q.    Why did you leave FedEx?

A.    A head hunter approached me and I interviewed for a job at Hellman and they offered me quite a substantial amount more.

Q.    What was the Hellman offer?

A.    120,000.

Q.    What were you making at FedEx at the time that you accepted the Hellman offer?

A.    About 105.

Q.    How long did you stay at Hellman?

A.    Year and a half.  They fired my boss, they fired the sales manager who worked with me, and then the new guy came in and fired all of sales.  There were three of us.  They fired all three of us.

Q.    When were you fired from Hellman?

A.    Right before I went to Ceva.

Q.    So sometime before May 2014?

A.    Mm-hmm.

Q.    Yes?

A.    Yes.  Maybe April, April.

MR. LEVINE:  Time for a break.

(Whereupon, a short break was taken.)

BY MR. LEVINE:

Q.  Is it accurate to say that Kevin Colligan offered you a job at Ceva twice?

A.  Yes.

Q.  When is the first time Mr. Colligan offered you a job?

A.  I was at FedEx.

Q.  Oh, I was looking for a date.

A.  I don't know the exact date.

Q.  Do you remember the year?

A.  I don't remember the year.  It was about a year before I joined Ceva, about a year.

Q.  So maybe in 2013 time frame?

A.  Yes.

Q.  How did it come to be that you and Kevin were talking about an opportunity for you to join Ceva in 2013?

A.  One of us called the other one.  I think, I think -- I can't remember who called who, but one of us called the other one.

Q.  What do you recall of the conversation?

MARY CAMPISE - 6/13/2019

A.    You know, you ready to come over here, national corporate account executive, so then we talked.

Q.    So that's what Kevin said to you, are you ready to come over here, offering you a corporate account executive position?

A.    Something like that.

Q.    What were you making at the time in the 2013 time frame that you were talking to Kevin?

A.    I think I was making 95 or 90, something like that.  Maybe it was 90.

Q.    And did you interview with Kevin in 2013 for a position?

A.    Yes.

Q.    Did you interview with anyone other than Kevin for the position at Ceva in 2013?

A.    Anyone else at Ceva?

Q.    Yes.

A.    There was another man.  I don't remember his name, but he was a station manager, station manager.

Q.    Do you remember what station?

A.    Chicago; a couple men, there were a couple.

MARY CAMPISE - 6/13/2019

Q.   So Mr. Colligan offered you a position at Ceva in 2013, correct?

A.   Correct.

Q.   And you initially accepted the offer?

A.   Yes.

Q.   And then you called Kevin back and told him you were going to stay with FedEx, correct?

A.   Correct.

Q.   Because FedEx offered you more money?

A.   Correct.

Q.   How much time passed between the time that you accepted the offer and then you notified Kevin you were actually going to reject it?

A.   I don't remember; two weeks maybe.

Q.   And do you recall calling Mr. Colligan on a Friday to tell him you would not be coming to the company on Monday as planned?

A.   I don't recall exactly, no.

Q.   But if Kevin said that was the case, you won't disagree with him I take it?

A.   Yeah, I don't know.

Q.   What was the offer that Kevin gave you to join Ceva in 2013?

MARY CAMPISE - 6/13/2019

A.    It might have been -- I don't remember. It might have been 97, something like that.  I don't remember.

Q.    How much did FedEx pay you to stay?

A.    Like 100 or something, something like that.

Q.    Were the commission pay-outs similar between FedEx and Ceva as it related to the offer in 2013 which you had at FedEx at the time?

A.    No, Ceva had a more lucrative program but I liked my team at FedEx and they had -- FedEx had profit-sharing.  They had a pension, they had a pension.

Q.    A pension, not a 401K?

A.    Both.

Q.    I should have asked this earlier, what's your date of birth?

A.    December 3, 1958.

Q.    So how old does that make you now?

A.    60.

Q.    There was nothing wrong in Kevin offering you that job in 2013, correct?

A.    What do you mean by that?

MARY CAMPISE - 6/13/2019

Page 42

Q. Anything wrong in him offering you a job in 2013?

A. No.

Q. In 2014 you ended up joining Ceva, correct?

A. Correct.

Q. How did it come to be that you and Mr. Colligan talked again about you coming to work in 2014?

A. I called him.

Q. Why did you call Kevin?

A. To see if he had an opening.

Q. Why were you interested in coming to Ceva at the time?

A. Because I had worked there before, I had been successful before, and I knew people there. I had friends at Ceva.

Q. And to be clear to work there again, meaning that Ceva --

A. I worked at Eagle.

Q. You worked at Eagle which Ceva had acquired?

A. Correct.

Q. Do you remember what year Ceva acquired

Eagle?

A.   I wasn't there.

Q.   So the answer is you don't know?

A.   I don't know.

Q.   What was the offer that Kevin made to you in 2014?

A.   I believe it was something like 97 plus a car allowance.

Q.   Did you negotiate your salary with Mr. Colligan?

A.   He said -- yeah, I did.

Q.   What did you ask for in salary?

A.   He said he gave me the max.

Q.   What did you ask for?

A.   What did I ask for?  Probably asked for what I was making before, 120, but I don't exactly remember.  He said I'm giving you the best I can.

Q.   In 2014 at the time you talked -- you called Mr. Colligan about a job opportunity, were you employed?

A.   No.

Q.   So you called Mr. Colligan after your termination at what company?

MARY CAMPISE - 6/13/2019

A.    Hellman.

Q.    Hellman.  Following your termination from Hellman, who else did you call other than Mr. Colligan about job opportunities?

A.    Nobody.

Q.    You called only one person and that was Mr. Colligan?

A.    He had an opening so why would I call?

Q.    How did you know he had an opening?

A.    I called and asked him if he did and he said yes.

Q.    But the only person you called about job opportunities was Mr. Colligan?

A.    He was the first one I called.

Q.    Anyone else?

A.    No.

Q.    And why did you call Kevin first?

A.    Because I liked working at Eagle and I thought I would like working at Ceva.  I had been successful before.

Q.    Was there any point in time in your career before you joined Ceva that you were unsuccessful in the work you provided?

A.    No.

MARY CAMPISE - 6/13/2019

Q. So I want to try to do the math, 1985 to 2014, about 30 years of experience before you came to Ceva? Yes?

A. Yes.

Q. And you accepted the offer that Ceva through Mr. Colligan made to you in 2014, correct?

A. Correct.

Q. And you joined the company?

A. Correct.

Q. Could you describe for us, please, the skill set you brought to the job at Ceva.

A. I'm very good with people. I'm very motivated. I work very hard. I'm a very good salesperson. I listen. I close business. I've had a very successful career.

Q. Did you have a noncompete with Hellman -- a non-solicitation of customers for the division that you had to honor with Hellman?

A. No.

Q. So you weren't restricted when you joined Ceva in who you would call upon as clients?

A. Correct.

MARY CAMPISE - 6/13/2019

Q.    Did you think there were any skill sets you were lacking after 30 years of experience being the time that is that you joined Ceva?

A.    No.

Q.    In the 30 years of employment that you held prior to joining Ceva, did you always have a quota or some sort of threshold you were required to meet?

A.    Yes.

Q.    Every single job?

A.    Yes.

Q.    And when you joined Ceva, you had a quota you had to meet at Ceva as well, correct?

A.    Yes.

Q.    Do you know how Ceva set quotas for salespersons like yourself?

A.    It was explained, yes.

Q.    And was it explained to you as your salary times five divided by four as a quarterly quota?

A.    Yes.

Q.    So you understood that when you took the job?

A.    Yes.

MARY CAMPISE - 6/13/2019

Q.   Were you given some sort of a ramp-up period under Ceva practice to start meeting the quota?

A.   Yes.

Q.   What was that period?

A.   I don't remember.  And Kevin said it's not like it used to be, you know, you got a little more time.  Don't worry about that, we'll get you there.

Q.   It's accurate to say you never met your quota while working for Ceva?

A.   I'm not sure.

Q.   Why are you not sure?

A.   Because the numbers were never accurate.  I had an account when I left, IES, that they never even got a bill and they had been shipping over a month and they didn't -- they never got a bill.

And my reports showed $10,000 that they had done but that $10,000 was one shipment that I had secured for them.  So the numbers were never correct and my accounts were on other people's reports and some of theirs were on mine.  It was never accurate reporting.

MARY CAMPISE - 6/13/2019

Q. So your testimony today is you're not sure if you met your quota or not?

A. Correct. The day I got let go I got my report that morning and it wasn't correct.

Q. Did you ever in writing complain about reports being inaccurate?

A. Yes.

Q. Do you remember the name of the software that was utilized for tracking or handling reports at Ceva for salespersons?

A. No.

Q. It was handled by a third-party, correct?

A. I don't know.

Q. You're not aware how Kevin Colligan had anything to do with inaccurate reports being maintained by the software system, are you?

MR. GASTON: I'm going to object to the form of the question.

BY MR. LEVINE:

Q. You can still answer.

MR. GASTON: You can answer.

BY MR. LEVINE:

Q. It's a form issue.

MARY CAMPISE - 6/13/2019

Page 49

A.    I have no idea.

Q.    So you would not have personal knowledge of what caused an account to move off your report and to somebody else's report?

MR. GASTON:  I'm going to object to that. Asked and answered.

BY MR. LEVINE:

Q.    That doesn't matter.  You can answer.

A.    No.

Q.    What was the highest revenue that you thought you generated in a quarter while working for Ceva?

A.    I don't remember.

Q.    Do you have any recollection of the kinds of dollars in sales that you made while working for Ceva?

A.    Don't remember.

Q.    What was your biggest account?

A.    Well, when I left it was IES.  I had just launched it.

Q.    Other than IES, what was the next biggest account?

A.    Swibco was a big account.

Q.    Could you spell that?

MARY CAMPISE - 6/13/2019

A.     S W I B C O.  But we lost it because of inaccurate billing for six months.

Q.     Do you think Mr. Colligan was responsible for inaccurate billing?

A.     He didn't help correct it.

Q.     Who handled the billing?

A.     The billing was -- the billing was under the brokerage department.

Q.     Where was that handled?

A.     Well, we had a VP of brokerage right there.

Q.     At the Chicago location?

A.     Mm-hmm, and they said well, it will be two months before we give them a credit back, and they didn't want to wait two months.

Q.     The customer didn't?

A.     Right.

Q.     So lost the Swibco account.

Was there another large account that you maintained that you called that Ceva maintained?

A.     Well, Medela was another account.  Air Imports.  They lost the shipment and I had to go out and find it in the warehouse.  It was

sitting in the warehouse. And the import department wouldn't answer their phones.

Q. Was that at the Chicago location too?

A. Yes.

Q. Who was responsible for that? Who oversaw air imports in Chicago?

A. There was a manager. When I called the manager she said well, we can't, we can't -- people keep quitting, we don't have a full staff.

Q. What's the name of the person that ran the brokerage department?

A. Brokerage was run by Jane.

Q. Say that again?

A. Jane Sorenson.

Q. Is that a woman?

A. Yes. They let her go.

Q. And the manager of air imports, you said it was a she. I didn't catch a name though.

A. I don't remember.

Q. Based on these answers, and I know you put in writing already, you have complaints about how Ceva operations handled matters and

MARY CAMPISE - 6/13/2019

how it impacted your ability to perform. You have told us a little bit those stories.

I want you to detail now your complaints with how Ceva operations impaired your ability to succeed.

A.   So there was a younger woman, Ally Knack, she was hired. She would sabotage all the women's accounts. She wouldn't call customers back. She wouldn't e-mail them back. She was suppose to be taking care of them onboarding them.

She would yell in the office. She would call in sick every Monday and this went on for a whole year. Nothing was ever done about that.

She would come in on a Saturday to do the men's accounts and she would not do the women's accounts. You would have a call set up for an account to go over the computer and she wouldn't be on the call. She was also verbally abusive.

Q.   What was her position?

A.   She was like a customer -- onboarding customer care. She had a position where she

MARY CAMPISE - 6/13/2019

would put together the proposals and onboard the customers.

Q.   Fairly low level position, correct?

A.   Well, she was our right-hand person.  I don't think it was low level.

Q.   She was admin, though, right?

A.   She was but a little more than that.

Q.   How did she sabotage your accounts?

A.   She just wouldn't do the work unless Kevin yelled at her which was very seldom.  She would do Joe and Ben's work, but not the women's work, not my work.

Q.   Would she only do Joe and Ben's work?

A.   That was a priority.

Q.   So she never did any work for any women?

A.   Occasionally but it wasn't -- it wasn't quality and she wouldn't follow-up on our accounts so then we would lose a customer because there was no follow-up.

Q.   Was she there when you were terminated?

A.   She had just been let go.

Q.   She had been fired?

A.   She didn't show up, I think.  So that

MARY CAMPISE - 6/13/2019

was -- she didn't show up for two days so then she got fired, two or three days, I don't know.

Q. So the original question was what kind of failures were there in Ceva operations that impacted your ability to succeed and you started talking about Ally Knack.

A. So there was also damaged shipments. So I had another customers, Modern Living, they had many damaged shipments.

I gave Kevin the credits and two or three times I had to e-mail the credits and he wasn't following up and so they were shipping less and less because I couldn't get those credits for the damages satisfied and they weren't going to give us anymore shipments and owe us anymore money till they got the credits.

They also lost a chair for the owner of that company and as I was taking her on a tour of Ceva, she saw her chair at the top of one of the storage areas. So lost shipments, damaged shipments, no follow-up.

Q. Who was responsible for the oversight of shipments?

A. Depended if it was domestic or

MARY CAMPISE - 6/13/2019

international.

Q. So who be would each person in each position?

A. Well, for a lost shipment, you know, we had people in an area that would follow-up on shipments and they said well, this one is lost.

Q. I was looking for who managed the shipment department.

A. I think Kevin was over that area of those people that were customer care people following the shipments and quoting the shipments.

Q. Who's responsible for having lost or damaged shipments? That's not a sales thing, right?

A. No.

Q. Who was responsible for that or overseeing that?

A. Just depends on domestic or international.

Q. Okay. And so who was in charge of domestic and who was in charge of international?

A. Well, you have different layers. You have the people that follow the shipments and

then you have different offices.

Q. Let me be clear. Who at the top of the food chain there was responsible for domestic and who was international?

A. Well, Luigi was in charge of the air portion. Domestic when I left was Adam Miller.

Q. What is Luigi's last name?

A. I don't know.

Q. So we were talking about operation failures that made it difficult for you to succeed at Ceva --

A. And billing.

Q. Okay. So billing, who was responsible -- who oversaw the billing department?

A. I don't know.

Q. What were the failures in the billing department?

A. Inaccurate billing, charging more than they owe, not following the SOP.

Q. Define SOP for us.

A. Standard operating procedure for us where you outline what the rates are.

Q. Were there any other Ceva operational

failures that impaired your ability to perform your job that you haven't discussed already?

A.    There were some operational failures in Brazil.

Q.    What were those?

A.    Not clearing shipments, not following shipments.

Q.    Are these operational issues that you've been describing reasons why you believe you were not as successful as you could have been at Ceva?

A.    Yes, in addition to gender discrimination.  Kevin would go on calls weekly with the men and I probably rode with him two times that year.

Q.    What's your personal knowledge of Kevin's travel with others?  How is it that you know who he was riding with?

A.    He would talk about it in the office.

Q.    Why did you need Kevin to ride with you?

A.    I didn't need to have Kevin, but many times he would say he was riding and at the very last minute he would cancel and that would be

MARY CAMPISE - 6/13/2019

embarrassing to me in front of a customer.

And, you know, I think that it shows that you care about the customer when the manager does come. I think that it shows that they're important.

Q. How many times did Kevin cancel going on a ride with you?

A. Several.

Q. Can you give a number on that?

A. Not really.

Q. Can you tell me the accounts?

A. Don't remember.

Q. So you didn't need Kevin to be on the ride, it was just embarrassing if he canceled and how it reflected on how you looked with the customers?

A. Because I already told them he was coming.

Q. Did you lose any accounts associated with Kevin not ridding with you?

A. I did one because we weren't so -- we went to see the customer and we were suppose to give them domestic rates. Kevin said I'll get that for you and then I had to remind Kevin

HANNA & HANNA, INC.
713.840.8484

MARY CAMPISE - 6/13/2019

several times we have to get this rate for them, and when he finally got it to me, the customer said that was three weeks ago and we didn't get the business because we didn't get them the rate back.

Q.   I will ask about that in the second, but my actual question was did you lose any business because Kevin didn't go on a ride with you?

A.   I didn't lose any.

Q.   Okay.  Now the different question is I think the answer to the question I haven't asked yet is was Kevin responsible for you losing any business?

A.   Yes.

Q.   Okay.  Now I want to talk about what accounts you think Kevin caused you to lose; name them.

A.   Well, Swibco because that was billing for six months, incorrect billing, and we needed to get them a credit and that goes through the manager.

Q.   Any other accounts?

A.   Medela.  I mean --

Q.    Well, how did Kevin cause you to lose Medela?

A.    Well, he's trying to call the people to answer the phone, you really have to -- you have to go there.  You have -- you have to go and talk to the people.

I just think that there was a priority for the men's accounts and not the women's.

Q.    Let's try to go back to my question.  I have heard your general statement a lot.

Medela you told us a little while ago you lost the account because of lost shipments, right?  Kevin didn't cause the shipments to be lost, did he?

A.    He didn't.

Q.    What other accounts do you think you lost because of Kevin?

A.    There were some; I don't recall.

Q.    Are there any other operational failures that Ceva had that caused you not to succeed in the job that you haven't told us about?

A.    Not that I remember.

Q.    Did Kevin Colligan ever make a gender

MARY CAMPISE - 6/13/2019

Page 61

bias statement in your presence?

A. He would talk about his sexcapades before he was married and like his lovemaking music. That was a little uncomfortable.

Q. Anything else?

A. They would joke; I don't remember exactly.

Q. One more time. I wanted to know what sexist remarks Kevin Colligan ever made. You said he talked about his sexcapades prior to being married.

Anything else you heard Kevin Colligan say that was sexist?

A. There were, but I don't recall exactly.

Q. So at this time under oath you can't remember anything specifically?

A. No.

Q. Did Kevin Colligan make any age bias remarks in your presence?

A. No.

Q. Did anybody ever tell you, and granted this is hearsay, but did anybody ever tell you that Kevin Colligan made a sexist remark?

A. Not -- yes, but I don't remember what

MARY CAMPISE - 6/13/2019

Page 62

it was.

Q. Who was it that says he made a sexist remark?

A. Sara.

Q. And Sara's last name was?

A. Marconi.

Q. You don't remember what Sara told you?

A. No.

Q. Sara is another sales representative?

A. Yes.

Q. Did anybody ever tell you that Kevin Colligan had made an age bias remark?

A. An age bias remark, no.

Q. What did Kevin Colligan say about his sexcapades as you described it?

A. That this is the music I used to have sex to.

Q. What music was it?

A. I don't exactly remember what was on the jukebox. I don't remember exactly.

Q. Where were you when he said it?

A. We were at a restaurant.

Q. Other than that statement, any other comments that Kevin Colligan ever made about his

MARY CAMPISE - 6/13/2019

Page 63

sexcapades?

A.    Guys would joke and laugh and say things under their breath.  I don't recall.

Q.    I'm looking for statements by Kevin Colligan, not the guys.

A.    Kevin is included.

Q.    So you don't remember anything else Kevin said?

A.    Not exactly, no.

Q.    Well, not specifically either, right? Specifically here you can't tell us under oath anything Kevin said that was sexist other than this was the music that I used to have sex to?

MR. GASTON:    I'm going to object to that.

MR. LEVINE:    That's fine.

BY MR. LEVINE:

Q.    You can answer.

A.    Yeah, there were other times, but I don't remember exactly what was said.

Q.    When did Kevin make the comment about the music on the jukebox?

A.    When?

Q.    Yeah.

A.    You mean like the date?

MARY CAMPISE - 6/13/2019

Q.    When during the term of your employment?

A.    We were at a restaurant.

Q.    I know, I know where.  I asked that. When, like when you worked there from --

A.    It was after work.

Q.    Right, I understand that.  I was trying to get month or year or something like that, a time frame.  Any idea?

A.    It was in the fall.

Q.    What year?  No idea?

A.    Must have been 2016.

Q.    Why do you think so?

A.    Because we were there because we would go there because we had our Christmas party there.  So it was in the fall because we were tasting the food that we were going to have at the Christmas party.  So the last Christmas party I went to was in 2016 so it was in the fall of 2016.

Q.    When did you first meet Kevin Colligan?

A.    At Eagle.

Q.    What year did you meet him?

A.    My first day at Eagle.

MARY CAMPISE - 6/13/2019

Q. It was also his first day at Eagle, correct?

A. Correct.

Q. Did you all become friends?

A. Yes.

Q. And how long did you all work together?

A. We worked together at Eagle and we worked together at Ceva.

Q. Right, no, how long did you like in years did you work with Mr. Colligan at Eagle?

A. Like six, six years I think. It was about six years.

Q. Did you leave the company before he left Eagle?

A. Yes.

Q. Who left first, you?

A. Yes. I went to UPS, yes.

Q. So you all worked together about six years at Eagle and you had a good relationship at the time; fair to say?

A. That's fair to say. We were sales reps together.

Q. Was that Mr. Colligan's first job in the industry as you understood it?

A.    I don't know.

Q.    Did you all ever socialize after work in those days of Eagle?

A.    As a group, as a work group.

Q.    Did you like Kevin at the time?

A.    Yes.

MR. LEVINE:  Take a short break.

MR. GASTON:  Okay.

(Whereupon, a short break was taken.)

BY MR. LEVINE:

Q.    Do you know Kim McCloud?

A.    Yes, I know who she is.

Q.    Have you ever met her in person?

A.    Yes.

Q.    How old a person is she?

A.    She's in her 50's probably.

Q.    What's her position -- or let me say it another better way.

During your employment with Ceva, what was her position?

A.    She's in sales.

Q.    On Mr. Colligan's team?

A.    Yes.

Q. Do you think that Mr. Colligan favored Ms. McCloud over you?

A. Yes.

Q. How so?

A. She -- he gave one of my accounts to her.

Q. What account?

A. They were in Villa Park about five minutes from my house.

Q. How is it your account?

A. I had visited them.

Q. Did you discuss with Kevin why he gave that account to Kim?

A. Yes.

Q. What did he say?

A. She knew them from before.

Q. Did he give you anymore details on that?

A. No.

Q. Do you know somebody named Linda Masarik?

A. No.

Q. Do you know a Kelly Hatfield?

A. No.

MARY CAMPISE - 6/13/2019

Q.   You do know Sara Marconi, correct?

A.   Correct.

Q.   How long have you known her?

A.   I worked with her at Eagle so yeah, 20 years or so.

Q.   And so Kevin knew her as well, correct?

A.   Yes.

Q.   Did Kevin send leads to Sara?

A.   I don't know.

Q.   Do you know that he gave her a book of business in Wisconsin?

A.   I know she worked in Wisconsin.

Q.   She had a connection in Wisconsin from the past?

A.   Yes.

Q.   You knew she grew up there or something like that?

A.   Yes.

Q.   Sara is in her 50's?

A.   Yes.

Q.   Sara ever tell you that she twice resigned and Kevin twice convinced her to stay?

A.   No.

Q.   You've never heard that before?

MARY CAMPISE - 6/13/2019

A.    I know about one time.

Q.    You know that -- so you know that Sara once resigned and that Kevin convinced her to stay?

A.    Yeah.

Q.    And you heard that from Sara?

A.    Yeah.

Q.    Did you get quarterly reports showing your sales?

A.    Yes.

Q.    I'm going to hand you a document that I'm marking Exhibit 1.

Could you take a look at Exhibit 1, please.

MR. GASTON:  Was this marked as 1 or A?

MR. LEVINE:  1.

MR. GASTON:  1.

MR. LEVINE:  I use numbers for exhibits typically at least in deposition.

BY MR. LEVINE:

Q.    Do you recognize Exhibit 1?

A.    No.

Q.    Have you seen this before?

A.    I don't remember it.

MARY CAMPISE - 6/13/2019

Q.   Do you remember having a performance review with Mr. Colligan in year 2016 -- or for year 2016 performance?

A.   Yes.

Q.   Could you take a look, please, at Exhibit 2.

Did I give you two copies?  I did.  Sorry.

Could you take a look at Exhibit 2 to your deposition, please.  Please continue your review.

You recognize Exhibit 2?

A.   Yes.

Q.   And your signature is on the second page, correct?

A.   Yep.

Q.   And dated December 16, 2016?

A.   Mm-hmm.

Q.   Yes?

A.   Yes.

Q.   This is a performance improvement plan that Mr. Colligan issued to you on December 16, 2016, correct?

A.   Correct.

MARY CAMPISE - 6/13/2019

Q.   And the first sentence reads:  "Your performance does not meet the expectations set forth for a senior account executive."

You see that?

A.   Yes.

Q.   At the time this was issued to you, did you agree with that statement?

A.   No.

Q.   Second sentence says:  "After eight measurable quarters you are not at a commissionable level of financial attainment per Ceva's business development plan."

Do you see that sentence?  Yes, ma'am?

A.   Yes, I see that.

Q.   That's a true statement as well?

A.   Yes.

Q.   You had to hit quota in order to get a commission; fair to say?

A.   Correct.

Q.   And you never got a commission while working for Ceva?

A.   Correct.

Q.   So you knew you weren't meeting your quota because you weren't getting a commission;

fair to say?

A. Correct.

Q. If you go down a little bit it talks about performance deficiencies in the middle of the page. Do you see where I am?

A. Yes.

Q. Mary's 2016 third quarter of measurable revenue generation was $51,003 or 42 percent of required quota.

Do you see that?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. Did you disagree with the numbers that are stated there?

A. No.

Q. You see that the third sentence says: "Company guidance suggests representative be at quota by the end" -- actually go in sequence. I apologize.

I may have said it, this represents the eighth measurable quarter. So you had been with the company for eight quarters at that point, correct? More actually, right?

MARY CAMPISE - 6/13/2019

A.    I started in 2014.

Q.    Company guidance suggests representatives be at quota by end of the fourth measurable quota.  Do you see that?

A.    Yes.

Q.    You were expected to hit your quota threshold within a full year of being on the job, correct?

A.    Eight quarters is two years, isn't it?

Q.    Company guidance suggests representatives be at quota by the end of the fourth measurable quarter.  So after four measurable quarters you had to be at quota, correct?

A.    According to this, correct.

Q.    And then it says:  "Performance improvement action required.  Mari will need to obtain the full quota attainment by end of Q1 2017."

Do you see that?

A.    Where is that?

Q.    Right under where we were reading.

A.    By end of Q1.

Q.    And you did not reach your full quota

MARY CAMPISE - 6/13/2019

attainment by the end of Q1 2017, correct?

A.   I don't know.  The numbers were inaccurate.

Q.   Have you flip to the second page.  This sentence beginning here, "Failure to show immediate and sustained improvement will result in disciplinary action up to and including termination of your employment with Ceva."

Do you see that?

A.   I do.

Q.   So you understood what this meant, didn't you?

A.   I did show immediate and sustained improvement and I did not meet with my regional sales director weekly.

Q.   So what percentage of your quota do you think you met for Q1 2017?

A.   Well, the numbers were inaccurate.  I had just closed a very, very large account and we were brining it on.  The numbers were inaccurate.  I have no idea.

I saw them that morning and two hours later I was terminated.

Q.   What do you think your -- what was the

MARY CAMPISE - 6/13/2019

account, IES?

A.    Yes.

Q.    How much revenue did Ceva attain from IES?

A.    Well, just one project was 100,000; one project out of China was 100,000.

Q.    100,000 in revenue?

A.    Yeah.  And one shipment was 10,000 and that was on the report.

But anyway, I never met with him weekly.  He met with the guys weekly.

Q.    Why did you need to meet with Kevin weekly?

A.    He would meet with the younger representative Lori every week and he would help her plan and he would meet with and ride with Kevin and Joe -- or Joe and Ben.

Q.    So my question, again, why did you need to meet with Kevin?

A.    He wanted to meet with the reps every week.

Q.    Did you need him to meet with you to help you with anything?

A.    Sometimes.

MARY CAMPISE - 6/13/2019

Page 76

Q.   Like what?

A.   Like he would have to sign off and get approval for a billing or credits for damage.

Q.   Did you retain any e-mail between you and Mr. Colligan?

A.   No, I don't have anything.  I'm sure there were some.

Q.   Right.  So here's the question:  Did you retain any e-mail from Mr. Colligan?

A.   Some.

Q.   Any of them that are relevant to this case?

A.   I'm not sure.

Q.   You've given all of them to your attorney?

A.   I -- no.

Q.   Look at Exhibit 3, please.

     Ms. Campise, do you know Kenneth Burch?

A.   Do I know Kenneth Burch?  No.

Q.   Do you know what his position with the company was on the date that you e-mailed him on July 6, 2017?

A.   Don't know his title.

Q.   What did you understand his job to be?

MARY CAMPISE - 6/13/2019

A.    Well, legal, he was in charge of legal.

Q.    And who did you understand Jen Whelpley to be?

A.    She must have been with H.R.

Q.    Did you know her?

A.    I did not know her.

Q.    How did you find her name?

A.    I probably asked somebody.

Q.    Is that how you found Mr. Birch's name?

A.    Yes.

Q.    Let's go through your letter.  Were you shocked by your termination?

A.    Yes.

Q.    Why?

A.    Because I just brought on a very big account and I was working very hard.  I was shocked, absolutely shocked, and I, you know...

Q.    Did the -- even though you had been issued the performance improvement plan you were still shocked about your termination?

A.    Yes.

Q.    Did you walk -- let's talk about your termination meeting.

You thought you were going to be

MARY CAMPISE - 6/13/2019

reviewed that day?

A.    Yes.

Q.    Did you walk into the meeting and tell Kevin I'm not being reviewed today, am I?

A.    I might have said that because I heard that other people were let go that morning.

Q.    Who was let go that morning?

A.    There were 50 people that were let go that morning.  I don't know exactly the names, but they were let go that morning.

Q.    Anybody in sales?

A.    It was a layoff.  Anybody in sales, no. I don't know, I don't know.

Q.    What do you recall of the termination meeting?

A.    I recall Kevin saying it was the system's broken; I didn't help you much, did I, and your husband is doing pretty well, isn't he.

Q.    Anything else you recall?

A.    Not really.

Q.    Do you recall what you said in the meeting?

A.    I was sad.

Q.    Do you recall what you said?

MARY CAMPISE - 6/13/2019

A.    Not really, kind of a blur.  I couldn't even find the elevator I was so distraught.

Q.    How did -- in the second paragraph you say:  "This event has damaged my stellar reputation in the freight industry."

What event are you talking about?

A.    The termination.

Q.    And how did it damage your stellar reputation?

A.    Well, it's embarrassing, it's humiliating to have to be walked out.  You lose your job when other younger people are kept on.  With my customers, you know, would they want to buy from me now.  They don't -- you know, it's just humiliating, tragic.

Q.    How many people on Kevin's team at the time you were terminated?

A.    How many?

Q.    Yes.

A.    One, two, three, four, five, I think about five or six.

Q.    He oversaw other stations too, correct?

A.    Correct.

Q.    Do you know how many people were in

MARY CAMPISE - 6/13/2019

those other stations?

A.    Not really.

Q.    Do you know the ages of the people in those other stations?

A.    I know there was a woman that quit and she was down south and she quit.  She said nobody ever rode with her and she only got yelled at and --

Q.    Do you remember my question --

A.    -- her name was Regina --

Q.    Do you remember my question I was --

A.    She was in her 50's.

Q.    Okay.

A.    She was in her 50's.

Q.    So the answer I guess you really don't know how many people Kevin directly supervised in sales?

A.    I know that the offices, I don't know the exact count no.

Q.    You probably don't know who Kevin has hired while working for Ceva I take it?

A.    You mean now?

Q.    You, you, but no one else that he hired?

MARY CAMPISE - 6/13/2019

A.   Yeah, he hired -- you mean during the time I worked there?

Q.   Yes.

A.   Yes.  He hired Lori Serafini.  He hired Ally Knack.

Q.   Who else?

A.   He hired Sara's young niece.  She worked in -- she was in her 20's.

Q.   What position?

A.   She was in quoting.

Q.   Is that like an administrative position?

A.   She did customers' quotes.

Q.   Like entry level?

A.   Maybe.

Q.   Who else do you know that Kevin hired while you were employed with the company?

A.   He hired Lori and he hired Kim.

Q.   Is Kim the niece?

A.   No.  Her name starts with a -- no, her last name -- I don't remember, I don't remember the young niece.  She worked in the quoting.

Q.   These were all hires in the Chicago location, correct?

MARY CAMPISE - 6/13/2019

Page 82

A. Yes.

Q. So he hired you, Lori, Ally, Kim, and somebody's niece, correct?

A. Yeah.

Q. So you know that he hired five women, correct?

A. Yes. And when I came there he already had Steve McGuigan was already there.

Q. Do you know if he hired Steve?

A. I think he hired Steve.

Q. But you know he hired five women. Those are the only people you know for certain he hired during your employment?

A. Yes, and Janice. She was in her 20's. Janice was in her 20's.

Q. Was she the niece?

A. She is not the niece.

Q. So you know he hired six women, that Kevin hired six women during your tenure with Ceva including you being one of them?

A. Right.

Q. You haven't identified any men that Kevin hired during your employment?

A. He promoted a man to --

MARY CAMPISE - 6/13/2019

Q.   What was my question; hired, right?
Let's stick with the questions.

A.   He hired, I think he hired Tom in Kansas City.

Q.   Let's talk about the Chicago location. Who did he hire --

A.   Oh, the Chicago location.

Q.   Who did he hire in the Chicago location?

A.   Well, he hired --

Q.   Any men that he hired in the Chicago location?

A.   Yeah, Joe, he hired Joe.

Q.   Anybody else, any other men?

A.   Not that I recall.

Q.   So you know that including yourself Kevin hired six women and one man, right?

A.   Steve McGuigan, two men.

Q.   In Chicago?

A.   Yeah.

Q.   Okay.  Were quota numbers based on revenue or profit?

A.   Profit.

Q.   You had to share some profit with

different departments sometimes on a deal, is that right?

A.    Yeah.

Q.    Yeah, like how would that work?

A.    Well, if it went over collect or something, you would split the profit.

Q.    So in this third paragraph of this letter, or this e-mail, that you sent to Mr. Burch -- oh, it was a letter you actually attached to the e-mail, correct, to say what we are looking at here, Exhibit 3?

A.    Yeah.

Q.    Looking at the third paragraph down, right about the middle, you said, "My new business revenue on the report indicated $10,000 total profit."

Was that 10,000 profit actually that you had to split 50-50 with some other group in Ceva?

A.    I'm not sure.  All I know is that the customer said they never got a bill.

Q.    On the second page of this document if you could flip to the next page, you make a statement at the end of the second paragraph,

MARY CAMPISE - 6/13/2019

"Kevin has been known to mock successful female executives despite their clear ability to succeed."

What are you talking about?

A. Which paragraph are we --

Q. Right there (indicating). Kevin has been known, begins right there.

A. There was a rep in Kansas City, Regina, and he would mock her, and he would mock Viana Carrigan 3saying that she didn't --

Q. Who was the rep in Kansas City?

A. Regina. He would say she couldn't sell.

Q. What else did he say about Regina?

A. She couldn't sell and she lost accounts, her fault she lost accounts and --

Q. What else did he say about Regina?

A. Regina, those two things; she couldn't sell and she lost accounts, it was her fault.

And he would say that Viana doesn't speak right and she's got an accent and she couldn't spell. And she was older, she was in her 60's. And she was the best we had as far as she knew her job very well and she -- customers

literally loved her.

Q. You make a comment about her a little bit down that you asked Kevin if she could be considered for a promotion to account manager and you stated in this letter that he said no because she spoke with broken English and could not write well.

Let's flip to the third page.

A. Yeah, I know.

Q. That's what he said?

A. Yeah.

Q. What else did he say about Viana?

A. That's what he said.

Q. That's it?

A. Yeah.

Q. That's all he said?

A. And he talked like her, he would mock her the way she spoke. She has an accent.

Q. And he didn't promote her?

A. No, he promoted the man.

Q. Who was the man he promoted to --

A. He was the -- an account manager, yeah.

Q. I'm not sure I understand. So you asked if Viana could be promoted to account

MARY CAMPISE - 6/13/2019

Page 87

manager. Was there some other person Kevin promoted to account manager?

A. Yeah.

Q. Who did he promote to account manager?

A. There were a couple guys in the area. There were a couple guys that he preferred.

Q. Employees that he promoted to account manager or people he hired?

A. They were employees.

Q. Who got promoted to account manager by Kevin?

A. Well, I mean Byron was promoted and he made one guy a manager over the whole thing and --

Q. Okay. I want to be real specific. Who was promoted specifically to account manager, Byron?

A. Byron was one and there is another guy. He had red hair and he got promoted. All I know is Viana was not and a man was.

Q. Who was -- what was Byron's position before?

A. You know, I don't know. I don't, I don't know exactly.

MARY CAMPISE - 6/13/2019

Q.    Do you know anything about his job performance?

A.    I know he was very good.

Q.    Byron was?  Yes?

A.    They were, they were -- yeah, I can't really say.  He didn't work for me.  I mean at the time I don't know.

Q.    The redhead guy who got promoted, what position did he hold before?

A.    I'm not sure.

Q.    Do you know anything about his job performance?

A.    No.

Q.    Obviously you are not claiming damages associated with Miss Carrigan not being promoted; fair to say?

A.    I'm just telling you how she was treated as a woman and an older woman.  She was not promoted.

Q.    And you thought she was a good employee?

A.    Excellent.  I got letters all the time from customers.

Q.    We're still on the third page there.

MARY CAMPISE - 6/13/2019

Next paragraph you made this statement: "Kevin showed favoritism to male reps with the exception of Kim McCloud in Wisconsin."

Are you suggesting that he favored Kim?

A. Yeah, he did.

Q. Kim is in her 50's and a female?

A. But he --

Q. Is that a yes?

A. It's not a yes.

Q. She's not in her 50's and a female?

A. That's true she is.

Q. That's what I was asking.

Do you have any personal knowledge of how responsive Kevin was to your male colleagues in e-mails?

A. Well, if I wasn't included in the e-mail, no.

Q. Yeah, well, because in this document you say -- I thought you were suggesting that he was responsive to men but not to women?

A. He was.

Q. But you wouldn't know if he was responsive to men in an e-mail, would you?

A. Verbally, verbally. You know, we have

MARY CAMPISE - 6/13/2019

meetings together and they would have something coming up and he would say I'm going to ride with you. I just know that they got more attention; they got more accounts.

Q. Do you know how many times Kevin has canceled on men on rides?

A. No.

Q. What are your claims in the lawsuit; just by cause of action what are you suing for?

A. Gender and age discrimination.

Q. I've handed you as Exhibit 4 a copy of the complaint you filed in this lawsuit.

Do you recognize this document?

A. Yes.

Q. Did you read --

A. And emotional distress.

Q. Right, we'll talk about that in a minute.

Did you read this document before it was filed with the court?

A. Yes.

Q. Page 2 there's a list of factual allegations that you make, paragraph 14. The allegation is, "Additionally plaintiff made

MARY CAMPISE - 6/13/2019

valuable contributions to the company and went out of her way to add to the success of the company."

I want you to just tell us how you did that.

A. I had very good accounts. I knew people well. They followed me. They liked me. I brought many opportunities to the table.

I would have events and organize those and I usually always had the most customers at the events. I also when people rode with us, when people would come in to ride, I would ride. I usually had more of the appointments to ride with guests. I stayed -- you know, I worked very, very hard.

Q. Did you ever complain to Kevin Colligan about sexist comments in the workplace?

A. Yeah, I spoke to him.

Q. What did you tell him?

A. You know, I wasn't very comfortable. Like when he would say about the sexcapades, tell us about yours, you know, I didn't want to. I didn't say anything about mine. It was very uncomfortable.

MARY CAMPISE - 6/13/2019

Q.   That was the one incident you talked about in the fall of 2016?

A.   Yes.

Q.   Did you ever complain to Kevin Colligan about any other sexist comments made by other individuals?

A.   Yes.

Q.   What did you say?

A.   There was a gentleman that I was uncomfortable with like off to the side in the office there and they would laugh and say things under their breath.

Q.   I need to deal with one at a time.  I want to understand what complaints you made to Kevin.  So did you complain to Kevin about the gentleman that you felt uncomfortable with that worked to the side of you?

A.   Yeah.

Q.   What's the guy's name?

A.   I don't remember.  Art, Art.

Q.   And do you remember Art's position?

A.   No.  He's an ocean guy.

Q.   Art fired you at a prior employer?

A.   He did.

MARY CAMPISE - 6/13/2019

Q.    Yeah, is that why you were uncomfortable with him?

A.    No, he fired all three of us.

Q.    Right.  But were you uncomfortable working with Art because he had fired you before?

A.    That's not why.

Q.    What did Art do that made you feel uncomfortable?

A.    He was a very mean and angry man.

Q.    Did Art make any gender biased or sexist remarks?

A.    Inferred it, yeah.

Q.    What did Art say?

A.    I don't remember exactly.

Q.    Other than Art, did any other person make gender biased or sexist remarks in the workplace that you haven't told me about already?

A.    Byron would make sexist remarks.

Q.    Byron?

A.    Byron, yes, he did.

Q.    Did you complain to somebody about Byron?

MARY CAMPISE - 6/13/2019

Page 94

A.  You know, yeah.

Q.  Who?

A.  Well, you know, there really wasn't an H.R. person, but it went on.  It went on.  He would say these things and I just stopped going around -- stopped going around him.

Q.  Did you ever complain to anybody about Byron?

A.  I think I did verbally.

Q.  To who?

A.  I can't remember.

Q.  You are not bringing a sexual harassment case to this lawsuit, correct?

A.  Gender and age discrimination.

Q.  But not a sexual harassment claim, correct?

A.  No, correct.

Q.  Paragraph 19, "Prior to plaintiff's termination she made numerous complaints about being treated differently than her male colleagues."

What complaints are you talking about?

A.  About giving accounts to Ben and Joe that are in our territory.

MARY CAMPISE - 6/13/2019

Q.   Who did you complain to?

A.   Kevin.

Q.   In your territory?

A.   Yes.

Q.   What accounts did Ben get in your territory?

A.   Flextronics.

Q.   And what --

A.   And when Sara --

Q.   I'm sorry, hold on.  Let's keep with the question.

      What accounts did Ben get in your territory?

A.   Flextronics.

Q.   Any others?

A.   Not that I remember but there were.  I don't remember exactly who it was, but there were.

Q.   What other accounts did Joe get in your territory?

A.   There were accounts; I don't remember.

Q.   Did Kevin explain to you why he gave the account to Ben, the Flextronics account that is?

A.    He never explained anything.

Q.    Did Kevin ever explain why he gave certain accounts to Joe and not you?

A.    No.  And when Steve and Sara left, those accounts were given to Joe and Ben.

Q.    Is Kansas City your territory?

A.    It is not.

Q.    Paragraph 34 says, "Many of the males who were shown favoritism were younger and less capable than plaintiff of doing the job."

      Specifically what men are you talking about?

A.    Steve McGuigan.  He was given all the leads.

Q.    Any other men that were less capable than you?

A.    I was referring to Steve McGuigan.

Q.    Was Steve employed by Ceva at the time you were terminated?

A.    No, not when I was terminated, but I worked there at the same time he did.

Q.    How long did Steve stay with Ceva after you got to the job?

A.    Maybe nine months.  I don't remember

exactly.

Q. Did he leave or was he terminated?

A. He left.

Q. Do you know where he went to work?

A. No.

Q. Do you know if he was a successful salesperson?

A. No.

Q. Were Joe and Ben successful do you know?

A. Yes.

Q. Do you know how successful they were?

A. No.

Q. Have you looked at any of the reports that have been produced in relation to this case that show sales for people like Joe and Ben?

A. No.

Q. If you could flip to page 6.

Do you understand that ADEA stands for the Age Discrimination Employment Act?

A. Yes.

Q. And then Count 2 is intentional infliction of emotional distress. Do you see that there?

MARY CAMPISE - 6/13/2019

Page 98

A.    Which one is it?

Q.    Count 2, page 7.  Right in the middle of -- I'm sorry, page 7, flip the page.  Thank you.  Here.

You bring a claim for intentional infliction of emotional distress, correct?

A.    Yes.

Q.    Who specifically at Ceva intentionally inflicted emotional distress upon you?

A.    Well, Kevin.

Q.    What were the outrageous acts that Kevin committed that you believe constituted the intentional infliction of emotional distress?

A.    Showing favoritism toward the men, showing favoritism toward younger women.

Q.    Anything else?

A.    And not following up which caused me emotional distress.

Q.    What do you mean by not following up?

A.    His approval had to be done before, before credits were given, things like that.  So not completing that in a timely fashion for me as a woman caused me distress.

Q.    So you're basically saying because

MARY CAMPISE - 6/13/2019

Kevin did not perform his job well with respect to you, he intentionally inflicted emotional distress upon you?

A. Yes.

Q. Any other outrageous conduct that you allege Mr. Colligan committed that constitutes the intentional infliction of emotional distress?

A. He would reprimand you in e-mails and with the other men and reps in contact -- in copied.

Q. Like what kind of reprimands did you receive?

A. I'm taking this account away and giving it to someone else with everyone copied.

Q. What account in particular can you recall?

A. It was in Villa Park.

Q. What was the name of the account?

A. I don't remember.

Q. How many times did that happen?

A. Several. That's the one that comes to mind the most.

Q. How many accounts can you remember?

MARY CAMPISE - 6/13/2019

A.    Three or four.

Q.    You can't remember the names of any of them?

A.    No.  He would do that in the meeting to Sara too.  Did you call on this account last month.  No.  Okay, I'm giving it to so and so.

But he never did that to -- you know, it was the women most often.

Q.    Do you know who Kevin Colligan terminated during the course of your employment with the company?

A.    Do I know?

Q.    Yeah.

A.    No.

Q.    Do you know who David Buckley is?

A.    No.

Q.    Do you know somebody named Bjork, Michael Bjork?

A.    No.

Q.    Did you ever work with a guy named Patrick Dabich?

A.    No.

Q.    Do you accuse anyone other than Mr. Colligan of engaging in discrimination?

HANNA & HANNA, INC.
713.840.8484

MARY CAMPISE - 6/13/2019

A.   Would you care to expound on that?

Q.   Do you accuse anyone else employed by Ceva of engaging in discrimination against you during your employment other than Mr. Colligan?

A.   He was my direct -- he was my direct manager, no.

Q.   So you don't accuse anyone else of discrimination, just Mr. Colligan?

A.   Right.

Q.   Well, the reason I asked is that let's go paragraph 62.  It says, "Defendant knew or should have known that its failure to protect Campise from the abuse of employees and co-workers and ongoing harassment based on her age would reasonably cause plaintiff serious injury."

A.   Well, like I said, Byron and other managers, it's true they -- there was abusive language.  There was abusive language going on.

Q.   What was the abusive language going on?

A.   You know, sometimes in the warehouse or you go down and they're out there smoking or the drivers or, you know, it was, it was harassment. There was a hostile environment.

MARY CAMPISE - 6/13/2019

Q.    What was the abusive language that you heard?

A.    Swearing.

Q.    Did anybody ever swear at you?

A.    Yeah.

Q.    Who?

A.    Yeah.  People in the operation.

Q.    Who?

A.    You know, I don't really exactly know their names but...

Q.    What did they say?

A.    Just it was abusive.

Q.    Right, but specifically what was said to you that was abusive?  Can you recall any of it?

A.    Yeah.

Q.    What?

A.    Well, they would -- they would -- they would swear on the phone.  Like, I would ask some of the guys that were handling the accounts and I would say, you know, you've got to get on this.  What the fuck, Mari, I've got, you know, I've got other customers besides you.  You know, things like that.

MARY CAMPISE - 6/13/2019

Q.   Okay.   Anything else other than that that you can describe for us that was the abusive atmosphere?

A.   Yeah, just, you know, not even being -- some of the men not be able to approach them to follow-up on accounts and they would, you know, get back to me when they felt like it.  They would swear and --

Q.   Who specifically?

A.   There were a couple guys in the account, the manager and a couple of guys in the accounts -- with the accounts.

Q.   I was looking for names if you have them.

A.   I can't remember.

Q.   If you look to the next page, Page 8.

     Were you familiar with Ceva's policies and procedures?

A.   Some of them.

Q.   You were given access to all the company's policies and procedures when you joined, correct?

A.   I don't know.

Q.   You don't remember or --

A.    I don't know if I got access to all of them.

Q.    Well, you had access to the policy against discrimination certainly, right?

A.    I'm sure.

Q.    Set this aside.

A.    Don't remember it.

I'm going to have to take a break in a minute.

Q.    Sure, let's take a break now.

(Whereupon, a short break was taken.)

MR. LEVINE:  I'm passing the witness.  And she'll probably read and sign, I presume.

MR. GASTON:  Signature reserved.

THE COURT REPORTER:  Are you going to order the transcript?

MR. LEVINE:  Yes, I will be.  I like e-mail.

THE COURT REPORTER:  Did you want a copy, sir?

MR. GASTON:  Yes, e-tran.

FURTHER DEPONENT SAITH NOT.

MARY CAMPISE - 6/13/2019

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

CHICAGO DIVISION

MARY CAMPISE,                    )

     Plaintiff,                   )

 vs.                              ) No. 1:18-cv-6534

CEVA LOGISTICS, LLC,             )

     Defendant.                   )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Patricia A. Mache, Certified Shorthand Reporter, on June, 13, 2019, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

_____

             MARY CAMPISE

SUBSCRIBED AND SWORN TO

before me this _____ day

of _____ 2019.

_____

Notary Public

HANNA & HANNA, INC.
713.840.8484

STATE OF ILLINOIS      )
                       )   SS:
COUNTY OF DU PAGE      )

I Patricia A. Mache, being first duly sworn, on oath says that she is a court reporter doing business in the City of Chicago; and that she reported in shorthand the proceedings of said hearing, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said hearing.

_____
Patricia A. Mache, CSR
LIC. NO. 084-002229
Hanna & Hanna, Inc.
8582 Katy Freeway, Suite 105
Houston, Texas 77024
713-840-8484 - 713-583-2442
www.hannareporting.com

MARY CAMPISE - 6/13/2019

**A**

ability 52:1,5 54:5 57:1 85:2
able 103:5
aboveentitled 105:12
absolutely 77:17
abuse 101:13
abusive 52:21 101:18,19,20 102:1,12,14 103:3
accent 85:21 86:18
accepted 37:11 40:4,12 45:5
access 103:20 104:1,3
account 11:4,7 23:17 24:7,9 25:10,21 26:15 27:18 30:23 32:3,17,18 34:4 39:2,6 47:15 49:3,18 49:22,23 50:18 50:19,22 52:19 60:12 67:7,10 67:13 71:3 74:19 75:1 77:16 86:4,22 86:24 87:2,4,7 87:10,16 95:23 95:23 99:14,16 99:19 100:5 103:11
accounts 11:3 12:22,23 25:6 25:8 26:5,10 30:14,18,19 31:15,18,23,24 47:22 52:8,17 52:18 53:8,19 58:11,19 59:17 59:23 60:8,16

67:5 85:16,16 85:19 90:4 91:6 94:23 95:5,12,19,21 96:3,5 99:24 102:20 103:6 103:12,12
accurate 38:5 47:10,15,24
accurately 105:14
accuse 100:23 101:2,7
acquired 42:22 42:24
act 97:20
action 73:17 74:7 90:9
acts 98:11
actual 59:7
adam 56:6
add 91:2
addison 7:10,15
addition 57:12
additionally 90:24
address 7:13
adea 97:19
admin 53:6
administrative 81:11
aforesaid 106:9
age 16:3 61:18 62:12,13 90:10 94:14 97:20 101:15
ages 80:3
ago 26:3 30:10 59:3 60:11
agree 71:7
agreed 9:1
air 13:21 50:22 51:6,18 56:5
aircraft 13:22
allegation 90:24

allegations 90:23
allege 99:6
allowance 43:8
ally 52:6 54:6 81:5 82:2
amount 37:7
andre 2:2,2
angry 93:10
annual 21:24
answer 4:24 5:8 5:10,12,17 8:19 11:23 25:24 28:12,18 29:12,22 35:12 36:2 43:3 48:21,22 49:8 51:2 59:12 60:4 63:17 80:15
answered 49:6
answers 51:22 105:15
antidepressant 18:13 19:17
anybody 9:10 35:11 61:21,22 62:11 78:11,12 83:14 94:7 102:4
anymore 11:7 54.15,16 67:17
anyway 9:2 75:10
apex 6:3 8:22,22 9:4 13:9,22,24
apologize 72:20
appear 105:16
appearances 2:1
applied 8:11,14 9:7 15:12
apply 14:22 15:8 16:1
appointments 91:13

approach 103:5
approached 11:8 34:9 36:4 37:5
approval 76:3 98:20
april 9:12,19,22 10:17,19,20 11:12 13:3 37:24,24
area 29:6,17 30:4 55:5,9 87:5
areas 24:13 54:20
arm 13:21
art 92:20,20,23 93:5,8,11,14 93:16
arts 92:21
asia 13:23,23
aside 104:6
asked 25:10 29:7 41:17 43:15 44:10 49:6 59:12 64:4 77:8 86:3,24 101:10 105:15
asking 89:12
assigned 23:12
associated 32:19 58:19 88:15
associates 34:5
assume 4:20
atmosphere 103:3
attached 84:10
attain 75:3
attainment 71:11 73:18 74:1
attention 90:4
attorney 76:15
attractive 16:14
audible 4:24

august 7:4
aurora 24:2,13
avenue 18:22
award 34:23,24
awards 36:7
aware 27:21,23 28:1 48:15
awhile 6:20,20 18:8

**B**

b 3:6 50:1
back 10:18 25:19 40:6 50:14 52:9,9 59:5 60:9 103:7
background 34:10
based 51:22 83:21 101:14
basically 98:24
basis 6:7 8:2,6 9:8 10:3 13:13
bathroom 36:11
beginning 33:2 74:5
begins 85:7
behalf 2:5,10
believe 30:11,11 43:7 57:9 98:12
ben 25:14 30:19 75:17 94:23 95:5,12,23 96:5 97:9,16
benefits 6:10 10:7 11:16,19
bens 53:11,13
bensenville 34:19
best 5:7 43:18 85:23
better 32:1 66:19

MARY CAMPISE - 6/13/2019

bias 61:1,18
62:12,13
biased 93:11,17
bid 12:23 13:1
25:9,15 28:2
bids 25:12
big 34:3 49:23
77:15
bigger 34:6
biggest 35:21
49:18,22
bill 47:16,18
84:21
billing 50:2,4,6
50:7,7 56:12
56:13,14,17,19
59:19,20 76:3
bills 10:24
birchs 77:9
birth 41:18
bit 28:9 52:2
72:3 86:3
bjork 100:17,18
blur 79:1
bolingbrook
24:2,13
book 68:10
boss 35:21 37:14
bought 35:20
brazil 57:4
break 36:11
38:1,2 66:7,9
104:8,10,11
breath 63:3
92:12
bring 98:5
bringing 94:12
brining 74:20
broke 19:6
broken 78:17
86:6
brokerage 50:8
50:10 51:12,13
brook 24:1
brought 45:12

77:15 91:8
bth 15:11
btm 15:9,10,15
15:23 16:2,6,9
16:13
buckley 100:15
building 34:6
burch 76:18,19
84:9
business 9:1
30:9,20 32:10
34:7,8 45:15
59:4,8,14
68:11 71:12
84:15 106:5
buy 79:14
byron 87:12,17
87:18 88:4
93:20,21,22,24
94:8 101:17
byrons 87:21

———— C ————
c 2:6 50:1
call 13:4 17:10
22:18 31:18
42:11 44:3,8
44:17 45:22
52:8,13,18,20
60:3 100:5
called 1:8 4:4
6:3 7:19 13:10
27:12 28:2
30:2 38:21,22
38:23 40:6
42:10 43:20,23
44:6,10,12,14
50:20 51:7
calling 40:16
calls 57:13
campise 1:3,8
3:2,11 4:3,11
4:12 76:18
101:13 105:4
105:19

cancel 57:24
58:6
canceled 58:14
90:6
cant 5:2 19:13
27:8 38:22
51:8,8 61:15
63:11 88:5
94:11 100:2
103:15
capable 96:10
96:15
capacity 32:11
car 16:18 43:8
care 34:7 52:10
52:24 55:10
58:3 101:1
career 32:20
35:11,14 44:22
45:16
carol 23:24
carrigan 85:10
88:15
case 40:20 76:12
94:13 97:15
catch 51:19
cause 60:1,13
90:9 101:15
105:12
caused 17:3 20:8
49:3 59:17
60:20 98:17,23
center 18:19,21
21:20
certain 82:12
96:3
certainly 104:4
certified 1:13
105:13
certify 105:10
ceva 1:6 4:13
5:21,24 6:18
8:12 10:4 13:3
14:5,22 15:13
15:21 16:14

17:14 20:15
21:15 22:9,17
22:23 23:2,13
25:15 26:23
27:3,7,15,21
31:6,7,10
34:12 37:20
38:6,15,20
39:16,17 40:2
40:24 41:8,11
42:4,14,17,19
42:21,24 44:19
44:22 45:3,5
45:12,22 46:3
46:6,12,13,15
47:2,11 48:10
49:12,16 50:20
51:24 52:4
54:4,19 56:11
56:24 57:11
60:20 65:8
66:20 71:21
74:8 75:3
80:21 82:20
84:19 96:18,22
98:8 101:3
105:7
cevas 22:14
71:12 103:17
chain 56:3
chair 54:17,19
charge 55:21,22
56:5 77:1
charges 35:24
charging 56:19
charles 32:4
chicago 1:2 7:16
23:21 24:1
39:23 50:12
51:3,6 81:23
83:5,7,8,11,19
105:3 106:5
children 33:8
china 75:6
christmas 64:15

64:18,18
city 18:7 83:4
85:8,11 96:6
106:5
civil 1:11
claim 16:20,23
17:3 94:15
98:5
claiming 88:14
claims 90:8
clarifying 19:4
clarity 30:13
clear 9:24 42:18
56:2 85:2
clearing 35:23
57:6
client 17:3
clients 26:24
45:23
clinic 19:1,7,24
close 11:3 45:15
closed 74:19
coast 15:10
cold 21:19
colleagues 89:14
94:21
collect 84:5
colligan 2:12
23:6,9 38:6,8
40:1,16 42:8
43:10,20,23
44:4,7,13 45:6
48:15 50:3
60:24 61:9,12
61:18,23 62:12
62:14,24 63:5
64:21 65:10
67:1 70:2,22
76:5,9 91:16
92:4 99:6
100:9,24 101:4
101:8
colligans 65:23
66:23
com 106:17

MARY CAMPISE - 6/13/2019

come 10:14 27:11 35:7 38:18 39:1,5 42:7 52:16 58:4 91:12
comes 99:22
comfortable 91:20
coming 40:17 42:8,13 58:18 90:2
comment 63:20 86:2
comments 32:2 62:24 91:17 92:5
commission 6:8 10:9,10 11:5,7 13:11 16:13,17 16:19 41:7 71:18,20,24
commissionable 71:11
commissions 10:11 12:13,17 12:20 16:11
committed 98:12 99:6
companies 13:13,19 14:4 14:9
company 6:3 15:9 25:3 32:12 33:16,23 34:1,3 40:18 43:24 45:9 54:18 65:13 72:18,23 73:2 73:10 76:21 81:17 91:1,3 100:11
companys 103:21
complain 48:5 91:16 92:4,15

93:23 94:7 95:1
complaint 3:12 22:15,23 23:2 90:12
complaints 23:8 51:23 52:4 92:14 94:19,22
complete 5:11
completely 11:23
completing 98:22
computer 52:19
condition 27:1
conduct 99:5
connection 4:17 68:13
considered 86:4
constituted 98:12
constitutes 99:6
consumer 35:4
contact 99:10
contains 106:9
continue 70:10
contract 6:17,23 7:9 16:5,5,6 26:19
contractor 6:7 13:13
contributions 91:1
conversation 38:24
convinced 68:22 69:3
copied 99:11,15
copies 70:7
copy 90:11 104:19
corporate 39:2,6
correct 7:6 8:2,3 14:7 19:9,14 20:24 26:1

29:23 31:9 36:18,20 40:2 40:3,7,8,10 41:23 42:5,6 42:23 45:7,8 45:10,24 46:13 47:22 48:3,4 48:13 50:5 53:3 65:2,3 68:1,2,6 70:15 70:23,24 71:19 71:22 72:2,24 73:8,14,15 74:1 79:22,23 81:24 82:3,6 84:10 94:13,16 94:17 98:6 103:22 106:8
corridor 23:20
couldnt 10:24 17:10 54:13 79:1 85:12,15 85:18,22
counsel 14:20
counseling 17:7
counselor 17:6 18:2
count 80:19 97:22 98:2
county 106:2
couple 6:13 39:23,24 87:5 87:6 103:10,11
course 100:10
court 1:1 5:4 90:20 104:16 104:19 105:1 106:4
courts 1:12
cove 13:10,10,24
cover 25:1
coworkers 101:14
credit 50:14 59:21

credits 54:10,11 54:14,16 76:3 98:21
csr 106:14
culture 22:6
current 32:22
customer 27:4 35:22 50:16 52:23,24 53:19 55:10 58:1,3 58:22 59:2 84:21
customers 6:19 17:11,14 35:10 45:18 52:9 53:2 54:8 58:16 79:13 81:13 85:24 88:23 91:10 102:23
customs 35:24

## D

d 3:1
dabich 100:21
daily 17:8
dakota 18:7
damage 76:3 79:8
damaged 54:7,9 54:20 55:14 79:4
damages 16:21 16:24 54:14 88:14
damco 10:15 11:8,11,13 12:5,8,13,17
darn 9:2
date 6:14 32:23 38:11,12 41:18 63:24 76:21
dated 70:17
dates 33:20
david 100:15

day 20:12,13,14 48:3 64:24 65:1 78:1 105:21
days 20:4 26:19 27:4,7 33:17 54:1,2 66:3
deadlines 25:15
deal 84:1 92:13
december 41:19 70:17,22
decided 11:9
defendant 1:7,9 2:10 101:11 105:8
deficiencies 72:4
define 56:21
demands 27:4
demerge 35:24
dental 10:9 11:15
department 50:8 51:2,12 55:8 56:15,18
departments 84:1
depended 54:24
depends 55:19
deponent 104:22
deposition 1:8 4:17,21 69:19 70:10 105:11
depositions 1:12 4:19
depression 17:10,20 19:3 20:7,18 21:14
deprivation 20:11,17,22
describe 10:10 17:2 45:11 103:2
described 62:15
describing 57:9
description 3:8

HANNA & HANNA, INC.
713.840.8484

MARY CAMPISE - 6/13/2019

23:23
despite 85:2
detail 52:3
details 67:17
development 71:12
dhl 32:15 33:1,4 33:7,21
didnt 5:9 11:6 16:6,17 17:24 27:12,15 29:16 29:18 30:20 34:7 47:17 50:5,15,16 51:19 53:24 54:1 57:22 58:13 59:3,4,8 59:10 60:13,15 74:12 78:17 85:10 86:19 88:6 91:22,23
different 13:16 13:18 23:11 55:23 56:1 59:11 84:1
differently 94:20
difficult 56:10
direct 101:5,5
directly 80:16
director 35:3 74:15
disagree 40:21 72:14
disciplinary 74:7
discretion 24:6
discrimination 16:3 57:13 90:10 94:14 97:20 100:24 101:3,8 104:4
discuss 27:13 29:8 67:12
discussed 21:1 27:19 30:16

31:14 57:2
discussion 29:3 32:7
distinguish 7:24 8:4
distraught 79:2
distress 16:21,24 17:2,6,20 21:2 90:16 97:23 98:6,9,13,18 98:23 99:3,8
district 1:1,1,11 105:1,2
divided 46:19
division 1:2 45:19 105:3
doctor 18:18 21:17
doctors 18:23,24 19:1
document 69:11 84:22 89:18 90:13,19
doesnt 49:8 85:20
doing 5:1,19 27:22 78:18 96:10 106:4
dollars 11:5 12:24 35:1 49:15
domestic 13:20 13:22 14:1 54:24 55:19,22 56:3,6 58:23
dont 8:17 12:21 12:22 15:2 17:22,24 18:10 18:11 19:18,19 19:20,20 20:19 20:19 21:7,21 21:24 22:12,12 28:5,7,13 30:8 30:10 31:12,13 37:1 38:12,14

39:19 40:15,19 40:22 41:1,3 43:3,4,16 47:6 47:8 48:14 49:13,17 51:9 51:21 53:5 54:2 56:8,16 58:12 60:18 61:6,14,24 62:7,19,20 63:3,7,19 66:1 68:9 69:24 74:2 76:6,23 78:9,13,13 79:14 80:15,18 80:20 81:21,21 87:23,23,24 88:7 92:20 93:15 95:17,21 96:24 99:20 101:7 102:9 103:23,24 104:1,7
door 36:1,2
double 29:22
downers 18:19 18:22 23:24
downtown 23:19
dr 21:10,10
drive 34:20
drivers 101:23
du 106:2
due 25:12
duly 4:5 106:3

——— E ———
e 3:1,6 24:20,20
eagle 33:19 34:9 34:11,11,14,21 34:22 35:2,10 42:20,21 43:1 44:18 64:22,24 65:1,7,10,14 65:19 66:3 68:4

earlier 41:17
early 12:16 24:24
earn 10:11 12:13
earned 14:9,19
earning 11:1 12:20
easier 5:4 28:7
easiest 4:23
east 15:10
edge 17:22
eight 71:9 72:23 73:9
eighth 72:22
either 63:10
elevator 79:2
eleven 2:7
elk 30:21 34:18 34:18
elses 49:4
email 3:11 52:9 54:11 76:4,9 84:8,10 89:17 89:23 104:18
emailed 76:21
emails 89:15 99:9
embarrassed 17:13
embarrassing 58:1,14 79:10
emergency 18:18,21 19:5 19:7,24 21:20 22:1
emotional 16:21 16:24 17:2,6 17:20 21:2 90:16 97:23 98:6,9,13,18 99:2,7
employed 43:21 81:17 96:18 101:2
employee 88:21

employees 25:18 87:7,9 101:13
employer 92:23
employment 7:22,23 8:1 9:7 10:3 12:16 46:5 64:2 66:20 74:8 82:13,23 97:20 100:10 101:4
ended 7:2 42:4
engaging 100:24 101:3
english 86:6
entire 32:20 35:11,14
entry 81:14
environment 101:24
essentially 32:20
estimate 14:2
ethics 22:14,18
etran 104:21
event 79:4,6
events 91:9,11
exact 38:12 80:19
exactly 15:2 37:1 40:19 43:17 61:7,14 62:19,20 63:9 63:19 78:9 87:24 93:15 95:17 97:1 102:9
examination 1:9 3:3 4:7
examined 4:5
excellent 88:22
exception 89:3
exclusive 24:5
executive 32:17 32:18 39:2,6 71:3
executives 85:2

exhibit 3:8,9,10
3:11,12 69:12
69:13,21 70:6
70:9,12 76:17
84:11 90:11
exhibits 69:18
expectations
71:2
expected 73:6
expenses 16:16
16:16,18
experience
36:13 45:2
46:2
expertise 32:9
explain 17:15
28:10,24 95:22
96:2
explained 28:4
46:17,18 96:1
exports 13:23
expound 101:1

**F**

f 24:20
facility 19:6
factual 90:22
failure 74:5
101:12
failures 54:4
56:10,17 57:1
57:3 60:20
fair 65:20,21
71:18 72:1
88:16
fairly 53:3
fall 15:24,24
64:10,16,20
92:2
familiar 22:14
103:17
far 85:23
fashion 98:22
fault 85:16,19
favored 67:1

89:4
favoritism 25:17
89:2 96:9
98:14,15
february 9:18
februarymarch
9:20
federal 1:10
fedex 36:4,4,5,8
36:19,22 37:4
37:10 38:10
40:7,9 41:4,8,9
41:12,13
feel 93:8
felt 17:12 92:16
103:7
female 85:1 89:6
89:10
file 22:22 23:1,8
filed 4:14,18
90:12,20
final 33:4
finally 59:2
financial 71:11
find 50:24 77:7
79:2
fine 13:15 63:15
finish 5:10,16
11:22 36:9,12
fired 37:14,15
37:16,17,19
53:23 54:2
92:23 93:3,5
first 4:4,20,23
5:24 6:1,20
10:2 16:17,19
17:8,21 20:9
32:11 33:1
38:8 44:14,17
64:21,24 65:1
65:16,23 71:1
106:3
fit 32:1
five 46:19 67:8
79:20,21 82:5

82:11
flextronics 95:7
95:14,23
flip 74:4 84:23
86:8 97:18
98:3
follow 55:24
followed 91:7
following 5:21
44:2 54:12
55:11 56:20
57:6 98:17,19
follows 4:6
followup 9:5
53:18,20 54:21
55:5 103:6
food 56:3 64:17
force 33:14
foregoing
105:14 106:7
form 48:18,24
forms 34:3,7
forth 71:3
found 77:9
four 33:17 46:19
73:12 79:20
100:1
fourth 73:3,12
frame 38:16
39:9 64:9
freeway 106:16
freight 79:5
friday 40:17
friends 15:20
42:17 65:4
front 58:1
fuck 102:22
full 51:9 73:7,18
73:24
fulltime 7:21,23
9:7 10:3
further 32:6
104:22

**G**

gaston 2:2,2
8:19 11:22
28:12,18,21
36:9,14 48:18
48:22 49:5
63:14 66:8
69:15,17
104:15,21
gender 16:3
57:12 60:24
90:10 93:11,17
94:14
general 4:18
60:10
generated 49:11
generation 72:8
gentleman 92:9
92:16
getting 7:17
14:6 35:24
71:24
give 5:8 6:14
8:13,16 9:3
12:22 25:14
28:16 30:24
50:14 54:15
58:9,23 67:17
70:7
given 24:4,8
25:5,8,20,22
26:6,7,9,10,11
26:16 30:15,17
47:1 76:14
96:5,13 98:21
103:20 105:15
106:10
giving 43:17
94:23 99:14
100:6
global 33:19
34:9
go 7:17 9:3 19:7
21:20 22:2,6
25:5,19 35:6
48:3 50:23

51:17 52:19
53:22 57:13
59:8 60:5,5,9
64:15 72:3,19
77:11 78:6,7,8
78:10 101:11
101:22
goes 59:21
going 40:7,13
48:18 49:5
54:15 58:6
63:14 64:17
69:11 77:24
90:2 94:5,6
101:19,20
104:8,16
golden 34:22
good 9:2 18:2
45:13,14 65:19
88:3,20 91:6
gotten 30:20
35:15
granted 61:21
greenway 2:7
grew 68:16
ground 4:19
group 6:1,2,6,12
6:15,24 7:7,21
8:8 9:3 13:7,8
13:20 66:4,4
84:18
grove 18:19,22
23:24 30:21
34:18,18
guess 29:13
80:15
guests 91:14
guidance 72:18
73:2,10
guy 37:16 87:13
87:18 88:8
92:22 100:20
guys 63:2,5
75:11 87:5,6
92:19 102:20

MARY CAMPISE - 6/13/2019

103:10,11
gynecologist
21:11

**H**

h 3:6 22:10 23:2
77:4 94:4
hadnt 30:3
hair 87:19
half 11:4 12:24
35:19 36:17
37:14
hand 69:11
handed 90:11
handle 19:22
handled 48:12
50:6,9 51:24
handling 48:10
102:20
hanna 106:15,15
hannareporting
106:17
happen 24:7
99:21
happens 17:15
harassment
94:13,15
101:14,23
hard 5:4 10:10
17:9,15 20:8
45:14 77:16
91:15
hatfield 67:23
havent 20:21
30:16 57:2
59:12 60:21
82:22 93:18
head 5:1 30:10
37:5
headquartered
15:10
healthy 21:23
heard 60:10
61:12 68:24
69:6 78:5

102:2
hearing 106:7
106:10
hearsay 61:22
held 46:6
hellman 37:6,8
37:11,13,19
44:1,2,3 45:18
45:19
help 50:5 75:15
75:23 78:17
heres 76:8
hes 21:11 35:14
60:3 92:22
hewitt 34:4,5
high 18:3
highest 49:10
hillside 24:1
hire 83:6,8
hired 24:3,11,22
24:23 35:11
52:7 80:21,24
81:1,4,4,7,16
81:18,18 82:2
82:5,9,10,11
82:13,18,19,23
83:1,3,3,10,11
83:13,17 87:8
hires 81:23
hit 71:17 73:6
hold 88:9 95:10
honor 45:19
hostile 101:24
hot 22:15,17,18
hour 1:16
hours 74:22
house 67:9
houston 2:8
106:16
human 22:23
humiliated
17:13
humiliating
79:11,15
hunter 37:5

husband 16:6
78:18

**I**

idea 49:1 64:9
64:11 74:21
identified 82:22
ies 47:15 49:19
49:21 75:1,4
ill 8:16 22:2,6
36:9 58:23
illinois 1:1,15
2:4 7:11 105:2
106:1
im 8:4 21:23
26:13 28:1
43:17 45:13,13
45:14 47:12
48:18 49:5
63:4,14 69:11
69:12 76:6,13
78:4 84:20
86:23 88:10,17
90:2 95:10
98:3 99:14
100:6 104:5,8
104:13
immediate 74:6
74:13
impacted 52:1
54:5
impaired 52:4
57:1
import 51:1
important 58:5
imports 13:23
50:23 51:6,18
improvement
3:10 70:21
73:17 74:6,14
77:19
inaccurate 48:6
48:16 50:2,4
56:19 74:3,18
74:21

inartful 5:17
incident 92:1
included 23:22
63:6 89:16
including 74:7
82:20 83:16
income 14:8,18
incorrect 59:20
increased 11:4
independent 6:7
7:18 13:12
indicated 84:15
indicating 85:6
individuals 92:6
industry 17:4
33:18,24 35:15
65:24 79:5
inferred 93:13
inflicted 98:9
99:2
infliction 97:23
98:6,13 99:7
influence 19:21
initially 40:4
injury 101:16
intentional
97:22 98:5,13
99:7
intentionally
98:8 99:2
interested 42:13
internal 21:18
22:22 23:1
international
8:23 13:21
36:6 55:1,20
55:22 56:4
interrupt 5:7
interview 9:15
39:12,15
interviewed
8:21 9:17,20
37:6
isnt 27:20 73:9
78:18

issue 17:20
48:24
issued 70:22
71:6 77:19
issues 21:2 57:8
itasca 10:16
ive 8:17 12:23
17:4 45:15
90:11 102:22
102:23

**J**

j 2:7
jane 51:13,15
janice 82:14,15
jen 77:2
jewel 22:2,3
job 5:19,24 6:1,5
7:17 8:5 9:11
9:15,17,18,22
10:15 11:10,11
13:3,10 14:6
14:23 15:15,17
15:23 16:1
17:5 32:16
33:16 34:14
35:16 36:4
37:6 38:6,9
41:23 42:2
43:20 44:4,13
45:12 46:10,23
57:2 60:21
65:23 73:8
76:24 79:12
85:24 88:1,11
96:10,23 99:1
joe 26:9 29:1,6
30:19 53:11,13
75:17,17 83:13
83:13 94:23
95:19 96:3,5
97:9,16
join 36:22 38:20
40:24
joined 8:22 13:9

MARY CAMPISE - 6/13/2019

31:6,7,10
36:16 38:15
44:22 45:9,22
46:3,12 103:22
**joining** 42:4
46:6
**joke** 61:6 63:2
**joy** 21:10,10,10
**jukebox** 62:20
63:21
**july** 7:4 76:22
**june** 1:16 105:13

**K**

**kansas** 83:4 85:8
85:11 96:6
**kaplan** 2:6
**katy** 106:16
**keep** 51:9 95:10
**kelly** 67:23
**kenneth** 76:18
76:19
**kept** 79:12
**kevin** 2:12 23:3
23:4,6,8,16
25:10 28:5,9
28:10,23 29:4
29:9 30:14
31:14,22 32:6
32:8 38:5,19
39:4,9,12,16
40:6,13,20,23
41:22 42:11
43:5 44:17
47:6 48:15
53:10 54:10
55:9 57:13,20
57:22 58:6,13
58:20,23,24
59:8,13,17
60:1,13,17,24
61:9,12,18,23
62:11,14,24
63:4,6,8,12,20
64:21 66:5

67:12 68:6,8
68:22 69:3
75:12,17,19
78:4,16 80:16
80:20 81:16
82:19,23 83:17
85:1,6 86:3
87:1,11 89:1
89:14 90:5
91:16 92:4,15
92:15 95:2,22
96:2 98:10,12
99:1 100:9
**kevins** 24:6
57:17 79:16
**kids** 33:10
**kim** 66:12 67:13
81:18,19 82:2
89:3,4,6
**kind** 12:3 18:12
19:7 20:10
22:22 23:1,20
54:3 79:1
99:12
**kinds** 49:15
**knack** 52:7 54:6
81:5
**knew** 13:15
17:14,14 23:14
29:10 42:16
67:16 68:6,16
71:23 85:24
91:6 101:11
**know** 6:9,17,19
6:22 7:1 8:23
8:24 9:3 12:24
14:8 17:10,15
17:22 18:11,13
18:16 22:17
26:18,20,23
27:3,7 28:1,23
29:6,16 30:8
30:10,23 34:2
38:12 39:1
40:22 43:3,4

44:9 46:15
47:7 48:14
51:22 54:2
55:4 56:8,16
57:18 58:2
61:8 64:4,4
66:1,12,13
67:20,23 68:1
68:9,10,12
69:1,2,2 74:2
76:18,19,20,23
77:5,6,17 78:9
78:13,13 79:13
79:14,24 80:3
80:5,16,18,18
80:20 81:16
82:5,9,11,12
82:18 83:16
84:20 86:9
87:19,23,23,24
88:1,3,7,11
89:22,24 90:3
90:5 91:14,20
91:22 94:1,3
97:4,6,10,12
100:7,9,12,15
100:17 101:21
101:23 102:9,9
102:21,22,23
103:4,6,23
104:1
**knowledge**
26:13 49:3
57:16 89:13
**known** 68:3 85:1
85:7 101:12

**L**

19:14
**label** 18:15
**lacking** 46:2
**language** 101:19
101:19,20
102:1
**large** 11:3 27:18

50:19 74:19
**late** 24:23
**lauffer** 8:21,22
9:9,10
**laugh** 63:2 92:11
**launched** 49:20
**law** 2:2
**lawsuit** 4:13,17
16:23 90:8,12
94:13
**lawyer** 14:15
28:8,8
**layers** 55:23
**layoff** 78:12
**leads** 68:8 96:14
**learn** 27:14
**learning** 35:22
**leave** 31:5,11
33:7 35:2 37:4
65:13 97:2
**led** 16:1
**left** 30:17,18
31:6 33:21
47:15 49:19
56:6 65:14,16
96:4 97:3
**legal** 77:1,1
**lemmer** 34:8
**letter** 77:11 84:8
84:9 86:5
**letters** 88:22
**level** 53:3,5
71:11 81:14
**levine** 2:7 3:3
4:8 12:2 28:15
28:20,22 36:12
36:15 38:1,4
48:20,23 49:7
63:15,16 66:7
66:11 69:16,18
69:20 104:13
104:18
**lic** 106:15
**liked** 15:20,20
41:12 44:18

91:7
**linda** 67:20
**line** 22:15,15,17
22:18 36:10
**lion** 30:21
**list** 8:11 9:6 26:3
30:24 31:1
90:22
**listen** 45:15
**literally** 86:1
**little** 28:9 30:21
47:8 52:2 53:7
60:11 61:4
72:3 86:2
**living** 54:8
**llc** 1:6 105:7
**local** 7:8 22:10
**location** 7:14
50:12 51:3
81:24 83:5,7,9
83:12
**logistic** 32:10,12
**logistics** 1:6 4:13
6:4 13:10
32:20 33:19
34:9 105:7
**lombard** 24:1
**long** 5:22 6:11
6:22 18:15
19:16,19 30:9
33:1 34:21
37:13 65:6,9
68:3 96:22
**longer** 20:5
31:21
**look** 69:13 70:5
70:9 76:17
103:16
**looked** 58:15
97:14
**looking** 9:6 35:6
38:11 55:7
63:4 84:11,13
103:13
**lori** 24:16,22

MARY CAMPISE - 6/13/2019

25:20,23 75:15 81:4,18 82:2
lose 10:6 53:19 58:19 59:7,10 59:17 60:1 79:11
losing 17:5 59:13
lost 50:1,18,23 54:17,20 55:4 55:6,13 60:12 60:12,14,17 85:15,16,19
lot 18:16 60:10
loved 86:1
lovemaking 61:3
low 53:3,5
lucrative 11:9 41:11
luigi 56:5
luigis 56:7
lynn 21:10,11

**M**

m 1:16
maam 33:12 71:13
mache 1:13 105:12 106:3 106:14
maintained 48:17 50:20,21
making 37:10 39:8,10 43:16
male 89:2,14 94:20
males 96:8
man 35:10 39:19 82:24 83:17 86:20,21 87:20 93:10
managed 55:7
management 3:9
manager 36:1

37:15 39:20,21 51:7,8,18 58:4 59:22 86:4,22 87:1,2,4,8,10 87:13,16 101:6 103:11
managers 101:18
march 9:18
marconi 62:6 68:1
mari 73:17 102:22
mark 2:7 36:9
marked 69:15
marking 69:12
married 61:3,11
mary 1:3,8 3:2 3:11 4:3,11 105:4,19
marys 72:7
masarik 67:21
masters 17:7
math 45:1
matter 49:8
matters 51:24
max 43:13
mccloud 66:12 67:2 89:3
mcguigan 30:18 31:2,4 82:8 83:18 96:13,17
mean 6:6 11:1,2 11:24 14:15 15:5 41:24 59:24 63:24 80:22 81:1 87:12 88:6 93:10 98:19
meaning 42:19
meant 74:11
measurable 71:10 72:8,22 73:4,12,13
medela 50:22

59:24 60:2,11
medical 10:8 11:15 18:18,21 20:21 21:20 22:1 26:8 28:24 29:4,9 29:15,19,24 30:6,7
medication 17:17,19 18:12 18:17 19:14,20
medicine 21:18 21:19
meet 46:8,13 64:21,23 71:2 74:14 75:12,14 75:16,19,20,22
meeting 47:2 71:23 77:23 78:3,15,22 100:4
meetings 90:1
men 24:8 25:8 25:17 30:22 31:18 39:23 57:14 82:22 83:11,14,18 89:20,23 90:6 96:11,15 98:14 99:10 103:5
menlo 35:20
mens 52:17 60:8
met 47:10 48:2 66:14 74:17 75:10,11
michael 100:18
middle 23:20 72:4 84:14 98:2
mike 34:8
miller 56:6
million 11:4 12:24 35:1
mind 99:23
mine 47:24

91:23
minute 9:6 57:24 90:18 104:9
minutes 67:9
missed 25:15
mmhmm 5:3 37:22 50:13 70:18 72:11
mock 85:1,9,9 86:17
modern 54:8
monday 40:18 52:13
money 18:1 40:9 54:16
month 6:14 10:17,17,19 47:17 64:8 100:6
months 5:23 11:6 13:5 31:12 50:2,14 50:15 59:20 96:24
morning 48:4 74:22 78:6,7,9 78:10
motivated 45:14
move 49:3
moved 34:6
music 61:4 62:16,18 63:13 63:21

**N**

n 3:1 24:20
name 4:9 18:4 18:23 21:10 24:16,17 31:1 39:20 48:8 51:11,19 56:7 59:18 62:5 77:7,9 80:10 81:20,21 92:19

99:19
named 67:20 100:17,20
names 26:5 78:9 100:2 102:10 103:13
naperville 24:2
national 39:2
need 21:19 36:10 57:20,22 58:13 73:17 75:12,18,22 92:13
needed 59:20
negative 29:22
negotiate 43:9
never 20:1 22:20 31:14 47:10,14 47:16,18,22,24 53:15 68:24 71:20 75:10 84:21 96:1 100:7
new 6:19 21:7 22:7 35:21 37:16 84:14
news 27:10,17
niece 81:7,19,22 82:3,16,17
nine 96:24
nod 5:1
noises 5:2
noncompete 6:18 17:11 45:17
nonsolicitation 45:18
north 1:14 2:3
northern 1:1 105:2
notary 1:14 105:24
notes 106:8
notice 1:10
notified 40:13

| | | | | |
|---|---|---|---|---|
| number 58:9 | 83:21 87:15 | owe 54:16 56:20 | 27:4,7 33:4 | phones 51:2 |
| numbers 47:14 | 100:6 103:1 | owner 54:17 | 41:4 | phrase 29:21 |
| 47:21 69:18 | old 33:10 41:20 | | payment 26:19 | physical 22:3 |
| 72:14 74:2,18 | 66:16 | **P** | payouts 41:7 | physicals 21:24 |
| 74:20 83:21 | older 85:22 | p 2:2,2,6 9:14 | pending 28:20 | physician 21:3,5 |
| numerous 94:19 | 88:18 | page 3:1,8 70:15 | pension 41:13 | 21:6,22 |
| | omron 32:4,7 | 72:5 74:4 | 41:14,15 | pick 6:18 24:14 |
| **O** | onboard 53:1 | 84:22,23 86:8 | people 17:13 | place 10:2 19:8 |
| o 9:14,14 50:1 | onboarding | 88:24 90:22 | 31:15,23 42:16 | places 8:11 9:7 |
| oak 24:1 | 52:11,23 | 97:18 98:2,3,3 | 45:13 51:9 | 15:12 |
| oath 61:15 63:11 | once 17:23 19:2 | 103:16,16 | 55:5,10,10,24 | plaintiff 1:4 2:5 |
| 106:4 | 19:24 32:8 | 106:2 | 60:3,6 78:6,8 | 90:24 96:10 |
| obgyn 21:17 | 69:3 | paid 11:5,6 | 79:12,16,24 | 101:15 105:5 |
| object 48:18 | ongoing 101:14 | 12:17 16:19 | 80:3,16 82:12 | plaintiffs 94:18 |
| 49:5 63:14 | online 13:1 | paragraph 79:3 | 87:8 91:7,11 | plan 3:10 70:21 |
| obtain 73:18 | opening 42:12 | 84:7,13,24 | 91:12 97:16 | 71:12 75:16 |
| obviously 88:14 | 44:8,9 | 85:5 89:1 | 102:7 | 77:19 |
| occasionally | operating 56:22 | 90:23 94:18 | peoples 47:23 | planned 40:18 |
| 53:17 | operation 56:9 | 96:8 101:11 | percent 9:1 72:9 | plaza 2:7 |
| ocean 13:21 | 102:7 | park 24:2 67:8 | percentage 6:8,9 | please 4:10 |
| 92:22 | operational | 99:18 | 74:16 | 45:11 69:14 |
| oclock 1:16 | 56:24 57:3,8 | part 16:18 23:17 | perfect 35:13,13 | 70:5,10,10 |
| offer 15:15,17 | 60:19 | 24:12 25:16 | 35:15 | 76:17 |
| 15:23 35:3 | operations | 32:5 | perform 52:1 | plus 10:9 16:11 |
| 37:8,11 40:4 | 51:24 52:4 | participate 12:7 | 57:1 99:1 | 43:7 |
| 40:12,23 41:9 | 54:4 | 12:10 | performance 3:9 | point 44:21 |
| 43:5 45:5 | opportunities | particular 22:10 | 3:10 70:1,3,21 | 72:23 |
| offered 37:7 | 44:4,13 91:8 | 23:12 25:3,21 | 71:2 72:4 | policies 103:17 |
| 38:6,9 40:1,9 | opportunity | 99:16 | 73:16 77:19 | 103:21 |
| offering 16:8 | 5:10 38:19 | parts 24:1 | 88:2,12 | policy 104:3 |
| 39:5 41:23 | 43:20 | party 64:15,18 | period 13:4 14:3 | popular 18:14 |
| 42:1 | optical 10:9 | 64:19 | 14:5,10 20:6 | portion 56:6 |
| office 2:2 7:8,16 | options 35:5 | passed 40:11 | 33:15 47:2,5 | position 12:19 |
| 34:17 52:12 | order 71:17 | passing 104:13 | person 21:8,23 | 39:6,13,16 |
| 57:19 92:11 | 104:16 | patricia 1:13 | 23:9 44:6,12 | 40:1 52:22,24 |
| offices 56:1 | organize 91:9 | 105:12 106:3 | 51:11 53:4 | 53:3 55:3 |
| 80:18 | original 54:3 | 106:14 | 55:2 66:14,16 | 66:18,21 76:20 |
| ogden 18:22 | outline 56:23 | patrick 100:21 | 87:1 93:16 | 81:9,12 87:21 |
| oh 38:11 83:7 | outrageous | patterson 26:8 | 94:4 | 88:9 92:21 |
| 84:9 | 98:11 99:5 | 28:24 29:4,8 | personal 49:2 | possible 8:13 |
| okay 5:5,6,17 | outside 23:2 | 29:15,19,24 | 57:16 89:13 | practice 47:2 |
| 8:17 22:5 27:9 | oversaw 51:6 | 30:6,7 | pertaining 1:12 | pray 18:16 |
| 28:17 55:21 | 56:14 79:22 | paula 18:5 19:12 | pharmacy 22:3 | precludes 26:24 |
| 56:13 59:11,16 | overseeing 55:18 | pay 6:9 10:24 | phone 60:4 | preferred 87:6 |
| 66:8 80:13 | oversight 54:22 | 16:8,15 18:1 | 102:19 | prescribe 19:13 |

prescribed 18:17
prescription 19:24 20:1,3
presence 61:1,19
present 2:11
presume 104:14
pretty 9:2 78:18
prior 21:14 46:6 61:10 92:23 94:18
priority 53:14 60:7
probably 9:17 15:3,4 20:3 36:16 43:15 57:14 66:17 77:8 80:20 104:14
procedure 1:11 56:22
procedures 103:18,21
proceedings 106:6,9
process 28:6
produced 97:15
products 13:16 13:18 35:4
professional 18:1 20:22
profit 9:1 35:1 83:22,23,24 84:6,16,17
profitsharing 41:13
program 11:9 41:11
project 75:5,6
promote 86:19 87:4
promoted 82:24 86:20,21,24 87:2,7,10,12 87:16,19 88:8

88:16,19
promotion 86:4
proposals 53:1
prospect 30:2
protect 101:12
provide 8:20
provided 14:15 14:18 44:23
public 105:24
pulaski 2:6
purolator 9:12 9:13,14,16 10:2,6,12,18 11:21 12:11 13:3 14:6
pursuant 1:9,10
put 31:1 51:23 53:1

**Q**
q1 73:18,23 74:1 74:17
quality 53:18
quarter 49:11 72:7,22 73:12
quarterly 46:19 69:8
quarters 10:13 10:14 71:10 72:23 73:9,13
question 5:16 8:19 11:22 25:19,20,24 26:4 28:13,13 28:19,20,21 29:12,21 48:19 54:3 59:7,11 59:12 60:9 75:18 76:8 80:9,11 83:1 95:11
questions 4:24 28:7,9 35:12 36:10 83:2 105:15

quit 10:21,22,23 25:7 80:5,6
quite 37:7
quitting 51:9
quota 46:7,13 46:20 47:3,11 48:2 71:17,24 72:9,19 73:3,4 73:6,11,13,18 73:24 74:16 83:21
quotas 46:15
quotes 81:13
quoting 55:11 81:10,22

**R**
r 9:14,14 22:10 23:2 24:20,20 77:4 94:4
rampup 47:1
ran 51:11
rapid 18:7
rate 59:1,4
rates 56:23 58:23
reach 73:24
read 18:15 90:15 90:19 104:14 105:10
reading 73:22
reads 71:1
ready 39:1,5
real 87:15
really 15:2 16:17 21:21 34:7,10 58:10 60:4 78:20 79:1 80:2,15 88:6 94:3 102:9
reason 101:10
reasonably 101:15
reasons 57:9
recall 29:3 33:5

38:24 40:16,19 60:18 61:14 63:3 78:14,16 78:19,21,24 83:15 99:17 102:14
receive 99:13
received 14:13
recognize 69:21 70:12 90:13
recollection 49:14
record 4:10 28:12,18
red 87:19
redhead 88:8
referring 96:17
reflected 14:12 58:15
regina 80:10 85:8,12,14,17 85:18
regional 74:14
regular 21:3,5 21:18
reject 40:13
related 17:20 21:2 41:8
relation 97:15
relationship 7:18 29:14,18 29:24 65:19
relevant 76:11
remain 34:21
remark 61:23 62:3,12,13
remarks 61:9,19 93:12,17,20
remember 7:13 15:2,14,22 18:10,23 19:18 22:12,12 31:12 31:13 33:21 34:13 37:1 38:13,14,22

39:20,22 40:15 41:1,3 42:24 43:17 47:6 48:8 49:13,17 51:21 58:12 60:23 61:6,16 61:24 62:7,19 62:20 63:7,19 69:24 70:1 80:9,11 81:21 81:21 92:20,21 93:15 94:11 95:16,17,21 96:24 99:20,24 100:2 103:15 103:24 104:7
remind 58:24
reorganization 35:20
rep 25:7 85:8,11
repeat 16:22
rephrase 28:17
report 48:4 49:4 49:4 75:9 84:15
reported 106:6
reporter 1:14 5:5 104:16,19 105:13 106:4
reporting 47:24
reports 47:19,23 48:6,10,16 69:8 97:14
represent 4:13
representative 22:10 62:9 72:18 75:15
representatives 73:3,11
represents 72:21
reprimand 99:9
reprimands 99:12
reps 36:7 65:21 75:20 89:2

MARY CAMPISE - 6/13/2019

Page 117

99:10
reputation 79:5 79:9
require 26:24
required 46:8 72:9 73:17
requires 26:18 27:7
reserved 104:15
reside 18:6
resigned 68:22 69:3
resources 22:23 35:22
respect 99:1
responsible 50:4 51:5 54:22 55:13,17 56:3 56:14 59:13
responsive 89:14 89:20,23
restaurant 62:22 64:3
restricted 45:21
result 74:6
retail 35:4
retain 76:4,9
retirement 11:18
revenue 49:10 72:8 75:3,7 83:22 84:15
review 70:2,11
reviewed 78:1,4
ridding 58:20
ride 57:20 58:7 58:14 59:8 75:16 90:2 91:12,12,13
rides 90:6
riding 57:18,23
right 4:20 12:23 13:5 20:2 30:8 30:9 33:20 34:19 36:17

37:20 50:10,17 53:6 55:15 60:13 63:10 64:7 65:9 72:24 73:22 76:8 82:21 83:1,17 84:2 84:14 85:6,7 85:21 90:17 93:4 98:2 101:9 102:13 104:4
righthand 53:4
road 1:15 2:3
rode 57:14 80:7 91:11
roselle 1:15 2:3
routine 21:12
rule 4:23
rules 1:10 4:19
run 51:13

**S**

s 3:6 24:20,20 50:1
sabotage 52:7 53:8
sad 78:23
saith 104:22
salary 6:10 10:7 10:8 11:13 43:9,12 46:19
sales 6:9 32:11 32:17,19 36:6 37:15,17 49:15 55:14 62:9 65:21 66:22 69:9 74:15 78:11,12 80:17 97:16
salesperson 45:15 97:7
salespersons 46:16 48:10
sara 25:7 30:17

62:4,7,9 68:1,8 68:19,21 69:2 69:6 95:9 96:4 100:5
saras 31:23 62:5 81:7
satisfied 54:14
saturday 52:16
saw 21:7 54:19 74:22
saying 78:16 98:24
says 62:2 71:9 72:17 73:16 96:8 101:11 106:4
schaumburg 1:15 2:4 34:2
school 18:3
score 35:13,13 35:15
second 26:2 28:16 59:6 70:14 71:9 74:4 79:3 84:22,24
secure 12:22
secured 47:21
see 19:1 42:12 58:22 71:4,13 71:14 72:5,10 72:17 73:4,20 74:9 97:23
seek 8:5
seeking 7:21
seen 8:17 20:21 69:23
seldom 53:10
selfemployed 6:2,3,6
sell 8:22 34:24 85:13,15,19
send 68:8
senior 32:18 71:3

seniority 31:17 31:19,20
sense 5:13 8:10
sent 14:14 84:8
sentence 71:1,9 71:13 72:17 74:5
sequence 8:14 72:19
serafini 24:18 81:4
serious 101:15
set 45:12 46:15 52:18 71:2 104:6
sets 46:1
seven 34:22
sex 62:17 63:13
sexcapades 61:2 61:10 62:15 63:1 91:21
sexist 61:9,13,23 62:2 63:12 91:17 92:5 93:12,17,20
sexual 94:12,15
share 30:22 83:24
shell 104:14
shes 17:7 18:1,2 66:17,22 85:21 89:10
shipment 6:21 47:20 50:23 55:4,8 75:8
shipments 35:23 54:7,9,15,20 54:21,23 55:6 55:11,12,14,24 57:6,7 60:12 60:13
shipping 47:17 54:12
shocked 77:12 77:17,17,20

short 36:10 38:2 66:7,9 104:11
shorthand 1:14 105:13 106:6,8
show 53:24 54:1 74:5,13 97:16
showed 47:19 89:2
showing 69:8 98:14,15
shown 96:9
shows 58:2,4
shut 36:1
sick 52:13
side 92:10,17
sign 7:8 16:5 76:2 104:14
signature 70:14 104:15
signed 6:17,23
similar 41:7
simultaneously 13:14
single 46:10
sir 104:20
sister 17:6,23 18:2 19:11,13 20:23
sisters 18:4
sitting 51:1
six 5:23 31:12 36:5 37:2 50:2 59:20 65:11,11 65:12,18 79:21 82:18,19 83:17
skill 45:12 46:1
skipping 22:7
sleep 17:9 20:8 20:10,16,22
small 34:3
smoking 101:22
socialize 66:2
software 48:9,17
sold 34:3,4 35:22

MARY CAMPISE - 6/13/2019

Page 118

somebody 23:15 28:2 29:5 49:4 67:20 77:8 93:23 100:17
somebodys 82:3
soon 31:10
sop 56:20,21
sorenson 51:15
sorry 70:8 95:10 98:3
sort 4:18 23:17 23:18 46:7 47:1
sounds 29:22
south 18:7 24:12 25:2 80:6
speak 85:21
specialist 36:6
specific 87:15
specifically 61:16 63:10,11 87:16 96:11 98:8 102:13 103:9
spell 9:13 24:19 49:24 85:22
spend 33:9
split 84:6,18
spoke 86:6,18 91:18
ss 106:1
st 32:4
staff 51:10
standard 56:22
stands 97:19
start 6:5 12:19 20:9,10 32:11 47:2
started 6:16,16 10:16 33:18 54:5 73:1
starting 32:22
starts 81:20
state 4:9 106:1
stated 72:15

86:5
statement 60:10 61:1 62:23 71:7,15 84:24 89:1
statements 63:4
states 1:1,11 105:1,15
station 39:20,21 39:22
stations 79:22 80:1,4
stay 33:14 37:13 40:7 41:4 68:22 69:4 96:22
stayed 36:17 37:2 91:14
stellar 79:4,8
steve 30:18 31:2 31:11 82:8,9 82:10 83:18 96:4,13,17,18 96:22
steves 31:15
stick 83:2
stint 33:2
stock 35:4
stopped 94:5,6
storage 54:20
stories 52:2
stream 23:24
strictly 26:23
structure 10:11 16:13
subject 22:8 23:11
subscribed 105:20
substantial 37:7
suburbs 23:19 23:21,22
succeed 52:5 54:5 56:11 60:21 85:3

success 91:2
successful 42:16 44:20 45:16 57:10 85:1 97:6,9,12
suffer 17:16 20:16,18 21:14
suffering 20:9 20:10
suggesting 89:4 89:19
suggests 72:18 73:2,10
suing 90:9
suit 16:20
suite 1:15 2:3,8 106:16
summer 6:17 7:1,2,3
supervised 80:16
support 17:12
suppose 52:10 58:22
supreme 34:20
sure 4:24 5:11 5:18 8:18 26:13 47:12,13 48:2 76:6,13 84:20 86:23 88:10 104:5,10
surprise 27:14 27:16
surprising 27:20
sustained 74:6 74:13
swear 102:4,19 103:8
swearing 102:3
swibco 49:23 50:18 59:19
swift 7:15
sworn 4:1,5 105:20 106:3
system 17:12

48:17
systems 78:17

_____
T
_____
t 3:6 9:14
table 91:8
take 4:16 11:10 11:11 15:19 17:17,22 18:9 19:16,19,23 20:19,19,23 25:10 35:16 36:10 40:21 66:7 69:13 70:5,9 80:21 104:8,10
taken 1:9,13 4:21 17:19 38:3 66:10 104:12 105:11 106:9
takes 6:20,20
talk 13:4 17:23 19:12 20:23 32:9 35:9 57:19 59:16 60:6 61:2 77:22 83:5 90:17
talked 17:7 20:7 26:2 39:3 42:8 43:19 61:10 86:17 92:1
talking 38:19 39:9 54:6 56:9 79:6 85:4 94:22 96:11
talks 72:3
tasting 64:17
team 36:7 41:12 66:23 79:16
tell 5:9 8:16 10:7 26:5 40:17 58:11 61:21,22 62:11 63:11

68:21 78:3 91:4,19,22
telling 88:17
tenure 82:19
term 26:19 64:1
terminated 10:21 20:14 53:21 74:23 79:17 96:19,20 97:2 100:10
termination 5:21 6:23 8:12 10:4 13:2 14:5 14:19 15:6 21:15 43:24 44:2 74:8 77:12,20,23 78:14 79:7 94:19
territories 23:14 24:5
territory 23:12 23:15,18 24:8 24:9,10,12 25:1 26:9 30:5 32:5 94:24 95:3,6,13,20 96:6
test 35:9
testified 4:5
testimony 48:1
texas 2:8 106:16
thank 12:5 19:4 21:13 98:3
thanks 36:14
thats 9:2 15:10 24:9,10 34:11 39:4 55:14 63:15 65:21 71:15 86:10,13 86:14,16 89:11 89:12 93:7 99:22
theirs 47:23
theres 18:24

MARY CAMPISE - 6/13/2019

28:20,21 90:22
theyre 10:16
 34:2 58:5
 101:22
theyve 31:21
thing 16:4,7
 28:10 55:14
 87:13
things 5:1,3
 19:22 24:4
 63:3 85:18
 92:11 94:5
 98:21 102:24
think 5:23 8:17
 24:23 25:11
 26:6,11,15
 28:5 30:14
 32:1 38:22,22
 39:10 46:1
 50:3 53:5,24
 55:9 58:2,4
 59:12,17 60:7
 60:16 64:13
 65:11 67:1
 74:17,24 79:20
 82:10 83:3
 94:9
third 72:7,17
 84:7,13 86:8
 88:24
thirdparty
 48:12
thorndale 34:19
thought 8:24
 25:4,21 26:6
 44:19 49:11
 77:24 88:20
 89:19
three 10:13,14
 13:10,18 14:9
 35:9 37:17,18
 54:2,11 59:3
 79:20 93:3
 100:1
threshold 10:14

46:7 73:7
throat 22:6
thumb 19:6
till 54:16
time 4:21 13:4
 14:5,10 18:16
 19:11,19 22:4
 29:10 30:9
 33:15 36:3
 37:11 38:1,8
 38:16 39:8,9
 40:11,11 41:10
 42:14 43:19
 44:21 46:3
 47:8 61:8,15
 64:9 65:20
 66:5 69:1 71:6
 79:17 81:2
 88:7,22 92:13
 96:18,21
timely 98:22
times 5:17 46:19
 54:11 57:15,23
 58:6 59:1
 63:18 90:5
 99:21
title 76:23
today 4:16 48:1
 78:4
told 29:5 40:6
 52:2 58:17
 60:11,21 62:7
 93:18
tom 83:3
top 30:10 36:6
 54:19 56:2
topey 30:21
total 84:16
totally 23:11
tour 54:18
track 10:6
tracking 48:9
tragic 79:15
trans 6:1,1,5,11
 6:15,24 7:7,21

8:8 9:3 13:7,8
 13:20
transcribed 5:3
transcript
 104:17 105:11
 105:14 106:8
travel 57:17
treated 88:18
 94:20
treating 21:6,22
treatment 19:5
truck 13:24
trucking 14:1
true 27:6 71:15
 89:11 101:18
 106:7
try 5:15 7:24
 8:13 19:22
 45:1 60:9
trying 8:4 60:3
 64:7
twice 38:6 68:21
 68:22
two 11:3 13:1
 25:12 33:8
 40:15 50:14,15
 54:1,2,10
 57:14 70:7
 73:9 74:22
 79:20 83:18
 85:18
typical 21:6,21
typically 69:19

**U**

u 9:14
uhhuh 5:3
uncomfortable
 61:4 91:24
 92:10,16 93:2
 93:4,9
understand 4:12
 21:13 26:4
 28:3 64:7
 76:24 77:2

86:23 92:14
 97:19
understanding
 5:9
understood
 46:22 65:24
 74:11
unemployed
 5:22
united 1:1,11
 105:1
unsuccessful
 44:23
ups 35:4,16
 36:16 65:17
use 22:21 69:18
usually 91:10,13
utilized 48:9

**V**

valuable 91:1
verbally 52:20
 89:24,24 94:9
viana 85:9,20
 86:12,24 87:20
villa 24:2 67:8
 99:18
visited 67:11
vp 27:12 50:10
vs 1:5 105:6

**W**

w 50:1
w2 8:6 10:3
w2s 14:18
wait 50:15
walgreens 25:9
 25:12 26:2,3
 26:15,18 27:6
 27:8,12,15,22
 28:11
walk 77:22 78:3
walked 79:11
want 5:11 8:10
 9:5 13:4 20:19

32:9 35:18
 45:1 50:15
 52:3 59:16
 79:13 87:15
 91:4,22 92:14
 104:19
wanted 9:3 24:9
 28:2 33:9 35:9
 61:8 75:20
warehouse
 50:24 51:1
 101:21
warrenville
 30:11,12
wasnt 18:14,15
 25:15 27:19,19
 43:2 48:4
 53:17,17 54:12
 89:16 91:20
 94:3
way 11:18 13:18
 28:6 29:21
 33:8 66:19
 86:18 91:2
week 17:24
 33:17 75:15,21
weekly 57:13
 74:15 75:11,11
 75:13
weeks 13:1
 19:18,19 40:15
 59:3
went 7:8 23:15
 30:22 34:10
 36:19 37:20
 52:13 58:22
 64:19 65:17
 84:5 91:1 94:4
 94:4 97:4
western 23:19
westmont 23:24
weve 25:12
weycer 2:6
whats 18:4
 24:17 41:18

MARY CAMPISE - 6/13/2019

51:11 57:16 66:18 92:19
**whelpley** 77:3
**whos** 55:13
**wilson** 18:5 19:12
**wisconsin** 68:11 68:12,13 89:3
**witness** 3:1 4:1,4 8:21 11:24 28:14 104:13
**woman** 24:11,15 51:16 52:6 80:5 88:18,18 98:23
**women** 53:16 82:5,11,18,19 83:17 89:20 98:15 100:8
**womens** 52:8,18 53:11 60:8
**won** 36:7
**wonderful** 5:19
**wont** 40:21
**work** 6:11 8:1 8:12 14:4 15:8 15:12 25:13 27:3,8,15,22 28:6 32:20 33:14 34:9,11 34:17 36:19 42:9,18 44:23 45:14 53:9,11 53:12,12,13,15 64:6 65:6,10 66:2,4 84:4 88:6 97:4 100:20
**worked** 13:8,8 14:3 22:11 23:13 33:17 34:18 37:15 42:15,20,21 64:5 65:7,8,18 68:4,12 81:2,8

81:22 91:14 92:17 96:21
**working** 8:5 13:6,12 15:13 22:9 26:24 29:11 32:11 44:18,19 47:11 49:11,16 71:21 77:16 80:21 93:5
**workplace** 91:17 93:18
**worry** 47:8
**wouldnt** 51:2 52:8,9,20 53:9 53:18 89:22
**write** 86:7
**writing** 48:5 51:23
**wrong** 31:3 41:22 42:1
**www** 106:17

--- **X** ---

**x** 3:1,6

--- **Y** ---

**yeah** 14:14 17:21 20:18 22:1 31:21 36:12 40:22 43:11 63:18,23 68:4 69:5,7 75:8 81:1 82:4 83:13,20 84:3 84:4,12 86:9 86:11,15,22 87:3 88:5 89:5 89:18 91:18 92:18 93:1,13 94:1 100:13 102:5,7,16 103:4
**year** 9:19 11:12 15:3,5 17:12

31:6,7,12 33:16,19,21,24 34:13 35:1,17 35:19 36:17,21 36:21 37:14 38:13,14,15,15 42:24 52:14 57:15 64:8,11 64:23 70:2,3 73:7
**years** 6:13 17:5 33:3 34:22 36:5 37:2 45:2 46:2,5 65:10 65:11,12,19 68:5 73:9
**yell** 52:12
**yelled** 53:10 80:8
**yep** 70:16
**yesterday** 21:8
**young** 81:7,22
**younger** 24:11 24:15 25:18 52:6 75:14 79:12 96:9 98:15
**youre** 5:19 10:18 27:21 48:1,15 98:24
**youve** 4:21 9:7 10:2 57:9 68:24 76:14 102:21

--- **Z** ---

**zuber** 2:6

--- **0** ---

**00** 1:16
**000** 10:8 11:14 14:11 16:10 37:9 47:19,20 75:5,6,7,8 84:15,17

**003** 72:8
**084002229** 106:15

--- **1** ---

**1** 1:5 3:9 69:12 69:13,15,16,17 69:21 105:6
**10** 47:19,20 75:8 84:15,17
**100** 16:10 41:5 75:5,6,7
**105** 37:12 106:16
**1099** 8:1 9:8
**1099s** 14:12
**11** 13:5
**11month** 14:2
**12** 11:6
**120** 37:9 43:16
**13** 1:16 33:3 105:13
**14** 90:23
**1400** 2:8
**16** 70:17,22
**18cv6534** 1:5 105:6
**19** 94:18
**1901** 1:14 2:3
**1958** 41:19
**1985** 32:13,22 33:2 45:1

--- **2** ---

**2** 3:10 70:6,9,12 90:22 97:22 98:2
**20** 68:5
**2000** 34:15
**2005** 35:18 36:16
**2006** 36:23
**2013** 38:16,20 39:9,13,16 40:2,24 41:9

41:23 42:2
**2014** 31:8 37:21 42:4,9 43:6,19 45:2,6 73:1
**2016** 15:4,7,18 15:22 24:23 64:12,19,20 70:2,3,17,23 72:7 92:2
**2017** 7:5 8:22 9:11 13:2 24:24,24 73:19 74:1,17 76:22
**2018** 9:11,20,24 10:19 13:3
**2019** 1:16 10:20 11:12 105:13 105:22
**20s** 81:8 82:14 82:15
**22** 33:13
**26** 33:13
**28** 33:13

--- **3** ---

**3** 3:11 41:19 76:17 84:11
**30** 9:1 17:5 20:4 45:2 46:2,5
**34** 96:8
**3saying** 85:10

--- **4** ---

**4** 3:3,12 90:11
**401** 11:20
**401k** 11:24 12:4 12:5,7,10 41:15
**42** 72:9

--- **5** ---

**50** 14:11 78:8
**5050** 84:18
**50s** 66:17 68:19 80:12,14 89:6 89:10

HANNA & HANNA, INC.
713.840.8484

MARY CAMPISE - 6/13/2019

Page 121

**51** 72:8

---
**6**
---
**6** 76:22 97:18
**60** 41:21
**60195** 2:4
**60s** 85:23
**62** 101:11
**6305603692** 2:4
**69** 3:9

---
**7**
---
**7** 98:2,3
**70** 3:10
**7135832442**
 106:17
**7138408484**
 106:17
**7139619045** 2:9
**76** 3:11
**77024** 106:16
**77046** 2:8

---
**8**
---
**8** 103:16
**80** 10:8 33:6
**800** 1:15 2:3
**8582** 106:16

---
**9**
---
**9** 1:16
**90** 3:12 26:19
 27:4,7 39:10
 39:11
**95** 39:10
**97** 11:14 41:2
 43:7
**98** 33:22
**99** 34.15



TO:      Mari Campise

FROM:   Kevin Colligan, RSD

CC:      Adam Miller-DOO ORD
            Human Resources File

DATE:   December 16, 2016

RE:      Performance Improvement Plan

Your performance does not meet the expectations set forth for a Senior Account Executive. After eight measurable quarters, you are not at a commissionable level of financial attainment per CEVA's Business Development plan. Therefore, you are being placed on a performance improvement plan. Immediate and sustained improvement must be demonstrated with the results from Q1/2017 Quarterly Sales Commission Results and in your overall performance.

Effective immediately you must:

*GR and NR Generation Improvement*

Performance Deficiencies:

Mari's 2016 3rd QTR quarter of measurable revenue generation was $51,003, or, 42% of required quota ($121,250). This represents the 6th measurable quarter. Company guidance suggests representatives be at quota by the end the 4th measurable quarter.

Performance Improvement Action Required: Mari will need to obtain full quota attainment by end of Q1 2017.

ADMINISTRATIVE RESPONSIBILITIES:

MTA Adherence:

Performance Improvement Action Required:

All MTA activity will be reviewed weekly. These entries will be discussed to help assist driving additional revenues. This will be reviewed by the RSD weekly.

MAINTAIN ACCEPTED PIPELINE ACTIVITY AND STANDARDS

Performance Deficiencies: Per new CPEOPLE guidelines, each team member should carry a minimum 15 opportunities within the pipeline. This is in conjunction of supporting a 30% hit rate. Mari currently as 13 opportunities indicating $1,900,000 GR.

*Performance Improvement Action Required: Increase number of active pipeline opportunities required to meet obtaining quota attainment.*

EXHIBIT

2

PENGAD 800-631-6989

CEVA_01_000071

You will discuss with the Regional Sales Director weekly to review the progress of your performance. Immediate and sustained improvement must be demonstrated by the end of Q1/2017 in these areas and in your overall performance. Failure to show immediate and sustained improvement will result in disciplinary action up to and including termination of your employment with CEVA.

Your signature indicates the contents of this document have been discussed with you, and you further understand the expectations that have been set forth for continued employment.

_Mari Campise_                    _12/16/16_
Mari Campise                       Date

_Kevin Colligan_                   _12/16/16_
Kevin Colligan                     Date

**CEVA_01_000072**