KEVIN COLLIGAN - 6/13/2019

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

MARY CAMPISE,                  )
                               )
          Plaintiff,           )
                               )
   vs.                         )   No. 1:18-cv-6534
                               )
CEVA LOGISTICS, LLC,           )
                               )
          Defendant.           )

The deposition of KEVIN COLLIGAN, called by the Plaintiff for examination taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Patricia A. Mache, a Certified Shorthand Reporter and Notary, at 1901 North Roselle Road, Suite 800, Schaumburg, Illinois, on June 13, 2019, at the hour of 12:20 o'clock p.m.

HANNA & HANNA, INC.
713.840.8484

EXHIBIT C

KEVIN COLLIGAN - 6/13/2019

Page 2

APPEARANCES:

        LAW FIRM OF ANDRE GASTON
        MR. ANDRE GASTON
        1901 North Roselle Road
        Suite 800
        Schaumburg, Illinois   60181
        630-560-3692

            On behalf of the Plaintiff;

        WEYCER KAPLAN PULASKI & ZUBER PC
        MR. MARK LEVINE
        Eleven Greenway Plaza
        Suite 1400
        Houston, Texas   77046
        713-961-9045

            On behalf of the Defendant.

ALSO PRESENT:

  Mary Campise

KEVIN COLLIGAN - 6/13/2019

Page 3

I N D E X

WITNESS                                        PAGE

KEVIN COLLIGAN

    Examination by MR. GASTON                    4

E X H I B I T S

EXHIBIT            DESCRIPTION              PAGE

Exhibit 1    Performance Management          48

Exhibit 2    Performance Improvement Plan    51

HANNA & HANNA, INC.
713.840.8484

Case: 1:18-cv-06534 Document #: 19-4 Filed: 08/23/19 Page 4 of 65 PageID #:200

(Witness sworn.)

WHEREUPON:

KEVIN COLLIGAN,

called as a witness herein, having been first

duly sworn, was examined and testified as

follows:

EXAMINATION

BY MR. GASTON:

Q.    So I was looking, it's good afternoon,

and I'm going to just get you to state your name

for the record and spell it.

A.    Name, full name, sir?

Q.    Yes.

A.    Kevin, K E V I N, middle name is James,

J A M E S, last name is Colligan,

C O L L I G A N.

Q.    And as you know, my name is Andre

Gaston.   I'm the attorney for Mary Campise and I

represent her in a claim against Ceva Logistics.

You've probably been deposed before,

but as you know I'll ask you questions.   The

court reporter will transcribe those questions.

That means type down my questions and your

answers.

KEVIN COLLIGAN - 6/13/2019

And you understand that, correct?

A.   Yes.

Q.   And you understand that your answers will be given under oath subject to the penalties of perjury the same as if you were testifying in court.

You understand that?

A.   Yes, sir.

Q.   And your testimony may e used later in this proceeding at the trial as evidence.

You understand that?

A.   Yes, sir.

Q.   And if you don't understand one of my questions in whole or in part, please tell me and I will explain to you or rephrase the question.

If you answer my question without asking for clarification, I will take that to mean that you understood it, correct?

A.   Yes, sir.

Q.   If at any time you do not hear one of my questions in whole or in part, for some reason you become distracted, please tell me and I will repeat the question.  If you answer my

KEVIN COLLIGAN - 6/13/2019

Page 6

question without me, without asking me to repeat it, I will take that to mean that you heard it clearly.

Do you understand?

A.    Yes, sir.

Q.    May be times today that in the middle of one of my questions you may feel that you know what I'm going to say.  Just wait and allow me to finish my entire question for the benefit of the court reporter.

Will you do that for me?

A.    Yes, sir.

Q.    And likewise if at any time today I start to ask you a question and you were not finished with your answer to the last question, please tell me and I will allow you to finish.

If you permit me to move on to another question, I will take that to mean that you have answered that question in its entirety.

Do you understand that?

A.    Yes, sir.

Q.    Your testimony today is based on your own personal knowledge.  If you do not know the answer to one of my questions, please tell me

KEVIN COLLIGAN - 6/13/2019

Page 7

that you don't know.  Your testimony is not to be based on speculation or conjecture.

Do you understand that?

A.   Yes, sir.

Q.   And from time to time, Mr. Colligan, your attorney may object to the form of one of my questions.  Please give your attorney an opportunity to make that objection before you answer.

Once that objection has been made unless your attorney instructs you otherwise, you can then answer my question.

Do you understand that?

A.   Yes, sir.

Q.   If you need to take a break during the deposition, please let me know.

Are there any mental or physical conditions that you suffer from today that would prevent you from giving accurate and truthful answers to my questions?

A.   No, sir.

Q.   Have you been prescribed any medications?

A.   No, sir.

KEVIN COLLIGAN - 6/13/2019

Q.    Are you taking any medications today?

A.    No, sir.

Q.    And no medications or any other substance that would prevent you from answering these questions truthfully?

A.    No, sir.

Q.    Keep in mind that the court reporter is recording words.  Similar to what your attorney told my client, refrain from head nodding or uh-uh, nonverbal.  Words responsive will be appropriate, okay?

A.    Yes, sir.

Q.    And I think you stated off the record that you're married, is that correct?

A.    Yes, sir.

Q.    And how long have you been married?

A.    17 years in July.

Q.    And have you discussed this case or the deposition with your wife?

A.    I have, yes.

Q.    And when you discussed that, when you discussed the deposition with your wife, what did you talk about?

MR. LEVINE:  I've got to object to that.  Do

you not have a spousal privilege here in Illinois?

MR. GASTON: I don't know that you have -- you know what, I'll pass.

MR. LEVINE: Yeah, in Texas that's a big no no.

MR. GASTON: I don't think that we have spousal privilege in Illinois with respect to these depositions, but I'll pass on that.

MR. LEVINE: Okay, thank you.

MR. GASTON: Move that on.

BY MR. GASTON:

Q. Have you had any discussions other than with your attorney with anyone else about this deposition?

A. Yes, sir.

Q. And were those co-workers?

A. Wife and prior to this a couple of co-workers.

Q. And did you -- and was that when you were made aware that Ms. Campise was bringing a lawsuit against the company?

A. Yes, sir.

Q. What is your highest level of

KEVIN COLLIGAN - 6/13/2019

education?

A. Bachelor's of science.

Q. And where did you get that degree from?

A. Indiana University.

Q. Was that in Bloomington?

A. Bloomington.

Q. Go Hoosiers.

A. Yes, sir.

Q. Law school.

A. Did you go there?

Q. Yep, yep.

And so have you attended any other colleges or vocational schools?

A. No, sir.

Q. Have you received any certifications in human resources?

A. No, sir.

Q. As part of your employment with Ceva Logistics have you ever received any certifications as it relates to the Age Discrimination and Employment Act?

A. It is posted and available.

Q. So is your answer no?

A. Repeat the question, please.

KEVIN COLLIGAN - 6/13/2019

Q.    Have you ever received a certification in a course that relates to the American Age Discrimination and Employment Act?

A.    There is training available.

Q.    But you've never received a certification?

A.    No, no, sir, sorry.

Q.    And have you ever received a certification -- well, let me ask you this: Have you ever done any training that relates to gender discrimination while you've been employed at Ceva Logistics?

A.    Yes, sir.

Q.    And who provided those trainings?

A.    Ceva Logistics.

Q.    And did Ceva Logistics have -- was it someone within your company?

A.    It was computer-based web-based training.

Q.    And is that just kind of like a questionnaire?

A.    It's a slide deck that reviews the intent and then you do a questionnaire afterwards and your certificate is produced.

KEVIN COLLIGAN - 6/13/2019

Q.   And is that training, is that done along with other trainings or is that simply a separate training?

A.   It's separate training.

Q.   But you've never taken any classes or anything like that?

A.   Not a formal class, no.

Q.   And this is a little bit -- have you ever been charged with a crime?

A.   No, sir.

Q.   And are you currently employed at Ceva?

A.   Yes, sir.

Q.   How long have you been there?

A.   With Ceva eight years and six months.

Q.   And before you worked at Ceva where did you work?

A.   A company by the name of Mainfreight.

Q.   And where is that?

A.   That is in Elk Grove Village at the time of employment.

Q.   And how long did you work there?

A.   14 months.

Q.   Why did you leave there?

A.   Promotion, bigger opportunity to lead

KEVIN COLLIGAN - 6/13/2019

and run a team.

Q. And that opportunity was at Ceva?

A. Yes, sir.

Q. So you left Mainfreight in order to go to Ceva?

A. Yes, sir.

Q. And prior to Mainfreight where did you work before then?

A. A company by the name of EA Logistics.

Q. And where are they?

A. They are in, I believe, Wood Dale.

Q. And how long had you worked there?

A. 11 months I believe.

Q. And what was the reason that you left EA Logistics?

A. I was terminated from EA Logistics.

Q. What was the basis for that termination?

A. Performance.

Q. And when you were at EA Logistics, what was your title?

A. I was the sales manager.

Q. And as a sales manager were you responsible for sales?

KEVIN COLLIGAN - 6/13/2019

A.    I was, yes, sir.

Q.    And were you responsible for supervising a team there?

A.    Yes, sir.

Q.    And so the team of people that you supervised, the sales team, did their performance impact your job stability?

Let me ask you it a different way.

A.    Go ahead, sorry.

Q.    If your team underperformed, would that place your job in jeopardy?

A.    Yes, sir.

Q.    And so were you compensated based on commission as well?

A.    No, sir.

Q.    So it was straight salary?

A.    Straight salary, yes, sir.

Q.    How much was that salary?

A.    125,000.

Q.    So when you were at EA Logistics, were you ever placed on a performance improvement plan?

A.    No, sir.

Q.    So at the time that you were terminated

KEVIN COLLIGAN - 6/13/2019

from EA Logistics, were you just called in the office and terminated on the same day?

A.     Yes, sir.

Q.     You weren't given any warning?

A.     Yes, sir.

Q.     But you knew that you were underperforming?

A.     No, sir.

Q.     No.   Did EA Logistics have a metric by which they were measuring your performance?

A.     No, sir.

Q.     How did they make that determination that you were underperforming?

A.     I'm not quite sure how they drew that conclusion.

Q.     So when you were hired at Ceva, just kind of moving forward, you said that was a promotion.  And what was your job title at the time that you were hired?

A.     At Ceva, sir?

Q.     Yes, sir.

A.     Regional sales manager.

Q.     And as the regional sales manager, have you remained in that same position the entire

time that you've been at Ceva?

A. I was promoted two years ago. I would say it's the same function but larger title to regional sales director.

Q. And is there any substantive difference between regional sales manager and regional sales director?

A. Only financially under the current definition.

Q. But you still essentially do the same job?

A. Yes, sir.

Q. And as a regional sales director you oversee a team of sales people?

A. Yes, sir.

Q. And is this the same, same team that Mari Campise was on during the time she was employed there?

A. Yes, sir. There were changes in the stations I managed because we were restructured. If you are speaking specifically to Chicago absolutely, yes, sir.

Q. And how many people do you -- how many people do you oversee?

KEVIN COLLIGAN - 6/13/2019

A.    Active currently or budgeted?

Q.    Let's say at the time Mary Campise was there.

A.    I would say approximately, it would fluctuate, of course, 15 to 20.  To clarify, the largest was around 25 at one point in time.

Q.    Okay.  Thank you.  And I think -- and it's true that you met Mary Campise when you guys were employed at another place, correct?

A.    At Eagle Global Logistics is the first time I met Mari.  We started the same day.

Q.    And when you worked at Eagle Global Logistics, what was your title there?

A.    I was an account executive field sales.

Q.    And you testified that Mari, you and Mari were hired on the same day?

A.    Yes, sir.

Q.    So I just want to -- when you were at Ceva when Mari came on, you were the person who was personally responsible for bringing her in, correct?

A.    While I was at Eagle or at Ceva?

Q.    No, while you were at Ceva, when she came to join Cea.

KEVIN COLLIGAN - 6/13/2019

A.   Yes, sir, I recruited her.

Q.   Do you remember how you came into contact with Mari regarding that opportunity?

A.   It was -- so it was reference that one of the -- Sara who has been referenced in the deposition today, had referred to me that Mari might be interested in exploring other options.

Q.   And so did she reach out to you or did you reach out to her?

A.   So to clarify, on the first time where she retracted her employment, I believe I reached out to her.  And the second time as she notated she reached out to me.

Q.   So in that first time that you reached out to Mari, you reached out to her with respect to the opportunity of a sales position for her?

A.   Yes, sir.

Q.   And did you do your due diligence on her before reaching out to her?

A.   Yes, sir.

Q.   And who did you talk to her about her prior to you reaching out to her?

A.   So her friends who are my friends and former employees of mine.  Sara Marconi was the

KEVIN COLLIGAN - 6/13/2019

primary one, she was the one that was kind of communicating between us.

Q.   And so prior to that, prior to you reaching out to her about that opportunity, you felt like it would be beneficial if she was hired on at Ceva, correct?

A.   Yes, sir.

Q.   Because otherwise it would not have been an incentive for you to offer her a position?

A.   Yes, sir, that is correct.

Q.   And you felt like in giving her an opportunity, that she would be able to meet whatever goals Ceva had?

A.   Yes, sir.

Q.   And you didn't have any reason to believe she wouldn't meet those expectations?

A.   Yes, sir.

Q.   You testified that you are now the regional sales director.  I want to understand a little bit about the hierarchy at Ceva.

So I understand that the team is below you, but who is above you?  Who do you answer to?

KEVIN COLLIGAN - 6/13/2019

A.    So I answer to the senior vice president of business development for North America.

Q.    And what's his name?

A.    Steve Walter.

Q.    How long has Steve been -- Mr. Walter been SVP?

A.    Eight months I believe.

Q.    And how long has -- do you know how long he has been at the company?

A.    Eight months.  So he is a returning employee so eight months on his return.

Q.    And what's the physical address of Ceva?

A.    The Houston address?

Q.    Where do you work?

A.    I work on 1717 Busse Drive in Elk Grove Village.

Q.    How many people work in that office?

A.    It fluctuates due to temp labor, but I would say on average full time about 175.

Q.    And out of those 175 people that work in there, there are warehouse workers too?

A.    Yes, sir.

KEVIN COLLIGAN - 6/13/2019

Q.    How many warehouse workers do you think are there?

A.    I would approximate 50 to 70.  Sorry, it's a wide range.

Q.    So we say 50 to 70, and that would mean anywhere from 125 to -- 100 to 125 other people that are working in some capacity?

A.    Seems high to me.

Q.    Roughly --

A.    Yes.

Q.    -- somewhere about that.

So you work in an office building where there are actually offices?

A.    Yes, sir.

Q.    And are there people who work in cubicles there?

A.    Yes, sir.

Q.    But you work in an office?

A.    I do, yes.

Q.    With the ability to be able to close a door?

A.    With a window.

Q.    With a window.  And so is that door -- is that door, is that wooden door or is it a

KEVIN COLLIGAN - 6/13/2019

glass door?

A.    Wood door with the glass in the middle.

Q.    Okay.

A.    That you can see in.

Q.    And does Ceva have an H.R. department onsite at your work location?

A.    Yes, sir.

Q.    And who works in the H.R. department?

A.    Specific to Mari's time of employment or currently now?

Q.    At Mari's time.

A.    Jen Whepley was the HR manager.

Q.    And how many other people worked in H.R.?

A.    Jen's supervisor, Andrew Altschul, A L T S C H U L, I believe.

Q.    And who else?

A.    That is it that I'm aware.

Q.    So two people --

A.    Yes, sir.

Q.    -- comprise the H.R. department.  So Jen Wehpley, and what's her title?

A.    I believe she was an H.R. manager.

Q.    But the corporate office for Ceva is in

KEVIN COLLIGAN - 6/13/2019

Houston?

A.   Yes, sir.   Global headquarters are now in Marseille, France.

Q.   And Steve Walter, the SVP of business development, who does he report to?

A.   He reports to the managing director of North America.

Q.   Who is that?

A.   Jerome Lorraine.   Lorraine is L O R R A I N E.

Q.   And is Mr. Lorraine, does he work in your physical location?

A.   No, sir, he works out of Houston.

Q.   So you described your job duties as overseeing a team of sales people and it's my understanding that you would communicate with your various employees about sales and their territories, correct?

A.   Yes, sir.

Q.   And how much territory did your team cover?  Was it only in Illinois or was it regional?

A.   So expand on that, it's by station coverage.   So each station has a certain number

KEVIN COLLIGAN - 6/13/2019

of zip codes that they manage.

For example, in Chicago for all intents of this conversation, it's about two-thirds of Illinois, about three-quarters of Wisconsin, and about three-quarters of the Iowa markets would be the territory in general.

Q.   And so in your position overseeing this team, you're responsible for driving sales with the team, correct?

A.   One of my core responsibilities, yes.

Q.   In driving sales with the team, the overall performance of the team reflects on your job, correct?

A.   Yes, sir.

Q.   And so if the team performed poorly, that may result in some negative review as it relates to your position, correct?

A.   Yes, sir.

Q.   Because Ceva doesn't want to have a regional sales director who has a team that's underperforming, correct?

A.   Yes, sir.

Q.   So in your position, are you -- do you receive an incentive if the team exceeds a

KEVIN COLLIGAN - 6/13/2019

certain sales goal?

A.    Sales teams and at the time of Mari's employment it was primarily based on station performance.  There was a secondary income based on team performance.

Q.    So there is some incentive for performance by that team?

A.    Yes, sir.

Q.    And so it's fair to say that you have an incentive to make sure that the reps are selling at a high level, correct?

A.    Yes, sir.

Q.    And how do you achieve that?

A.    So it all starts with market plans, getting organized, identifying accounts that the reps can go into, and then managing and pushing resources to these reps when they bring them to the table, subject matter experts, brokerage experts, et cetera.

Introducing training from the subject matter experts to help round them out, to help them in the selling process.  Obviously supporting on sales calls when available among other.

KEVIN COLLIGAN - 6/13/2019

Page 26

Q.   And it's my understanding that based on this team that you have that you would meet with the sales representatives on a one-on-one basis, correct?

A.   Inconsistent.  We would be a team. Sometimes it was a team meeting and sometimes it was one-on-one, again based on availability in the market.

Q.   What would be a reason for you to meet with a sales representative on a one-on-one basis?

A.   Talk about a specific account potentially.

Q.   Would you ever meet with a sales representative on a one-on-one basis if they were having problems with their numbers?

A.   Yes, we do reviews every -- quarterly. So whether there was a problem or not, there was a quarterly review done on performance of every rep.

Q.   So in between those quarterly reviews, on occasion you might meet with another sales representative for any reason?

A.   Yes.

KEVIN COLLIGAN - 6/13/2019

Q. And in your position, it's your -- let me ask you this: On occasion you will ride along with one of the members of the sales team?

A. Correct.

Q. Correct?

A. Yes.

Q. And why do you do that?

A. Typically when I ride I've been asked to go on the ride.

Q. Have you on any occasion ever suggested that you needed to ride with one of the employees or do they ask you every time?

A. I probably have been asked 75 percent. 25 percent -- 25 percent of the time it may be my request based on a specific account they are typically calling on.

Q. So it's your testimony today that you have stated to a sales representative that you needed to ride with them on a route, correct?

A. Occasionally, yes.

Q. And I think you testified that roughly it would be about 25 percent of the time, correct?

A. Yes.

KEVIN COLLIGAN - 6/13/2019

Q. And so does Ceva have a written policy with respect to when you decide to ride along with an employee?

A. No, sir.

Q. Whose policy is that? Who authorizes -- who authorizes you to ride along with an employee?

A. That is at my discretion.

Q. But that's not written in the handbook or there's no Ceva policy that allows you to do it, it's just within your discretion to be able to do it?

A. Yes, sir.

Q. And prior to the time that you worked there, did the person -- did the regional sales manager ride along with some of the other employees?

A. Yes.

Q. Are you aware of that?

A. Yes, sir, I did.

Q. And so because there's no written policy there is no formula on who you ride with or when you ride with that person, correct?

A. That is correct, yes.

KEVIN COLLIGAN - 6/13/2019

Q. So you kind of pick and choose whenever you decide?

A. Yes, sir.

Q. And you can pick and choose who you want to ride with?

A. Yes, sir.

Q. And it doesn't matter whether it's a male or female, correct?

A. Yes, sir.

Q. And so within your sole discretion you could ride along with a male 75 percent of the time and a female 25 percent of the time?

A. Yes, sir.

Q. Because it's entirely up to you?

A. My discretion, yes.

Q. So if you preferred to ride with males more than females, you could do that because that's within your discretion, yes or no?

A. Yes.

Q. And it was also your responsibility, or is your responsibility, to assign the members of your sales team to certain accounts, correct?

A. At my discretion, yes.

Q. At your discretion. And so there's no

KEVIN COLLIGAN - 6/13/2019

written policy by Ceva stating who should be assigned to a certain account?

A.    There is not.

Q.    And so that's within your sole discretion, correct?

A.    Yes.

Q.    So you could assign -- conceivably you could assign accounts, let's call them empty accounts, right.  So let's say if an account needs to have a salesperson assigned to it, within your discretion you could assign 20 straight accounts to males before you assign an account to a female, correct?

A.    There would be an opportunity, yes.

Q.    Yes, because it's within your discretion to do so?

A.    That is correct, yes.

Q.    You don't have a formula for doing that, do you?

A.    I have a logic.

MR. LEVINE:  Objection.  Form.

BY MR. GASTON:

Q.    Do you have a policy by which you subscribe in terms of who you give accounts to?

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

Page 31

A.   Performance.

Q.   Is that the only -- is that the only --

A.   No, but it's the core decisionmaking that I will apply; skill set obviously.

Q.   How many employees have you reached out to -- how many employees have you recruited since you've been working at Ceva?

A.   One moment.  Let me think through it.

Q.   Just approximately.

A.   Probably recruited in the eight and a half years, probably 20, 20 to 25.

Q.   And out of those 20 to 25 people that you recruited, how many actually came to Ceva?

A.   How many -- I'm sorry.  That's how many I've hired.

Q.   So you've hired 20 to 25 people?

A.   Yes, sir.

Q.   Out of those 25 people that you've hired, did you do your due diligence on all of them?

A.   For the most part, yeah.

MR. LEVINE:  Objection.  Form.

BY MR. GASTON:

Q.   You can answer.

KEVIN COLLIGAN - 6/13/2019

A.    Yes.

Q.    So when you hired these people, you felt that they were capable of performing, correct?

A.    Yes, sir.

Q.    Of these people, of these 20 to 25 people that you hired, were they all salespeople?

A.    Yes, sir.

Q.    Okay.

A.    No, correction.  Five members were inside sales.  So more administrative back office versus outside.

Q.    So based on the information that you had at that time, you felt comfortable in hiring these people, correct?

A.    Yes, sir.

Q.    Were any of these people that you hired, were any of them personal friends?

A.    Mari Campise --

Q.    And when you say --

A.    -- I would consider -- so maybe professional that blended into personal as she stated.

KEVIN COLLIGAN - 6/13/2019

Q.    Did you ever -- have you ever gone to Mari's house and had dinner?

A.    No, sir.

Q.    Has she ever gone to your house and had dinner?

A.    No, sir.

Q.    You along with your wife, have you guys ever had dinner with she and her spouse?

A.    No, sir.

Q.    Have you ever communicated with her on cellphone regarding any personal issue outside of work?

A.    Not that I can recall, no, sir.

Q.    So your relationship with Mari Campise at best could probably be described as friendly rooted in your professional dealings, correct?

A.    Yes.

Q.    She wasn't invited over to a baby shower, anything like that?

A.    Not that I'm aware of or remember.

Q.    So because you don't have a formula and it's within your sole discretion to give accounts to whomever you choose, have you ever -- have you ever looked at -- have you ever

KEVIN COLLIGAN - 6/13/2019

looked at the data to see whether you were giving more accounts to men compared to women?

A.   No, sir.

Q.   It's never been important, correct?

A.   It's not considered.

MR. LEVINE:  Objection.  Form.

THE WITNESS:  To answer the question, I put the account into the individual I feel has the best position to close the business to drive the performance for the organization.

BY MR. GASTON:

Q.   So you've never evaluated -- you've never given it any thought that you would give more accounts to men compared to women, correct?

A.   Basically strictly what I just said based on performance.

Q.   So it's not -- so you said that it's based on performance.  If you had one male -- if you had one person who outperformed another, when would a person -- when would the least performing person ever get assigned an account?

A.   Usually it's based on the complexity and size.  So if it's something that is smaller that I feel that individual can manage, I

KEVIN COLLIGAN - 6/13/2019

certainly would use opportunities for that to happen.

Q.   And how would you determine whether a person had the capacity to manage an account?

A.   So couple things.  Two core ones is their current performance and how they've been performing over the years.

The second one would be their skill set.  Because we play in such a large portfolio of services, there's a lot of different skill sets the team brings to the table.  So if an account is specifically domestic orientated, I had reps that were more comfortable selling domestic that I would apply maybe domestically to that individual and vice versa on the international.

Q.   But it's fair to say that if there's a person who is the least performing person and you base assigning these accounts based on performance, that person is going to be at the bottom of the hierarchy in terms of getting assigned accounts, correct?

A.   Not necessarily.

Q.   Then explain to me how the least

KEVIN COLLIGAN - 6/13/2019

performing person would get an account.

A. Just to reiterate what I just said, so because you're not performing up to your quota doesn't mean that you're demonstrating the skill set to get to that performance. So if I make a determination that this particular rep has got the proper book, is showing, demonstrating the skill set, I will assign it to them.

Q. But if you had ten really complex accounts, right, it's not likely that you would assign one of those ten complex accounts to the person who is at the bottom in terms of performing?

A. Not necessarily.

Q. So how would you -- so tell me how you would assign a complex --

A. Geography would start a lot of it. So I don't do territories. So I have applied territories.

So I have a rep in Wisconsin, Kim McCloud that's been brought up. So if I have something in Wisconsin, by default Kim would receive the lead because she's the only individual that's living up in that territory

KEVIN COLLIGAN - 6/13/2019

that I can typically give proper coverage to.

If it is in the Chicagoland location and if it's a complex import opportunity, Ben and Joe would probably lead point as they've demonstrated they can leverage those opportunities and drive the best performance for the organization.

If it's down south, as Mari mentioned she lives central here, I would have an opportunity to give that to Mari as well.

So geography does play a part, but it's not the only piece of it as well.

Q.   So if Mari had an area that she covered, and I think she testified to the western suburbs being her area, in what case would you assign an account in her area or her territory to someone else?

A.   So I don't do territories.  So there isn't a decision based on -- geographically, yes, if it's in Oak Brook and it's something I felt like she would manage, I would assign it to her.  But I want to say that there wasn't a lot of opportunities to assign accounts.

Q.   But there may have been other

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

opportunities in other areas to assign?

A. And she had free opportunity to call on those locations as well. She was not restricted to a territory.

Q. In your position, you're a pretty important person in that organization, correct? Is that fair to say?

A. Depends who you ask but yes.

Q. I'm asking you. You're pretty important, right? I mean you're responsible for driving sales and sales morph into revenue, correct?

A. Yes, sir.

Q. And if you don't drive those sales, then you're not being productive, the company probably has little use for you, correct?

A. I would say that's my core function.

Q. And so in driving those sales it's entirely possible that you could assign a disproportionate number of accounts to males compared to females without any intent, correct?

A. Yes.

Q. Because you're never looking at whether or not you're assigning males more accounts than

KEVIN COLLIGAN - 6/13/2019

females, correct?

A.   No.

Q.   So you could be discriminating against females based on assignment of the accounts without even knowing?

MR. LEVINE:  Objection.  Form.

THE WITNESS:  No, sir.

BY MR. GASTON:

Q.   Did you ever consult with anyone before you assigned an account to anyone on your team?

A.   Rarely; it's not necessary for me to do that.

Q.   And that goes the same for placing a person in a certain geographic area, correct? That's entirely up to you?

A.   Yeah.  So to clarify, every rep is on the level playing field of territories.  There are none.  So there isn't a placement into -- there's an implied region I would like them to work in, but they are under no governance to stay within that region.

Q.   I want to go back to your position just a little bit.  I said this because I mean it, I know that you're an important person in the

KEVIN COLLIGAN - 6/13/2019

Page 40

organization and those people who work -- your subordinates, they depend on you for guidance, correct?

A.   Yes.

Q.   And you would consider yourself a subject matter expert with respect to sales, correct?

A.   Yes.

Q.   And you would consider yourself a subject matter expert with respect to your profession, correct?

A.   Yes.

Q.   And so it is entirely possible that your assignment of accounts to certain individuals could make or break their careers, correct?

A.   No, no, sir.

Q.   So it's your testimony today that your assignment of accounts has no bearing on the outcome of a person's performance?

A.   Not as it pertains to Mari, no.

Q.   Well, I'm not asking about Mari. I'm asking about anyone.

A.   Yes, that could happen.

KEVIN COLLIGAN - 6/13/2019

Q.   So it's entirely possible that you could have a male employee that you would feel can handle complex accounts and you could assign that person five complex accounts that they close on and that person could meet their numbers, correct?

A.   That is sales, yes.

Q.   But it's also entirely possible that while you assign those accounts to that male and you don't assign them to the female, that that female could fail in her role because she didn't get those accounts, correct?

A.   No.  I don't follow that, the logic, I'm sorry.

Q.   If there is a male employee that you assign five complex accounts to, you've testified that that could result in that person being successful?

A.   Every individual has --

Q.   I'm not asking about every individual. I'm only asking about the one individual that you would assign these accounts to.

A.   I don't have one individual I would assign them to.

KEVIN COLLIGAN - 6/13/2019

Q.   But you don't have a science as far as how you assign the accounts either, correct?

A.   I have logic I apply to it with the individuals on the team.

Q.   And that logic ultimately is within your sole discretion, correct?

A.   Yes, for the most part yes.

Q.   Because there's no policy with Ceva about how you assign accounts, correct?

A.   Correct.

Q.   And there's no policy with Ceva on how you assign territories, correct?

A.   Correct.

Q.   Because within your sole discretion you can assign accounts to whomever you want to, correct?

A.   Correct.

Q.   And you can assign a person to a certain geographic area because that's within your sole discretion too?

A.   I could choose to; I do not.

Q.   Right, but you could?

A.   Yes.

Q.   I want to talk a little bit about some

KEVIN COLLIGAN - 6/13/2019

of your sales reps. Are you familiar with an individual Ben Vaughn?

A. Yes, sir.

Q. How do you know Mr. Vaughn?

A. Ben and I worked together with Mari as field sales reps at Eagle.

Q. Did you recruit Ben, did you recruit Mr. Vaughn to Ceva?

A. No, sir. He was part of an acquisition so he joined our team.

Q. And do you have a friendship with Ben outside of work?

A. I do, yes.

Q. Have you guys ever employed golf together?

A. Yes.

Q. How often do you guys play golf?

A. I haven't played golf with Ben in over ten years outside of a workplace environment.

Q. How do you guys socialize outside of work?

A. Very rarely.

Q. But you've communicated with Ben via cellphone?

Case: 1:18-cv-06534 Document #: 19-4 Filed: 08/23/19 Page 44 of 65 PageID #:240

A.    Yes.

Q.    But you guys have socialized outside of work, correct?

A.    Yes.  I have socialized outside of work with every employee.

Q.    And how about Joe Stupak?

A.    Yes.

Q.    How do you know Joe?

A.    I recruited him.

Q.    Where did you recruit Joe from?

A.    He was unemployed at the time.  I was recruiting him at a previous competitor.  He got accepted to the FBI and politely declined and he no-go'd his FBI training and decided to leave the academy and get back into civilian life. And he called me up from a prior recruitment period.

Q.    And you guys have a friendship outside of work?

A.    I would not consider it a personal friendship.

Q.    Have you ever communicated with him on his cellphone?

A.    I communicate with all my reps on

cellphone.

Q. Yeah, but I don't mean for business purposes. Have you ever -- let me ask more specifically.

Have you ever communicated with Joe on his cellphone for personal purposes?

A. Exercise.

Q. So that's a -- is that a yes?

A. We were holding each other accountable to exercise.

Q. That's a good partner. How about Steve McGuigan?

A. Steve, I recruited, yes, out of MBA school at Western Michigan.

Q. And you guys are friends outside of work, correct?

A. I haven't communicated with Steve maybe twice since he left.

Q. And how long has he been gone?

A. 2014, I believe.

Q. And how about can you give me the names, other than Mari Campise, can you give me the names of the female representatives that were on your team at the time that she worked

KEVIN COLLIGAN - 6/13/2019

there?

A.    In my whole region or just strictly Chicago?

Q.    Strictly Chicago.

A.    Lori Serafini, Kim McCloud, and Sara Marconi.  I also have the inside sales team.  I had a supervisor in between me and the team so I don't know how we want to interpret that.  There were females within that team as well.

Q.    And so Sara Marconi, do you remember when Sara Marconi left Ceva?

A.    Yes, I do.

Q.    And why did she leave Ceva?

A.    We had made changes to our commission structure that were impacting her financially which played a big role in this.  I think she had some frustrations with the organization. This was her third resignation as well I might note.

Q.    Are you aware that Sara Marconi contacted my office?

A.    I received paperwork for the intent.

Q.    Are you aware that she made allegations that she was being discriminated against based

on gender?

A.    Only after I saw the letter.

Q.    So you're aware she also made allegations that she was being discriminated against based on age as well?  Are you aware of that?

A.    When I received the letter is when I became aware.

Q.    I think you testified -- well, you may have testified before, but you testified that you had computer-based training on age discrimination, correct?

A.    It's part of the larger H.R.

Q.    If you recruit a person to join the sales team at Ceva, does someone else have to approve that hiring?

A.    Yes, sir.

Q.    Who else has to approve?

A.    My boss has to approve it, Steve Walter.

Q.    And what does he do in his process to approve that hiring?

A.    He approves a form with my justification for hire based on skill set, et

KEVIN COLLIGAN - 6/13/2019

cetera, referrals.  The vice president of operations -- you want me to continue with Steve or --

Q.    No.

A.    -- continue?  The vice president of operations for the region approves it.  At that time it was Max.  Bernaldo.  And then if I deem necessary they typically interview with the station manager in the particular station they're working out of.

Q.    Mr. Colligan, I'm going to hand you what your attorney introduced and marked as Exhibit 1.

And you recognize this document, don't you?

A.    Yes.  This is our --

Q.    And can you state for the record what this document is?

A.    Performance management document for Mari -- for Mary.

Q.    And I want you to turn to page 3 which would be the last page of this document.  Do you see at the bottom in the last box it has signature?

KEVIN COLLIGAN - 6/13/2019

Page 49

A. Yes, sir.

Q. Did you see a signature in that box?

A. No, sir.

Q. Whose signature is suppose to be in that box?

A. That is my signature, the direct supervisor.

Q. And why didn't you sign this document?

A. It's not an e-commerce signature; it's approved through the web, web-based.

Q. And this document, who generates this document?

A. This is a corporate-wide document that every employee goes through.

Q. So you don't know who generates the document?

A. H.R. creates the document I'm sure.

Q. But you don't know who individually --

A. No, sir.

Q. -- completes this document?

A. Who individually -- I'm sorry?

Q. You don't know what individual would have completed this document?

A. As far as the actual wording inside

KEVIN COLLIGAN - 6/13/2019

here?

Q.   Sure.

A.   That would have been me.

Q.   And once you complete this document, where does it go?

A.   Goes to H.R. and it's domiciled within H.R..

Q.   And once it goes to H.R., then where does it go after that?

A.   It's typically held -- it's reviewed by my boss.  So we use these as staff rankings for your -- it's not approached -- this has no connectivity to performance to threshold.  This is used more as a developmental tool.

Q.   So it's your testimony that you input data in this document?

A.   Yes, and it's shared with Mari for a response and I guess rebuttal for lack of a better word.

Q.   So do you have -- are you aware of any document that has Mari's signature on it that she ever received this document?

A.   No, but there is a return.  She has to click on it to demonstrate she reviewed it, had

KEVIN COLLIGAN - 6/13/2019

Page 51

access to it and returned it. So it's all electronic.

Q. So were you able to review -- were you able to review some portal or on the computer that she actually clicked the return?

A. Yes. If not I get alerts from H.R. that it hasn't been completed.

Q. Okay. But you don't remember the exact date?

A. No, sir.

Q. I'm going to hand you what your attorney introduced as Exhibit 2. And you recognize that document, don't you?

A. I'm sure I do, yes.

Q. And this the performance improvement plan that Mari was placed on, correct?

A. Yes, sir.

Q. You authored this document, correct?

A. Yes, sir, and reviewed by H.R.

Q. And in this document the company noted performance deficiencies, correct?

A. Yes, sir.

Q. And the first performance deficiency that was noted was that Mari only reached

KEVIN COLLIGAN - 6/13/2019

42 percent of the required quota, correct?

A.   Yes, at the end of third quarter 2016.

Q.   And you're aware that Mari has testified that certain accounts were given to males, correct?

A.   I'm sorry?

Q.   You're aware that Mrs. Campise is alleging that you engaged in preferential treatment and gave accounts to men over females, correct?

A.   They were given to females and males.

Q.   But I'm just saying that you're aware she's making these allegations --

A.   Yes, I'm aware.

Q.   -- correct?

And if these allegations are true and men were given more accounts than females, assuming that men were given more accounts than females, it's entirely possible that that would have affected her ability to be able to reach her goals, correct?

A.   No.

MR. LEVINE:  Objection.  Form.

KEVIN COLLIGAN - 6/13/2019

BY MR. GASTON:

Q. Have you ever sent any e-mail to any employee or anyone else regarding the performance of Mary Campise?

A. Not that I'm aware of, no.

Q. Did you send any e-mails regarding -- in connection with Mary Campise filing a lawsuit in this matter?

A. No.

Q. Did you ever make a telephone call to anyone regarding Mary Campise filing a lawsuit in this matter?

MR. LEVINE: Other than counsel.

BY MR. GASTON:

Q. Other than counsel.

A. Yes, prior to the letter.

MR. LEVINE: But also to counsel.

MR. GASTON: But also to counsel.

BY MR. GASTON:

Q. At any time during your employment as an adult have you ever been accused of sexual harassment?

A. Never.

Q. At any time have you and any other male

KEVIN COLLIGAN - 6/13/2019

Page 54

employees ever made jokes that were incentive toward women?

A.    No.

Q.    Did you ever make any statements about the music that you used prior to the time that you were being married?

A.    Yes.

Q.    And you did that at Ceva?

A.    Yes.

Q.    Did you do that at any other place where you worked?

A.    I'm sure I did.

MR. GASTON:  That's all I have.

MR. LEVINE:  Okay.  Thanks for your time. Read and sign.

THE COURT REPORTER:  Did you want to order the transcript, sir?

MR. GASTON:  Yeah, I'll order it.

THE COURT REPORTER:  Copy?

MR. LEVINE:  Yeah.

            FURTHER DEPONENT SAITH NOT.

KEVIN COLLIGAN - 6/13/2019

Page 55

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

CHICAGO DIVISION

MARY CAMPISE,                    )

     Plaintiff,                 )

  vs.                            ) No. 1:18-cv-6534

CEVA LOGISTICS, LLC,             )

     Defendant.                 )


   This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Patricia A. Mache, Certified Shorthand Reporter, on June 13, 2019, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.


_____

          KEVIN COLLIGAN

SUBSCRIBED AND SWORN TO

before me this _____ day

of _____ 2019.

_____

Notary Public


HANNA & HANNA, INC.
713.840.8484

STATE OF ILLINOIS          )
                           )   SS:
COUNTY OF DU PAGE          )


   I Patricia A. Mache, being first duly sworn, on oath says that she is a court reporter doing business in the City of Chicago; and that she reported in shorthand the proceedings of said hearing, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said hearing.

_____
Patricia A. Mache, CSR
LIC. NO. 084-002229
Hanna & Hanna, Inc.

8582 Katy Freeway, Suite 105

Houston, Texas 77024

713-840-8484 - 713-583-2442

www.hannareporting.com

KEVIN COLLIGAN - 6/13/2019

**A**

ability 21:20 52:20
able 19:13 21:20 28:11 51:3,4 52:20
above-entitled 55:12
absolutely 16:22
academy 44:15
accepted 44:13
access 51:1
account 17:14 26:12 27:15 30:2,9,13 34:8 34:21 35:4,12 36:1 37:16 39:10
accountable 45:9
accounts 25:15 29:22 30:8,9 30:12,24 33:23 34:2,14 35:19 35:22 36:10,11 37:23 38:20,24 39:4 40:14,19 41:3,4,9,12,16 41:22 42:2,9 42:15 52:4,9 52:17,18
accurate 7:19
accurately 55:14
accused 53:21
achieve 25:13
acquisition 43:9
Act 10:21 11:3
Active 17:1
actual 49:24
address 20:13 20:15
administrative 32:12
adult 53:21
aforesaid 56:11

afternoon 4:9
age 10:20 11:2 47:5,11
ago 16:2
ahead 14:9
alerts 51:6
allegations 46:23 47:4 52:13,16
alleging 52:8
allow 6:8,16
allows 28:10
Altschul 22:15
America 20:3 23:7
American 11:2
Andre 2:2,2 4:17
Andrew 22:15
answer 5:17,24 6:15,24 7:9,12 10:23 19:23 20:1 31:24 34:7
answered 6:19
answering 8:4
answers 4:24 5:3 7:20 55:15
appear 55:16
APPEARAN... 2:1
applied 36:18
apply 31:4 35:14 42:3
approached 50:12
appropriate 8:11
approve 47:16 47:18,19,22
approved 49:10
approves 47:23 48:6
approximate 21:3

approximately 17:4 31:9
area 37:13,15,16 39:14 42:19
areas 38:1
asked 27:8,13 55:15
asking 5:18 6:1 38:9 40:22,23 41:20,21
assign 29:21 30:7,8,11,12 36:8,11,16 37:16,21,23 38:1,19 41:3,9 41:10,16,22,24 42:2,9,12,15 42:18
assigned 30:2,10 34:21 35:22 39:10
assigning 35:19 38:24
assignment 39:4 40:14,19
assuming 52:18
attended 10:12
attorney 4:18 7:6,7,11 8:8 9:14 48:12 51:12
authored 51:18
authorizes 28:6 28:6
availability 26:7
available 10:22 11:4 25:23
average 20:21
aware 9:21 22:18 28:19 33:20 46:20,23 47:3,5,8 50:20 52:3,7,12,14 53:5

**B**

B 3:7
baby 33:18
Bachelor's 10:2
back 32:12 39:22 44:15
base 35:19
based 6:22 7:2 14:13 25:3,4 26:1,7 27:15 32:14 34:16,18 34:22 35:19 37:19 39:4 46:24 47:5,24
Basically 34:15
basis 13:17 26:3 26:11,15
bearing 40:19
behalf 2:5,10
believe 13:11,13 18:11 19:17 20:8 22:16,23 45:20
Ben 37:3 43:2,5 43:7,11,18,23
beneficial 19:5
benefit 6:9
Bernaldo 48:7
best 33:15 34:9 37:6
better 50:19
big 9:5 46:16
bigger 12:24
bit 12:8 19:21 39:23 42:24
blended 32:23
Bloomington 10:5,6
book 36:7
boss 47:19 50:11
bottom 35:21 36:12 48:23
box 48:23 49:2,5
break 7:15 40:15

bring 25:17
bringing 9:21 17:20
brings 35:11
brokerage 25:18
Brook 37:20
brought 36:21
budgeted 17:1
building 21:12
business 20:2 23:4 34:9 45:2 56:7
Busse 20:17

**C**

C 4:16 22:16
call 30:8 38:2 53:10
called 1:9 4:4 15:1 44:16
calling 27:16
calls 25:23
Campise 1:3 2:12 4:18 9:21 16:17 17:2,8 32:20 33:14 45:22 52:7 53:4,7,11 55:4
capable 32:3
capacity 21:7 35:4
careers 40:15
case 8:18 37:15
cause 55:12
Cea 17:24
cellphone 33:11 43:24 44:23 45:1,6
central 37:9
certain 23:24 25:1 29:22 30:2 39:14 40:14 42:19 52:4
certainly 35:1

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

certificate 11:24
certification 11:1,6,9
certifications 10:15,20
Certified 1:14 55:13
certify 55:10
cetera 25:19 48:1
Ceva 1:6 4:19 10:18 11:12,15 11:16 12:11,14 12:15 13:2,5 15:16,20 16:1 17:19,22,23 19:6,14,21 20:14 22:5,24 24:19 28:1,10 30:1 31:7,13 42:8,11 43:8 46:11,13 47:15 54:8 55:7
changes 16:19 46:14
charged 12:9
Chicago 1:2 16:21 24:2 46:3,4 55:3 56:7
Chicagoland 37:2
choose 29:1,4 33:23 42:21
City 56:7
Civil 1:12
civilian 44:15
claim 4:19
clarification 5:18
clarify 17:5 18:10 39:16
class 12:7
classes 12:5
clearly 6:3

click 50:24
clicked 51:5
client 8:9
close 21:20 34:9 41:5
co-workers 9:17 9:19
codes 24:1
colleges 10:13
Colligan 1:9 3:3 4:3,15 7:5 48:11 55:19
comfortable 32:15 35:13
commission 14:14 46:14
communicate 23:16 44:24
communicated 33:10 43:23 44:22 45:5,17
communicating 19:2
company 9:22 11:17 12:17 13:9 20:10 38:15 51:20
compared 34:2 34:14 38:21
compensated 14:13
competitor 44:12
complete 50:4
completed 49:23 51:7
completes 49:20
complex 36:9,11 36:16 37:3 41:3,4,16
complexity 34:22
comprise 22:21
computer 51:4
computer-based

11.18 47:11
conceivably 30:7
conclusion 15:15
conditions 7:18
conjecture 7:2
connection 53:7
connectivity 50:13
consider 32:22 40:5,9 44:20
considered 34:5
consult 39:9
contact 18:3
contacted 46:21
contains 56:11
continue 48:2,5
conversation 24:3
Copy 54:19
core 24:10 31:3 35:5 38:17
corporate 22:24
corporate-wide 49:13
correct 5:1,19 8:14 17:9,21 19:6,11 23:18 24:9,13,17,21 25:11 26:4 27:4,5,19,23 28:23,24 29:8 29:22 30:5,13 30:17 32:4,16 33:16 34:4,14 35:22 38:6,12 38:16,21 39:1 39:14 40:3,7 40:11,16 41:6 41:12 42:2,6,9 42:10,12,13,16 42:17 44:3 45:16 47:12 51:16,18,21

52:1,5,10,15 52:21 56:10
correction 32:11
counsel 53:13,15 53:17,18
COUNTY 56:3
couple 9:18 35:5
course 11:2 17:5
court 1:1 4:22 5:6 6:10 8:7 54:16,19 55:1 56:6
Courts 1:13
cover 23:21
coverage 23:24 37:1
covered 37:14
creates 49:17
crime 12:9
CSR 56:17
cubicles 21:16
current 16:8 35:6
currently 12:11 17:1 22:10

— D —

D 3:1
Dale 13:11
data 34:1 50:16
date 51:9
day 15:2 17:11 17:16 55:21
dealings 33:16
decide 28:2 29:2
decided 44:14
decision 37:19
decisionmaking 31:3
deck 11:22
declined 44:13
deem 48:7
default 36:22
Defendant 1:7 2:10 55:8

deficiencies 51:21
deficiency 51:23
definition 16:9
degree 10:3
demonstrate 50:24
demonstrated 37:5
demonstrating 36:4,7
department 22:5,8,21
depend 40:2
Depends 38:8
DEPONENT 54:21
deposed 4:20
deposition 1:9 7:16 8:19,22 9:15 18:6 55:11
depositions 1:13 9:9
described 23:14 33:15
DESCRIPTI... 3:8
determination 15:12 36:6
determine 35:3
development 20:2 23:5
developmental 50:14
difference 16:5
different 14:8 35:10
diligence 18:18 31:19
dinner 33:2,5,8
direct 49:6
director 16:4,7 16:13 19:20 23:6 24:20

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

discretion 28:8 28:11 29:10,15 29:18,23,24 30:5,11,16 33:22 42:6,14 42:20
discriminated 46:24 47:4
discriminating 39:3
discrimination 10:21 11:3,11 47:12
discussed 8:18 8:21,22
discussions 9:13
disproportion... 38:20
distracted 5:23
District 1:1,2,12 55:1,2
DIVISION 1:2 55:3
document 48:14 48:18,19,22 49:8,11,12,13 49:16,17,20,23 50:4,16,21,22 51:13,18,20
doing 30:18 56:6
domestic 35:12 35:14
domestically 35:14
domiciled 50:6
door 21:21,23 21:24,24 22:1 22:2
drew 15:14
drive 20:17 34:9 37:6 38:14
driving 24:8,11 38:11,18
DU 56:3
due 18:18 20:20

31:19
duly 4:5 56:5
duties 23:14

**E**
e 3:1,7 4:14,15 5:9 23:10
e-commerce 49:9
e-mail 53:2
e-mails 53:6
EA 13:9,15,16 13:20 14:20 15:1,9
Eagle 17:10,12 17:22 43:6
education 10:1
eight 12:14 20:8 20:11,12 31:10
either 42:2
electronic 51:2
Eleven 2:7
Elk 12:19 20:17
employed 11:11 12:11 16:18 17:9 43:14
employee 20:12 28:3,7 41:2,15 44:5 49:14 53:3
employees 18:24 23:17 27:12 28:17 31:5,6 54:1
employment 10:18,21 11:3 12:20 18:11 22:9 25:3 53:20
empty 30:8
engaged 52:8
entire 6:9 15:24
entirely 29:14 38:19 39:15 40:13 41:1,8

52:19
entirety 6:19
environment 43:19
essentially 16:10
et 25:19 47:24
evaluated 34:12
evidence 5:10
exact 51:8
examination 1:10 3:4 4:7
examined 4:5
example 24:2
exceeds 24:24
executive 17:14
exercise 45:7,10
Exhibit 3:8,9,10 48:13 51:12
expand 23:23
expectations 19:17
expert 40:6,10
experts 25:18,19 25:21
explain 5:15 35:24
exploring 18:7

**F**
fail 41:11
fair 25:9 35:17 38:7
familiar 43:1
far 42:1 49:24
FBI 44:13,14
Federal 1:11
feel 6:7 34:8,24 41:2
felt 19:5,12 32:3 32:15 37:21
female 29:8,12 30:13 41:10,11 45:23
females 29:17 38:21 39:1,4

46:9 52:9,11 52:17,19
field 17:14 39:17 43:6
filing 53:7,11
financially 16:8 46:15
finish 6:9,16
finished 6:15
FIRM 2:2
first 4:4 17:10 18:10,14 51:23 56:5
five 32:11 41:4 41:16
fluctuate 17:5
fluctuates 20:20
follow 41:13
follows 4:6
foregoing 55:14 56:9
form 7:6 30:21 31:22 34:6 39:6 47:23 52:23
formal 12:7
former 18:24
formula 28:22 30:18 33:21
forward 15:17
France 23:3
free 38:2
Freeway 56:19
friendly 33:15
friends 18:23,23 32:19 45:15
friendship 43:11 44:18,21
frustrations 46:17
full 4:12 20:21
function 16:3 38:17
FURTHER 54:21

**G**
G 4:16
Gaston 2:2,2 3:4 4:8,18 9:3,7,11 9:12 30:22 31:23 34:11 39:8 53:1,14 53:18,19 54:13 54:18
gender 11:11 47:1
general 24:6
generates 49:11 49:15
geographic 39:14 42:19
geographically 37:19
geography 36:17 37:11
getting 25:15 35:21
give 7:7 30:24 33:22 34:13 37:1,10 45:21 45:22
given 5:4 15:4 34:13 52:4,11 52:17,18 55:15 56:12
giving 7:19 19:12 34:2
glass 22:1,2
Global 17:10,12 23:2
go 10:7,10 13:4 14:9 25:16 27:9 39:22 50:5,9
goal 25:1
goals 19:14 52:21
goes 39:13 49:14 50:6,8
going 4:10 6:8

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

35:20 48:11
51:11
golf 43:14,17,18
good 4:9 45:11
governance
39:20
Greenway 2:7
Grove 12:19
20:17
guess 50:18
guidance 40:2
guys 17:9 33:7
43:14,17,20
44:2,18 45:15

**H**

H 3:7 22:16
H.R 22:5,8,14
22:21,23 47:13
49:17 50:6,7,8
51:6,19
half 31:11
hand 48:11
51:11
handbook 28:9
handle 41:3
Hanna 56:18,18
happen 35:2
40:24
harassment
53:22
head 8:9
headquarters
23:2
hear 5:21
heard 6:2
hearing 56:9,12
held 50:10
help 25:21,21
hierarchy 19:21
35:21
high 21:8 25:11
highest 9:24
hire 47:24
hired 15:16,19

17:16 19:6
31:15,16,19
32:2,7,19
hiring 32:15
47:16,22
holding 45:9
Hoosiers 10:7
hour 1:17
house 33:2,4
Houston 2:8
20:15 23:1,13
56:20
HR 22:12
human 10:16

**I**

identifying
25:15
Illinois 1:2,16
2:4 9:2,8 23:21
24:4 55:2 56:1
impact 14:7
impacting 46:15
implied 39:19
import 37:3
important 34:4
38:6,10 39:24
improvement
3:10 14:21
51:15
incentive 19:9
24:24 25:6,10
54:1
income 25:4
Inconsistent
26:5
Indiana 10:4
individual 34:8
34:24 35:15
36:24 41:19,20
41:21,23 43:2
49:22
individually
49:18,21
individuals

40:15 42:4
information
32:14
input 50:15
inside 32:12
46:6 49:24
instructs 7:11
intent 11:23
38:21 46:22
intents 24:2
interested 18:7
international
35:16
interpret 46:8
interview 48:8
introduced
48:12 51:12
Introducing
25:20
invited 33:18
Iowa 24:5
issue 33:11

**J**

J 4:15
James 4:14
Jen 22:12,22
Jen's 22:15
jeopardy 14:11
Jerome 23:9
job 14:7,11
15:18 16:11
23:14 24:13
Joe 37:4 44:6,8
44:10 45:5
join 17:24 47:14
joined 43:10
jokes 54:1
July 8:17
June 1:17 55:13
justification
47:24

**K**

K 4:14

KAPLAN 2:6
Katy 56:19
Keep 8:7
Kevin 1:9 3:3
4:3,14 55:19
Kim 36:20,22
46:5
kind 11:20
15:17 19:1
29:1
knew 15:6
know 4:17,21
6:8,23 7:1,16
9:3,4 20:9
39.24 43:4
44:8 46:8
49:15,18,22
knowing 39:5
knowledge 6:23

**L**

L 4:16,16 22:16
22:16 23:10
labor 20:20
lack 50:18
large 35:9
larger 16:3
47:13
largest 17:6
Law 2:2 10:9
lawsuit 9:22
53:7,11
lead 12:24 36:23
37:4
leave 12:23
44:14 46.13
left 13:4,14
45:18 46:11
let's 17:2 30:8,9
letter 47:2,7
53:16
level 9:24 25:11
39:17
leverage 37:5
LEVINE 2:7

8:24 9:5,10
30:21 31:22
34:6 39:6
52:23 53:13,17
54:14,20
LIC 56:17
life 44:15
likewise 6:13
little 12:8 19:21
38:16 39:23
42:24
lives 37:9
living 36:24
LLC 1:6 55:7
location 22:6
23:12 37:2
locations 38:3
logic 30:20
41:13 42:3,5
Logistics 1:6
4:19 10:19
11:12,15,16
13:9,15,16,20
14:20 15:1,9
17:10,13 55:7
long 8:16 12:13
12:21 13:12
20:6,9,10
45:19
looked 33:24
34:1
looking 4:9
38:23
Lori 46:5
Lorraine 23:9,9
23:11
lot 35:10 36:17
37:22

**M**

M 4:15
Mache 1:14
55:12 56:5,17
Mainfreight
12:17 13:4,7

KEVIN COLLIGAN - 6/13/2019

making 52:13
male 29:8,11
  34:18 41:2,9
  41:15 53:24
males 29:16
  30:12 38:20,24
  52:5,11
manage 24:1
  34:24 35:4
  37:21
managed 16:20
management
  3:9 48:19
manager 13:22
  13:23 15:22,23
  16:6 22:12,23
  28:16 48:9
managing 23:6
  25:16
Marconi 18:24
  46:6,10,11,20
Mari 16:17
  17:11,15,16,19
  18:3,6,15
  32:20 33:14
  37:8,10,13
  40:21,22 43:5
  45:22 48:20
  50:17 51:16,24
  52:3
Mari's 22:9,11
  25:2 33:2
  50:21
MARK 2:7
marked 48:12
market 25:14
  26:8
markets 24:5
married 8:14,16
  54:6
Marseille 23:3
Mary 1:3 2:12
  4:18 17:2,8
  48:20 53:4,7
  53:11 55:4

matter 25:18,21
  29:7 40:6,10
  53:8,12
Max 48:7
MBA 45:13
McCloud 36:21
  46:5
McGuigan
  45:12
mean 5:19 6:2
  6:18 21:5 36:4
  38:10 39:23
  45:2
means 4:23
measuring
  15:10
medications
  7:23 8:1,3
meet 19:13,17
  26:2,9,14,22
  41:5
meeting 26:6
members 27:3
  29:21 32:11
men 34:2,14
  52:9,17,18
mental 7:17
mentioned 37:8
met 17:8,11
metric 15:9
Michigan 45:14
middle 4:14 6:6
  22:2
mind 8:7
mine 18:24
moment 31:8
months 12:14,22
  13:13 20:8,11
  20:12
morph 38:11
move 6:17 9:11
moving 15:17
music 54:5

————— N —————

N 3:1 4:14,16
  23:10
name 4:10,12,12
  4:14,15,17
  12:17 13:9
  20:4
names 45:22,23
necessarily
  35:23 36:14
necessary 39:11
  48:8
need 7:15
needed 27:11,19
needs 30:10
negative 24:16
never 11:5 12:5
  34:4,12,13
  38:23 53:23
no-go'd 44:14
nodding 8:9
nonverbal 8:10
North 1:15 2:3
  20:2 23:7
NORTHERN
  1:2 55:2
Notary 1:15
  55:24
notated 18:13
note 46:19
noted 51:20,24
notes 56:10
notice 1:11
number 23:24
  38:20
numbers 26:16
  41:6

————— O —————

O 4:16 23:10
o'clock 1:17
Oak 37:20
oath 5:4 56:6
object 7:6 8:24
objection 7:8,10
  30:21 31:22

34:6 39:6
  52:23
obviously 25:22
  31:4
occasion 26:22
  27:2,10
Occasionally
  27:20
offer 19:9
office 15:2 20:19
  21:12,18 22:24
  32:13 46:21
offices 21:13
okay 8:11 9:10
  17:7 22:3
  32:10 51:8
  54:14
once 7:10 50:4,8
one-on-one 26:3
  26:7,10,15
ones 35:5
onsite 22:6
operations 48:2
  48:6
opportunities
  35:1 37:6,23
  38:1
opportunity 7:8
  12:24 13:2
  18:3,16 19:4
  19:13 30:14
  37:3,10 38:2
options 18:7
order 13:4 54:16
  54:18
organization
  34:10 37:7
  38:6 40:1
  46:17
organized 25:15
orientated 35:12
outcome 40:20
outperformed
  34:19
outside 32:13

33:11 43:12,19
  43:20 44:2,4
  44:18 45:15
overall 24:12
oversee 16:14,24
overseeing
  23:15 24:7

— —     P     —

p.m 1:18
page 3:2,8 48:21
  48:22 56:3
paperwork
  46:22
part 5:14,22
  10:18 31:21
  37:11 42:7
  43:9 47:13
particular 36:6
  48:9
partner 45:11
pass 9:4,9
Patricia 1:14
  55:12 56:5,17
PC 2:6
penalties 5:5
people 14:5
  16:14,23,24
  20:19,22 21:6
  21:15 22:13,19
  23:15 31:12,16
  31:18 32:2,6,7
  32:16,18 40:1
percent 27:13
  27:14,14,22
  29:11,12 52:1
performance
  3:9,10 13:19
  14:7,21 15:10
  24:12 25:4,5,7
  26:19 31:1
  34:10,16,18
  35:6,20 36:5
  37:6 40:20
  48:19 50:13

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

51:15,21,23
53:4
**performed**
24:15
**performing** 32:3
34:21 35:7,18
36:1,3,13
**period** 44:17
**perjury** 5:5
**permit** 6:17
**person** 17:19
28:15,23 34:19
34:20,21 35:4
35:18,18,20
36:1,12 38:6
39:14,24 41:4
41:5,17 42:18
47:14
**person's** 40:20
**personal** 6:23
32:19,23 33:11
44:20 45:6
**personally** 17:20
**pertaining** 1:13
**pertains** 40:21
**physical** 7:17
20:13 23:12
**pick** 29:1,4
**piece** 37:12
**place** 14:11 17:9
54:10
**placed** 14:21
51:16
**placement** 39:18
**placing** 39:13
**Plaintiff** 1:4,10
2:5 55:5
**plan** 3:10 14:22
51:16
**plans** 25:14
**play** 35:9 37:11
43:17
**played** 43:18
46:16
**playing** 39:17

**Plaza** 2:7
**please** 5:14,23
6:16,24 7:7,16
10:24
**point** 17:6 37:4
**policy** 28:1,5,10
28:22 30:1,23
42:8,11
**politely** 44:13
**poorly** 24:15
**portal** 51:4
**portfolio** 35:9
**position** 15:24
18:16 19:10
24:7,17,23
27:1 34:9 38:5
39:22
**possible** 38:19
40:13 41:1,8
52:19
**posted** 10:22
**potentially**
26:13
**preferential**
52:8
**preferred** 29:16
**prescribed** 7:22
**PRESENT** 2:11
**president** 20:2
48:1,5
**pretty** 38:5,9
**prevent** 7:19 8:4
**previous** 44:12
**primarily** 25:3
**primary** 19:1
**prior** 9:18 13:7
18:22 19:3,3
28:14 44:16
53:16 54:5
**privilege** 9:1,8
**probably** 4:20
27:13 31:10,11
33:15 37:4
38:16
**problem** 26:18

**problems** 26:16
**Procedure** 1:12
**proceeding** 5:10
**proceedings**
56:8,11
**process** 25:22
47:21
**produced** 11:24
**productive**
38:15
**profession** 40:11
**professional**
32:23 33:16
**promoted** 16:2
**promotion**
12:24 15:18
**proper** 36:7
37:1
**provided** 11:14
**Public** 55:24
**PULASKI** 2:6
**purposes** 45:3,6
**pursuant** 1:10
1:11
**pushing** 25:16
**put** 34:7

___ **Q** ___
**quarter** 52:2
**quarterly** 26:17
26:19,21
**question** 5:16,17
5:24 6:1,9,14
6:15,18,19
7:12 10:24
34:7
**questionnaire**
11:21,23
**questions** 4:21
4:22,23 5:14
5:22 6:7,24 7:7
7:20 8:5 55:15
**quite** 15:14
**quota** 36:3 52:1

___ **R** ___
**R** 23:10,10
**range** 21:4
**rankings** 50:11
**rarely** 39:11
43:22
**reach** 18:8,9
52:20
**reached** 18:12
18:13,14,15
31:5 51:24
**reaching** 18:19
18:22 19:4
**read** 54:15
55:10
**really** 36:9
**reason** 5:23
13:14 19:16
26:9,23
**rebuttal** 50:18
**recall** 33:13
**receive** 24:24
36:23
**received** 10:15
10:19 11:1,5,8
46:22 47:7
50:22
**recognize** 48:14
51:13
**record** 4:11 8:13
48:17
**recording** 8:8
**recruit** 43:7,7
44:10 47:14
**recruited** 18:1
31:6,10,13
44:9 45:13
**recruiting** 44:12
**recruitment**
44:16
**reference** 18:4
**referenced** 18:5
**referrals** 48:1
**referred** 18:6
**reflects** 24:12

**refrain** 8:9
**regarding** 18:3
33:11 53:3,6
53:11
**region** 39:19,21
46:2 48:6
**regional** 15:22
15:23 16:4,6,6
16:13 19:20
23:22 24:20
28:15
**reiterate** 36:2
**relates** 10:20
11:2,10 24:17
**relationship**
33:14
**remained** 15:24
**remember** 18:2
33:20 46:10
51:8
**rep** 26:20 36:6
36:20 39:16
**repeat** 5:24 6:1
10:24
**rephrase** 5:15
**report** 23:5
**reported** 56:8
**reporter** 1:15
4:22 6:10 8:7
54:16,19 55:13
56:6
**reports** 23:6
**represent** 4:19
**representative**
26:10,15,23
27:18
**representatives**
26:3 45:23
**reps** 25:10,16,17
35:13 43:1,6
44:24
**request** 27:15
**required** 52:1
**resignation**
46:18

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

resources 10:16 25:17
respect 9:8 18:15 28:2 40:6,10
response 50:18
responsibilities 24:10
responsibility 29:20,21
responsible 13:24 14:2 17:20 24:8 38:10
responsive 8:10
restricted 38:4
restructured 16:20
result 24:16 41:17
retracted 18:11
return 20:12 50:23 51:5
returned 51:1
returning 20:11
revenue 38:11
review 24:16 26:19 51:3,4
reviewed 50:10 50:24 51:19
reviews 11:22 26:17,21
ride 27:2,8,9,11 27:19 28:2,6 28:16,22,23 29:5,11,16
right 30:9 36:10 38:10 42:22
Road 1:16 2:3
role 41:11 46:16
rooted 33:16
Roselle 1:16 2:3
roughly 21:9 27:21
round 25:21

route 27:19
Rules 1:11
run 13:1

——— S ———

S 3:7 4:15 22:16
SAITH 54:21
salary 14:16,17 14:18
sales 13:22,23 13:24 14:6 15:22,23 16:4 16:6,7,13,14 17:14 18:16 19:20 23:15,17 24:8,11,20 25:1,2,23 26:3 26:10,14,22 27:3,18 28:15 29:22 32:12 38:11,11,14,18 40:6 41:7 43:1 43:6 46:6 47:15
salespeople 32:8
salesperson 30:10
Sara 18:5,24 46:5,10,11,20
saw 47:2
saying 52:12
says 56:6
Schaumburg 1:16 2:4
school 10:9 45:14
schools 10:13
science 10:2 42:1
second 18:12 35:8
secondary 25:4
see 22:4 34:1 48:23 49:2
selling 25:11,22

35:13
send 53:6
senior 20:1
sent 53:2
separate 12:3,4
Serafini 46:5
services 35:10
set 31:4 35:9 36:5,8 47:24
sets 35:11
sexual 53:21
shared 50:17
shorthand 1:15 55:13 56:8,10
shower 33:19
showing 36:7
sign 49:8 54:15
signature 48:24 49:2,4,6,9 50:21
Similar 8:8
simply 12:2
sir 4:12 5:8,12 5:20 6:5,12,21 7:4,14,21,24 8:2,6,12,15 9:16,23 10:8 10:14,17 11:7 11:13 12:10,12 13:3,6 14:1,4 14:12,15,17,23 15:3,5,8,11,20 15:21 16:12,15 16:19,22 17:17 18:1,17,20 19:7,11,15,18 20:24 21:14,17 22:7,20 23:2 23:13,19 24:14 24:18,22 25:8 25:12 28:4,13 28:20 29:3,6,9 29:13 31:17 32:5,9,17 33:3 33:6,9,13 34:3

38:13 39:7 40:17 43:3,9 47:17 49:1,3 49:19 51:10,17 51:19,22 54:17
six 12:14
size 34:23
skill 31:4 35:8 35:10 36:4,8 47:24
slide 11:22
smaller 34:23
socialize 43:20
socialized 44:2,4
sole 29:10 30:4 33:22 42:6,14 42:20
sorry 11:7 14:9 21:3 31:14 41:14 49:21 52:6
south 37:8
speaking 16:21
specific 22:9 26:12 27:15
specifically 16:21 35:12 45:4
speculation 7:2
spell 4:11
spousal 9:1,8
spouse 33:8
SS 56:2
stability 14:7
staff 50:11
start 6:14 36:17
started 17:11
starts 25:14
state 4:10 48:17 56:1
stated 8:13 27:18 32:24
statements 54:4
states 1:1,12 55:1,15

stating 30:1
station 23:23,24 25:3 48:9,9
stations 16:20
stay 39:21
Steve 20:5,6 23:4 45:11,13 45:17 47:19 48:2
straight 14:16 14:17 30:12
strictly 34:15 46:3,4
structure 46:15
Stupak 44:6
subject 5:4 25:18,20 40:6 40:10
subordinates 40:2
subscribe 30:24
SUBSCRIBED 55:20
substance 8:4
substantive 16:5
suburbs 37:15
successful 41:18
suffer 7:18
suggested 27:10
Suite 1:16 2:3,8 56:19
supervised 14:6
supervising 14:3
supervisor 22:15 46:7 49:7
supporting 25:23
suppose 49:4
sure 15:14 25:10 49:17 50:2 51:14 54:12
SVP 20:7 23:4
sworn 4:1,5 55:20 56:5

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

Page 64

| | | | | |
|---|---|---|---|---|
| **T** | 27:21 37:14 | 11:19 12:1,3,4 | 50:11 | 21:23 |
| T 3:7 22:16 | 41:17 47:9,10 | 25:20 44:14 | **Usually** 34:22 | **Wisconsin** 24:4 |
| **table** 25:18 | 47:10 52:4 | 47:11 | **V** | 36:20,22 |
| 35:11 | **testifying** 5:6 | **trainings** 11:14 | | **witness** 3:2 4:1,4 |
| **take** 5:18 6:2,18 | **testimony** 5:9 | 12:2 | **V** 4:14 | 34:7 39:7 |
| 7:15 | 6:22 7:1 27:17 | **transcribe** 4:22 | **various** 23:17 | **women** 34:2,14 |
| **taken** 1:10,14 | 40:18 50:15 | **transcript** 54:17 | **Vaughn** 43:2,4,8 | 54:2 |
| 12:5 55:11 | **Texas** 2:8 9:5 | 55:11,14 56:10 | **versa** 35:15 | **Wood** 13:11 |
| 56:11 | 56:20 | **treatment** 52:9 | **versus** 32:13 | 22:2 |
| **talk** 8:23 18:21 | **thank** 9:10 17:7 | **trial** 5:10 | **vice** 20:1 35:15 | **wooden** 21:24 |
| 26:12 42:24 | **Thanks** 54:14 | **true** 17:8 52:16 | 48:1,5 | **word** 50:19 |
| **team** 13:1 14:3,5 | **things** 35:5 | 56:9 | **Village** 12:19 | **wording** 49:24 |
| 14:6,10 16:14 | **think** 8:13 9:7 | **truthful** 7:19 | 20:18 | **words** 8:8,10 |
| 16:16 19:22 | 17:7 21:1 | **truthfully** 8:5 | **vocational** 10:13 | **work** 12:16,21 |
| 23:15,20 24:8 | 27:21 31:8 | **turn** 48:21 | **vs** 1:5 55:6 | 13:8 20:16,17 |
| 24:9,11,12,15 | 37:14 46:16 | **twice** 45:18 | | 20:19,22 21:12 |
| 24:20,24 25:5 | 47:9 | **two** 16:2 22:19 | **W** | 21:15,18 22:6 |
| 25:7 26:2,5,6 | **third** 46:18 52:2 | 35:5 | **wait** 6:8 | 23:11 33:12 |
| 27:3 29:22 | **thought** 34:13 | **two-thirds** 24:3 | **Walter** 20:5,6 | 39:20 40:1 |
| 35:11 39:10 | **three-quarters** | **type** 4:23 | 23:4 47:20 | 43:12,21 44:3 |
| 42:4 43:10 | 24:4,5 | **typically** 27:8,16 | **want** 17:18 | 44:4,19 45:16 |
| 45:24 46:6,7,9 | **threshold** 50:13 | 37:1 48:8 | 19:20 24:19 | **worked** 12:15 |
| 47:15 | **time** 5:21 6:13 | 50:10 | 29:5 37:22 | 13:12 17:12 |
| **teams** 25:2 | 7:5,5 12:20 | | 39:22 42:15,24 | 22:13 28:14 |
| **telephone** 53:10 | 14:24 15:19 | **U** | 46:8 48:2,21 | 43:5 45:24 |
| **tell** 5:14,23 6:16 | 16:1,17 17:2,6 | U 22:16 | 54:16 | 54:11 |
| 6:24 36:15 | 17:11 18:10,12 | **uh-uh** 8:10 | **warehouse** | **workers** 20:23 |
| **temp** 20:20 | 18:14 20:21 | **ultimately** 42:5 | 20:23 21:1 | 21:1 |
| **ten** 36:9,11 | 22:9,11 25:2 | **underperform...** | **warning** 15:4 | **working** 21:7 |
| 43:19 | 27:12,14,22 | 14:10 | **wasn't** 33:18 | 31:7 48:10 |
| **terminated** | 28:14 29:12,12 | **underperform...** | 37:22 | **workplace** 43:19 |
| 13:16 14:24 | 32:15 44:11 | 15:7,13 24:21 | **way** 14:8 | **works** 22:8 |
| 15:2 | 45:24 48:7 | **understand** 5:1 | **web** 49:10 | 23:13 |
| **termination** | 53:20,24 54:5 | 5:3,7,11,13 6:4 | **web-based** | **wouldn't** 19:17 |
| 13:18 | 54:14 | 6:20 7:3,13 | 11:18 49:10 | **written** 28:1,9 |
| **terms** 30:24 | **times** 6:6 | 19:20,22 | **Wehpley** 22:22 | 28:21 30:1 |
| 35:21 36:12 | **title** 13:21 15:18 | **understanding** | **weren't** 15:4 | **www.hannare...** |
| **territories** 23:18 | 16:3 17:13 | 23:16 26:1 | **western** 37:15 | 56:22 |
| 36:18,19 37:18 | 22:22 | **understood** 5:19 | 45:14 | |
| 39:17 42:12 | **today** 6:6,13,22 | **unemployed** | **WEYCER** 2:6 | **X** |
| **territory** 23:20 | 7:18 8:1 18:6 | 44:11 | **Whepley** 22:12 | X 3:1,7 |
| 24:6 36:24 | 27:17 40:18 | **United** 1:1,12 | **wide** 21:4 | |
| 37:17 38:4 | **told** 8:9 | 55:1 | **wife** 8:19,22 | **Y** |
| **testified** 4:5 | **tool** 50:14 | **University** 10:4 | 9:18 33:7 | **yeah** 9:5 31:21 |
| 17:15 19:19 | **training** 11:4,10 | **use** 35:1 38:16 | **window** 21:22 | 39:16 45:2 |

HANNA & HANNA, INC.
713.840.8484

KEVIN COLLIGAN - 6/13/2019

54:18,20
years 8:17 12:14
  16:2 31:11
  35:7 43:19
yep 10:11,11

**Z**

zip 24:1
**ZUBER** 2:6

**0**

**084-002229**
  56:17

**1**

**1** 3:9 48:13
**1:18-cv-6534** 1:5
  55:6
**100** 21:6
**105** 56:19
**11** 13:13
**12:20** 1:17
**125** 21:6,6
**125,000** 14:19
**13** 1:17 55:13
**14** 12:22
**1400** 2:8
**15** 17:5
**17** 8:17
**1717** 20:17
**175** 20:21,22
**1901** 1:15 2:3

**2**

**2** 3:10 51:12
**20** 17:5 30:11
  31:11,11,12,16
  32:6
**2014** 45:20
**2016** 52:2
**2019** 1:17 55:13
  55:22
**25** 17:6 27:14,14
  27:22 29:12
  31:11,12,16,18
  32:6

**3**

**3** 48:21

**4**

**4** 3:4
**42** 52.1
**48** 3:9

**5**

**50** 21.3,5
**51** 3:10

**6**

**60181** 2:4
**630-560-3692**
  2:4

**7**

**70** 21:3,5
**713-583-2442**
  56:21
**713-840-8484**
  56:21
**713-961-9045**
  2:9
**75** 27:13 29:11
**77024** 56:20
**77046** 2:8

**8**

**800** 1:16 2:3
**8582** 56:19

**9**

HANNA & HANNA, INC.
713.840.8484