Page 1

THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

MARY CAMPISE,                    )
                                 )
            Plaintiff,           )
                                 )   Case No. 1:18-cv-6534
                                 )
      v.                         )
                                 )   Plaintiff Demands Trial by
                                 )   Jury
CEVA LOGISTICS                   )
                                 )
            Defendant.           )

PLAINTIFF'S EXHIBIT D

ORAL DEPOSITION OF
STEVE WALTER
AUGUST 14, 2019

        ORAL DEPOSITION OF STEVE WALTER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above styled and numbered cause on Wednesday, August 14, 2019, from 10:06 a.m. to 10:59 a.m. before Donna Qualls, Notary Public in and for the State of Texas, reported by computerized stenotype machine, at the Williams Tower, 2800 Post Oak Boulevard, Suite 4100, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Andre P. Gaston
    THE LAW OFFICE OF ANDRE P. GASTON
    1901 North Roselle Road, Suite 800
    Schaumburg, Illinois 60181
    (630) 560-3692
    Andre.gaston@aimstonlaw.com

FOR THE DEFENDANT:
    Mr. Mark J. Levine
    WEYCER, KAPLAN, PULASKI & ZUBER, PC
    11 Greenway Plaza, Suite 1400
    Houston, Texas 77046
    (713) 961-9045
    Mlevine@wkpz.com

INDEX

Page 3

PAGE

Appearances .................................... 2

STEVE WALTER
Examination by Mr. Gaston...................... 4
Examination by Mr. Levine..................... 50
Further Examination by Gaston................. 51

Reporter's Certificate........................ 53

Page 4

STEVE WALTER,

having first been duly sworn, testified as follows:

EXAMINATION

BY MR. GASTON:

Q. Mr. Walter, before we get into the deposition, I want to thank you so much. I know the subpoena was issued to you kind of last minute. The judge issued a deadline on this case, so I had to get your deposition and fly out here. So I certainly appreciate you being able to make it, and that goes without saying.

As I have already introduced myself to you, my name is Andre Gaston. And I am the plaintiff's attorney for Mary Campise and her claims against CEVA Logistics based on a couple of causes of actions.

Have you ever been deposed before?

A. To where?

Q. Have you ever gone through this process before?

A. I have not.

Q. Okay. So let me begin by explaining the deposition process. I will ask you a series of questions. The court reporter is going to transcribe, that is type down my questions and your answers.

Do you understand that?

A. Yes, I do.

Q. Okay. And your answers will be given under

oath. You just took the oath subject to penalties of perjury, the same as if you were testifying in a courtroom.

Do you understand that?

A. Yes, I do.

Q. And your testimony may be used later in this proceeding and at trial as evidence.

Do you understand that?

A. Yes, I do.

Q. If at any time you don't understand one of my questions, in whole or in part, please tell me. I will either explain it to you or rephrase the question.

If you answer my question without asking for clarification, I will take that to mean that you understood it.

Do you understand that?

A. Yes.

Q. Okay. If at any time you don't hear one of my questions, in whole or in part, or if for some reason you become distracted, please tell me and I'll repeat the question. If you answer my question without asking me to repeat it, I will take that to mean that you heard it clearly.

Do you understand that?

A. Yes.

Q. Okay. There will be times today in the middle of one of my questions you may feel like you know what I'm going to say. Please wait and let me finish the entire question before you answer for the benefit of the court reporter.

Will you do that for me?

A. Yes.

Q. Okay. Likewise, if at any time I start to ask you a question and you are not finished with your answer to the last one, please tell me and I will allow you to finish it.

If you permit me to move on to another question without telling me you have more to say, I will take that to mean that you were finished with your answer to my previous question.

Do you understand that?

A. Yes.

Q. Okay. And your testimony today is based on your own personal knowledge. If you do not know the answer to one of my questions, it's okay to say that I do not know. You're not here to guess, speculate, or offer conjecture. If you answer a question, I will take that to mean that you believe that your answer is based on your personal knowledge.

Do you understand?

A. Yes.

Q. Okay. And have you spoken with anyone, including any attorneys, from CEVA Logistics about the matter?

A. No.

Q. Okay. And so from time to time, Mr. Levine, the attorney for CEVA, may object to the form of one of my questions. Give him the opportunity to object to the question, and then you can answer the question after that. Okay?

And if you need to take a break during the deposition at any time to use the bathroom or anything else, please let me know. We will be more than happy to give you a break. Okay?

Is there any mental or physical reason why you wouldn't be able to give accurate and truthful testimony to my questions today?

A. No.

Q. Have you been prescribed any medications?

A. No.

Q. Okay. Are you taking any medications today that will prevent you from answering these questions truthfully?

A. No.

Q. Just keep in mind that the court reporter is

transcribing words, so please refrain from head nodding without a verbal response or the use of uh-huh or anything like that. Word responses will be appropriate. Okay?

A. Yep.

Q. Okay. Can you state your full name for the record.

A. Steven Patrick Walter.

Q. And you're married.

A. Yes.

Q. Okay. And how long have you been married?

A. Nineteen years this September.

Q. All right. Congratulations.

A. Thank you.

Q. And have you discussed this case or deposition with your wife?

A. She knows I'm coming. That's really the extent.

Q. Okay. How about any other family members?

A. No.

Q. Okay. And have you discussed this case with any other employee or former employee of CEVA?

A. I have not.

Q. Okay. And what's your highest level of education?

A. College.

Q. Okay. And where did you go to college?

A. Bethel College.

Q. Great.

THE REPORTER: Where?

A. Bethel.

Q. (BY MR. GASTON) Bethel. B-E-T-H-E-L.

A. Correct.

Q. And I believe that's in Indiana; is that correct?

A. It is.

Q. And what was your major when you were in college?

A. Business.

Q. Did you attend any other colleges or vocational schools?

A. No.

Q. Have you completed any type of certifications in human resources or anything like that?

A. Through, like, a university?

Q. Through a university, anywhere.

A. No.

Q. Okay. And have you gotten any certifications or training as they relate to Title VII when it comes to age or gender discrimination?

A.  I mean, there are certain programs through the employer that provided information specific to that.

Q.  Right.  So training but not a certification?

A.  Correct.

Q.  Okay.  And you've never been charged with a crime.

A.  No.

Q.  Okay.  Where are you currently employed?

A.  I'm currently not.

Q.  Okay.  And prior to you being -- how long have you been unemployed?

A.  The exact date?  I mean, it's been a couple of weeks.

Q.  Approximately.

A.  It's been a couple of weeks.

Q.  Okay.

A.  I was with CEVA until the end of July.

Q.  Okay.  A few weeks.  So it's your testimony today before you became currently unemployed, you were working at CEVA Logistics?

A.  That's correct.

Q.  Okay.  How long did you work there?

A.  From '97 to 2015.  And then I was out for about three years.  And then rejoined in September of -- let's see here '18.

Q. Okay. Until a couple of weeks ago, which would be maybe approximately the beginning of August 2019?

A. The end of July, yep.

Q. So that's approximately?

A. About 19 years with CEVA.

Q. Okay. But this last stint was less than a year?

A. Yes.

Q. And what was the reason why you left that job? Were you terminated?

A. No. Separation agreement. They're making some changes on the board.

Q. Okay. And so when you say separation agreement --

A. There is new ownership with CEVA.

Q. Okay. And they decided to move in a different direction?

A. They did.

Q. And you entered into a confidentiality agreement based on your separation from the company?

A. That's correct.

Q. And so your separation wasn't rooted in any type of misconduct or anything like that?

A. No, it was not.

Q. Okay. Have you -- prior to your employment

Page 12

with CEVA, have you ever been terminated from a job?

A. I have not.

Q. And before you worked for CEVA, I know that you said from '97 to 2015. Then there was that gap between 2015 and September of '18, where did you work for those thee years?

A. Aries Worldwide Logistics.

Q. Okay. Are they affiliated with CEVA?

A. No, they're not.

Q. And where is that company?

A. They're founded here in Houston.

Q. And what was the reason you left CEVA that first time and went to Aries?

A. Also a separation agreement under the Apollo leadership.

Q. Okay.

A. A different company, different ownership within CEVA.

Q. Okay. But two times you've entered into separation agreements with CEVA?

A. That's correct.

Q. And that first time you just moved on to Aries, correct?

A. That's correct.

Q. And then the second time they had new ownership

or they had a new board and you separated, correct?

A. That's correct.

Q. Okay. When you separated from CEVA or when you got separated from each other this last time, was that unexpected?

A. Yeah. It was unexpected.

Q. Right. And did you -- was that a stressful situation for you.

A. Well, I mean, it's never a non-stress -- I would say somewhat, yeah.

Q. Right. Okay.

A. I mean the market is good. I'm not concerned. I've got a strong resume.

Q. Gotcha. But needless to say, were you upset about the separation?

A. I wouldn't say that I was upset. Disappointed.

Q. Okay. When you began working for CEVA, and this is the first time in 1997, what job were you hired for at that time?

A. I was management trainee operation supervisor.

Q. And was that pretty much straight out of college?

A. It was.

Q. And didn't remain in that same position the entire time?

A. I did not. No. I moved for the company about five times throughout my 19 years.

Q. Right. And that would be progression?

A. That's correct.

Q. Advancement through the company?

A. Yep.

Q. Okay. And so what I want to do is kind of move forward to the last time that you were at CEVA and that started in September of 2018.

A. Uh-huh.

Q. What position were you hired for at that time?

A. Senior vice president of business development.

Q. Okay. And you were located here in Houston with that position?

A. That's correct.

Q. And so tell me a little bit about your job duties as the senior VP.

A. So commercial responsibilities for the north half region, which was inclusive of, at the time, Canada and the US.

Q. Okay.

A. And then some restructuring took place, which then included Mexico.

Q. Okay. And so who did you answer to?

A. The managing director for the region, which was

Michael.

Q. Okay. What's his last name?

A. O'Donoghue.

Q. And where was he located?

A. Here in Houston.

Q. Okay. And you guys were in the same office building?

A. Correct.

Q. Okay. And so you reported to Michael, and you had people that reported to you, right?

A. That's correct.

Q. And where were these people located?

A. All over within that region.

Q. Okay. All over the region that you described previously?

A. That's correct.

Q. Including Mexico.

A. And Canada.

Q. Okay. And so those people who reported directly to you, what were their responsibilities in reporting to you?

A. Commercial responsibilities as well. So we had different fragments within my organizations. We had fuel sales. And I had regional sales directors that had specific regions within the overlying scope of the north

region.

Q. Okay.

A. And then I had people that were specific to the product, right. So ground, air, and ocean. I had leaders over those specific products that were responsible for driving the commercial responsibilities within those products. And then I had route development. So route development was trade links, as an example, China and the US.

Q. Okay. All right. And so was one of the people that reported to you, was that Kevin Colligan?

A. Yes. Kevin was a regional sales director for the central.

Q. Central. And that was in the Midwest?

A. Correct. He was based in Chicago.

Q. Okay. And as I explained to you earlier, this matter is being brought by the plaintiff, Mary Campise.

Do you know who Mary Campise is?

A. I do.

Q. Okay. And you know Mary personally?

A. I wouldn't say personally. I interviewed her for an opportunity to come into a sales position when I was based in Chicago.

Q. Okay.

A. I don't remember the year exactly. But she was

not hired while I was down -- assigned in Chicago.

Q. Okay.

A. She was probably -- maybe 12 to 18 months after I had relocated to Houston before she was hired.

Q. Okay. So your interaction with Mary was very brief?

A. Very brief.

Q. Right.

A. Very brief.

Q. Only within the confines of that interview. And then after that, you never saw her again?

A. I don't believe I saw her again after the interview.

Q. Okay. But you could testify that you didn't have any meaningful interaction?

A. I did not.

Q. Right. Okay. And so just to kind of -- I want to drill down a little bit on you responsibilities or the responsibilities of the regional VPs in reporting to you.

So Mr. Colligan, when he would report to you, what types of information would he report to you?

MR. LEVINE: Object. Form.

Q. (BY MR. GASTON) You can answer.

MR. LEVINE: You're allowed to answer.

A. Okay. Specific to commercial opportunities, any issues with business that would be at risk, openings that we're looking to fill, right. So we had vacancies that we were looking to fill. He had to report specifically where he was at in filling those vacancies.

Q. (BY MR. GASTON) And those vacancies that you're speaking of, are those sales representatives?

A. They are.

Q. And so when he would report to you that there was a vacancy for a sales rep, what would he tell you?

A. Well, I'm providing the vacancy report with an expectation to fill the vacancies.

Q. And the expectation would be that he would fill the vacancy?

A. Well, through the support of the recruiting group and Houston.

Q. Sure. Sure.

A. But he is responsible for ultimately conducting the interviews, selecting the candidates, and engaging me, if he wanted some different perspective, right, on campus.

Q. Sure. But you relied on his judgment to make the decisions about who was going to be hired, correct?

A. That's correct.

Q. Right. Because he was the person who was

actually interviewing these people, correct?

A. He was.

Q. And he could make the decision to say he was going to hire a sales representative, and you would essentially rubber-stamp it?

A. Yes. He was empowered to make those decisions.

Q. Right.

A. At the leadership level, we had different levels of vacancies. So if it was an area sales manager that he was interviewing, I always interviewed those candidates before the selection was made.

Q. Okay. And so do you remember on occasion whether he engaged you about the hiring of Mary Campise? And this would be aside from the first time that Mary Campise interviewed with you directly.

A. I don't know think I was in the -- so when Mary was hired -- I don't know what her hire date is. But I was not in the position of the commercial responsibilities within the organization.

Q. Okay.

A. At that time I was VP of operations. Domicile, Houston.

Q. Okay.

A. And I actually -- she may have been hired, you know, after 2000 -- March of '15, when I left the

organization. So I'm not sure when she was hired.

Q. So you don't know whether or not she was hired while you were in that position or not, but you're thinking that maybe she wasn't.

A. Well, she was not hired into the role when I was in my most current position with the organization.

Q. Okay. Okay. So do you know who Mr. Colligan reported to at the time that Mary was hired?

A. I do not.

Q. You don't know -- you don't remember who was in that position?

A. Can you provide the date she was hired?

Q. Yeah. I can't remember exactly, so we'll move on from that.

And so as part of your responsibility in Mr. Colligan reporting to you, would you say it's fair that it was important for you to understand what was happening with his sales team?

A. Yes.

Q. Okay. How important would you say it was?

A. Well, the performance of the reps, it's extremely important.

Q. Right. And the performance of the representatives that -- and the sales, did that have any bearing on your compensation?

A. No, it did not.

Q. So if the team was failing in terms of sales, that wouldn't jeopardize your job?

A. Well, my job is to make sure I'm driving the performance of the sales team.

Q. Right. So let's say the sales team is not performing well. Would that have impacted your employment?

A. I would say, yeah, there would probably be a certain degree of correlation to the performance of the sales time and my employment.

Q. And it's fair to say the performance of the sales team would certainly -- could possibly affect Mr. Colligan's job, if they weren't performing well, correct?

A. Correct.

Q. Okay. Because while it's your duty to drive sales, that's correct, it's also his duty to drive sales as well on a more local level?

A. That's correct.

Q. All right. The location where -- and Mr. Colligan was working in the Chicago area, correct?

A. Yes.

Q. Okay. But you never worked in the Chicago area at the same time that Mr. Colligan worked there,

correct?

A. No, I did.

Q. Oh, you did. How long did you work there while he was there?

A. Maybe two years.

Q. Okay. And after that, you moved on to Houston, correct?

A. That's correct.

Q. But you still remained his boss?

A. No. And when we worked together in Chicago, I was not his boss. I was vice president of operations. And the regions were structured differently at that point.

Q. Okay. So when did you become Mr. Colligan's boss?

A. When I was rehired by CEVA in September of 2018.

Q. Gotcha. Okay.

A. So I had operations and VP responsibilities when I was based in Chicago.

Q. Right.

A. Right. He had only business development responsibilities. And he reported through a different reporting line.

Q. Okay. So when you were rehired in 2018 and you

were Mr. Colligan's boss, how often did you travel to Chicago?

Well, let me ask you this question. How many times did you travel to Chicago from the date of your hire in 2018 until your date of termination?

A. So Chicago specifically, twice. But his region probably, three, maybe four times.

Q. Okay. But each time you traveled to his region, did you see him every time?

A. No.

Q. How many times did you see him during the three or four times that you traveled during that year roughly?

A. Twice.

Q. Okay. And when you saw him those two times during that year, did you guys have some kind of scheduled meeting one on one?

A. We had scheduled one-on-one meetings, yes.

Q. Okay. So it wasn't like a group meeting or --

A. We had a group meeting. We also had customer visits. And some of those customer visits did not include Kevin. They included the sales executive and myself in those meetings.

Q. Okay. So you didn't exclusively travel to Chicago for the sole purpose of just seeing

Mr. Colligan, did you?

A. No.

Q. Okay.

A. No. But we would speak around performance of business development executive, as well commercial opportunities on a weekly basis.

Q. Sure. At the location where you were working in Houston, was there a human resources department inside your building?

A. Yes.

Q. Was there a human resources department inside the building where Mr. Colligan worked in Chicago?

A. There is multiple buildings in Chicago, but there is an HR representative that sits in one of those buildings.

Q. Okay. But you're not sure whether that HR representative sits in the building where Mr. Colligan worked?

A. I'm about 90 percent sure --

Q. Okay.

A. -- that they sat in the same building.

Q. Okay. But you're not 100 percent sure?

A. No, I'm not.

Q. So the person could have been in another building?

A. Could have been.

Q. Correct. So that HR representative -- well, does CEVA have a handbook?

A. CEVA does have a handbook.

Q. CEVA does have an employee handbook?

A. Right.

Q. And so do you remember whether or not in that handbook it addresses anything about age or gender discrimination?

A. I belive I recall, yes, it does include those two items in the handbook.

Q. Okay. Do you remember the depth at which they address those issues?

A. I do not.

Q. But you believe they're in there, but you can't say with any certainty? Like, if I asked you --

A. I'm pretty sure they're in there.

Q. Okay. So it's your testimony that you're pretty sure that the handbook addresses both age and gender discrimination? That's your testimony, correct?

A. Yes, that's correct.

Q. Okay. Is it your testimony that when they address age and gender discrimination that it has some discussion about Title VII? Do you remember Title VII being attached to those two terms?

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) You can answer.

A. I don't recall.

Q. Okay. So during the time that -- so you've testified that Mr. Colligan had a team, correct?

A. Correct.

Q. And the team was a sales team, correct?

A. Correct.

Q. During the time that you worked at CEVA, this last time from 2018, did you know the makeup of the team? For example, did you know the ratio of men compared to women on that team?

A. I'm aware of who's in the roles. Do I know the percentage of women to men or men and women under the age of 45 or maybe over 45? No, I couldn't tell you those ratios.

Q. So you don't -- you can't testify that you know whether there were more men on the team at one time compared to women on the team? You simply knew he had a team, right?

A. That's right.

Q. Right. And so it wasn't really your job to -- wasn't really your job to keep track of the number of people on the team based on their gender, correct?

A. Correct. My job was to make sure we were

hiring the most qualified candidates for the position.

Q. Fair enough. And it's also fair to say that it wasn't your job to understand or to know the ages of the people on those teams either?

A. It's not.

Q. Right. Okay. So Mr. Colligan was given a great deal of autonomy to deal with his local sales team, correct?

A. Correct.

Q. And Mr. Colligan was responsible for assigning individuals to certain accounts, correct?

A. Maybe the approval of transfer accounts, so accounts that were previously owned by a rep that is no longer with the organization.

Q. Okay.

A. Outside of that, they're prospecting and generating opportunities on their own.

Q. Sure. But aside from them generating those opportunities on their own, there are certain accounts that, for example, like you said, that may have belonged to another rep that Mr. Colligan could assign to another rep that was still employed, correct?

A. That's correct.

Q. All right. So when Mr. Colligan made these assignments, for a lack of better term, of these

accounts, he didn't have to answer to you, did he?

A. Okay. So prior to me coming into the new role, I'm not sure how that was handled.

Q. Okay.

A. When I joined, any transfer account had to be approved by me prior to it being reassigned, if it had legacy business. If there was no revenue associated to the account, he could assign those as he saw fit.

Q. To anybody that he wanted to?

A. To anybody. But if there was revenue associated to the account, that had to be approved by me before it could be transferred.

Q. So let's discuss the revenue accounts, right?

A. Uh-huh.

Q. So there's a revenue account that needs to be transferred to a representative. Mr. Colligan comes to you. Does he make a recommendation about who should have the account?

A. Yes.

Q. Okay. And when he makes that recommendation, he makes that recommendation based on his own personal experience with the individual, right?

A. Well, and the account.

Q. And the account, right?

A. Correct.

Q. Right. And then, is it fair to say that based on his recommendation, that you would approve it?

A. No. I did not blindly approve.

Q. Well, I didn't ask -- yeah, I'm not asking if you blindly approved. I'm simply saying that in general, was it your practice to kind of follow his lead when he made that recommendation?

A. I would say 50 percent of the time. The other 50 percent, there was more engagement and discussion around why the decision was being made to transfer the account.

Q. Sure. What would be -- can you give me two examples why you would say, no, I don't want this account transferred to this person?

A. One could be there is an underperforming sales rep and there's a legacy account that's associated with quite a bit of revenue. So transferring the account to make the rep's performance look better than what they're actually producing on their own would take a lot of convincing on its own, for me to support.

Q. That would raise a red flag?

A. Absolutely.

Q. Because you wouldn't want the organization to suffer because the representative was inadequate?

A. That's correct.

Q. Okay. But did you ever tell Mr. Colligan that you didn't want an account assigned to a person because of gender?

A. No.

Q. Okay. Did you ever tell Mr. Colligan that you didn't want an account assigned to someone because of their age?

A. No.

Q. So it was only performance, correct? That is what was important. It was never that you intentionally said, I don't want someone to have an account because you're a woman, right?

A. That's right.

Q. And I don't want someone to have an account because of age, correct?

A. Correct.

Q. Because those factors would not have really mattered because you didn't know the makeup of the team anyway, correct?

A. Well, I mean, I know the makeup of the team. I know the team. Do I know the ratios to be able to provide those to you? No. But to answer your question, no, we would not, right, factor in age or gender in those decisions.

Q. Well, you would not factor it in, right? You

can't speak for what somebody else would do, right?

A. That's right.

Q. Right. So because Mr. Colligan had this autonomy to transfer these non-revenue accounts, is it your testimony that he could have assigned those accounts pretty much any way that he wanted to?

A. For non-revenue generated?

Q. Sure.

A. Yes. Sure.

Q. So it's entirely possible that there could have been 20 accounts and he could have assigned them to 20 males in a row, correct?

A. Well, sure.

Q. Okay. And it's entirely possible that he could have assigned those accounts to 20 females in a row, correct?

A. Sure.

Q. Because he didn't have to answer to anyone, correct, on the non-revenue accounts?

A. Well, I mean, he's making the best assignment based on his judgement on location.

Q. Or his personal feelings, correct?

A. Or experience, right.

Q. Sure.

A. I mean, some reps may have a stronger

international background versus a domestic.

Q. Sure. But he makes those decisions on his own, correct?

A. He has the autonomy to make those decisions.

Q. Sure. And you don't know why or you can't testify to what he's thinking when he makes those decisions, correct?

A. Correct.

Q. You can only testify based on what you think he would make those decisions on, right?

A. Sure.

Q. Because you can't think for Mr. Colligan.

A. That's correct. Although no revenue associated to the account.

Q. Sure.

A. Not a lot of exposure to the organization as it relates to --

Q. Sure. Absolutely understood.

But exposure or not, he can make those decisions and he can make those decisions any way he wanted to because -- simply because of the lack of exposure, right?

A. Well, yeah. He was empowered at his level to make those decisions based on his responsibilities.

Q. Sure. Do you know whether or not CEVA has a

policy on how -- a written policy on how Mr. Colligan would have assigned those accounts? That's just a yes or no question.

A. No, there's no policy.

Q. So you've never seen anything in writing about how a regional sales vice president would make those assignments, correct?

A. Correct.

Q. Okay. And so it's entirely possible that people in Mr. Colligan's position could assign those non-revenue accounts any way they wanted to, correct?

A. Sure.

Q. Right. It's also entirely possible that he could have a group of friends who are all male, and he decides to assign those accounts to all of his male friends, correct? That's a yes or no question.

MR. LEVINE: Objection; form.

A. It's a strong speculation.

Q. (BY MR. GASTON) Sure. But it's a yes or no question.

MR. LEVINE: Objection; form.

Q. (BY MR. GASTON) So is it possible that Mr. Colligan could have assigned those non-revenue accounts to his male friends?

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) You can answer.

A. Possible, but probably not probable.

Q. Well, I'm not asking you whether it's probable. I'm simply saying, you've testified --

A. It's possible.

Q. Right. So is it possible, or is it yes because you've testified -- well, let me go back.

You've testified that Mr. Mr. Collagen was empowered to assign those non-revenue accounts as he saw fit, correct?

A. Yes.

Q. And that he had the autonomy to do so, correct?

A. Yes.

Q. You've also testified that there was no written policy associated with how those accounts would be assigned, correct?

A. Correct. Now, some regional sales directors, just to clarify, have territories that are assigned. So zip codes -- call it Cairo, Elk Grove, Naperville, may be assigned to a particular rep. No other rep is going within those zip codes. So if there is a non-revenue account that falls within those zip codes, it would automatically go right to the sales associate that is associated to those zip codes.

Q. So even with the sales rep in that zip code,

Mr. Colligan was empowered to assign those accounts as he saw fit, correct?

A. Correct.

Q. And so he could have assigned those accounts to his male friends, if he wanted to, and they worked at the organization, correct?

A. It's possible.

Q. Okay. Did Mr. Colligan ever contact you about complaints from any of the people on his sales team about gender discrimination?

A. No.

Q. Did the human resources representative ever contact you about allegations of gender discrimination?

A. For Kevin?

Q. For any of the representatives on Kevin's team.

A. No.

Q. Would it have been the human resources representative's responsibility to report that to you? Or would that have been reported to someone else?

A. No. That would have likely been reported to me.

Q. Okay. And you testified that you know who Mary Campise is, correct?

A. I do.

Q. Are you aware that Mary Campise wrote a letter

to CEVA Logistics alleging that she had been discriminated against based on gender?

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) You can answer.

MR. LEVINE: You can answer.

Q. (BY MR. GASTON) You can answer.

A. I was not aware, no.

Q. Are you --

A. Do you know what year the letter was written?

Q. No.

A. Okay.

Q. 2018. I don't -- I don't remember.

Are you aware that -- do you know who Sara Marconi is?

A. I do.

Q. Okay. Are you aware that Sarah Marconi had complaints about being discriminated against based on gender?

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) You can answer.

A. Can you repeat the question?

Q. Are you aware that Sarah Marconi made allegations that she was being discriminated against based on gender while she worked at CEVA?

A. No.

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) Oh, no, you're not aware?

A. No.

Q. Okay. And it's your testimony that you're not aware that any female employee at CEVA, during the time that you worked there, who ever made allegations of gender discrimination?

A. That's correct.

Q. Okay. As part of your -- was part of your role dealing with human resource issues while you worked at CEVA?

A. Well, sure.

Q. Okay. Did you ever receive any complaints of any kind related to -- did you ever receive any complaints from any employee in Chicago about workplace discrimination while you were employed as CEVA this last time?

A. No.

Q. Would it have been a person's responsibility to report that information to Kevin Colligan if they had an issue?

A. Were they reporting to Kevin?

Q. Yeah. If -- if someone on the sales team that reported to Kevin had an issue, would they report it to Kevin?

A.   I think if they felt comfortable reporting it to Kevin.

Q.   Right.

A.   But if the complaint is against their boss, likely, they would take that to the HR representative.

Q.   Okay.  And so -- but if they felt comfortable, they could go to Kevin if they wanted to, correct?

A.   Yeah.  If there's an assumption and they want clarification, they would certainly --

Q.   Just whatever issue, if they're comfortable enough going to Kevin, then they could go to Kevin, right?

A.   Absolutely.

Q.   And so what was Kevin's responsibility after that report was made?  So let's say someone alleged that there was some workplace discrimination there, and they reported it to Kevin.  Then what was Kevin's responsibility?

A.   To report that to -- well, depending on the degree of what's being reported.

Q.   Okay.

A.   I mean, I don't know the severity of what's being reported or how the discussion went between him and the associate.

Q.   Right.

A. But all depending on the level of, like, concern, he would report that to HR.

Q. Sure. Okay. And if it didn't reach that level of concern, was he empowered to resolve those issues himself?

A. Yeah. I mean, his job is to make sure that he's working with his associates.

Q. Sure. Right. So he could resolve some ground-level human resources issues on his own, if he so chose, depending on the level, correct?

A. I would say so, yes.

Q. Right. Because he might just simply be able to fix it in office, correct?

A. Yeah. It could have just been a misunderstanding based on lack of communication between the associate. It may be other associates.

Q. Okay. Was he -- was he absolutely required to report any legal issue to human resources? So for example, let's say Kevin got a letter from a lawyer concerning -- right, concerning some allegation. Did he have an obligation to report that to you?

A. Not necessarily to me, but certainly to the HR organization.

Q. But what if that level -- what if that letter didn't reach the level of concern to report it? Could

he have just resolved that issue on his own?

A. No. If he received a legal letter?

Q. Sure.

A. No. That would have to go to the corporate office.

Q. Okay.

A. And likely, I would be aware, right. It would come to me, but it's certainly going to go to the HR group.

Q. Right. But it's entirely possible that a letter could have been sent and Mr. Colligan didn't report it to legal? It's entirely possible, correct?

A. I mean, it's possible.

Q. Right. Because you can't speak for whether Mr. Colligan ever got a letter and he failed to do something, correct?

A. That's correct.

Q. And you also can't speak to whether something exceeded a certain level that -- where it should have been reported to someone else but he didn't do it, correct?

A. Correct.

Q. Okay. Because Mr. Colligan was given a great deal of autonomy to deal with certain human resources issues, correct?

A.   Certain level of items, yes.

Q.   Sure, certain levels.  But that's subjective, correct?  Like, he would make the determination on whether he was going to deal with it or not, or whether it needed to be reported somewhere else, correct?

A.   Correct.

Q.   Okay.  Did CEVA have a policy on assigning accounts to people under 40 years of age?  Was there a written policy?

MR. LEVINE:  Objection.  Form.

Q.   (BY MR. GASTON)  Did CEVA have a written policy on assigning accounts based on age?

A.   No.

Q.   So you never saw anything in writing, correct?

A.   Why would age be a factor?

Q.   Well, I'm just asking the questions.  I'm not saying it is a factor.  I'm simply saying -- asking you if you've ever seen a written policy.

A.   No.

Q.   Okay.  And I think you testified earlier that you had never seen a written policy with respect to gender either, correct?

A.   That's correct.

Q.   Because it's your testimony that age nor gender would be --

A. A factor.

Q. -- a factor.

A. That's correct.

Q. Correct. But that's your testimony based on your understanding of the law and the company's goals, correct?

A. Yes.

Q. But you can't speak for Mr. Colligan and what he was thinking, correct?

A. That's correct.

Q. Okay. Because Mr. Colligan was empowered to assign those non-revenue accounts as he saw fit, correct?

A. Yes, that's correct.

Q. Have you ever sent or received any e-mails regarding the performance of Mary Campise?

A. No. I don't think she was employed when I returned. I think she was --

Q. Already gone?

A. Yep. I think she was hired after I was gone the first time.

Q. Okay.

A. She had departed before I had returned.

Q. Okay. And I don't know if I asked this question before. But does CEVA have a policy on

Page 43

determining which sales reps work a particular area?

Is there a written policy?

A. There's not.

Q. No? So for example, with Kevin Colligan's geographic area, he would make the determination on who serviced which area, correct?

A. Well, the regional sales directors could determine, if there was no territory assignments.

Q. Okay.

A. So they would then use the system to determine if nobody's calling on the account, then it's basically -- it's fair game for any of the associates to then go work on any of those accounts.

Q. Or conversely, he could make the decision that someone could go work that area, correct?

A. Yeah. Particular territories could be assigned.

Q. Sure. Okay.

A. With the ultimate goal driving productivity for windshield time, right.

Q. Absolutely.

How well do you know Mr. Colligan?

A. I know Kevin pretty well.

Q. Like, would you consider you and Kevin friends?

A. So did Kevin and I have any discussions from

the time I departed in 2015 to the time I returned, no we did not.

Q. Okay. But would you consider yourself friends though? You guys friends?

A. I -- I think we were -- yeah, I guess, Kevin could be considered a friend.

Q. Have you ever had any personal issues with Kevin?

A. Personal issues?

Q. Yeah.

A. What do you mean by that?

Q. Have you ever taken an exception to something that Kevin has done?

A. Yeah, I think one comes to mind back when I was down in Chicago.

Q. Okay. Tell me about that.

A. It was regarding the sales associate, Bruce Khunert.

Q. Okay.

A. At the time I had shared some information to better help Kevin. I think Kevin's communication style, specifically with Bruce, wasn't being well received by Bruce.

Q. Okay.

A. Bruce shared that information with me. My job

is to make sure I was putting Kevin in the best position to get the best results out of his team.

Q. Sure.

A. So I shared that information with Kevin so he could be discreet on how he changed his communication style with Bruce.

Q. Sure.

A. And it was revealed that Bruce had shared some information with me during that initial discussion. That -- that's the only thing I can ever recall.

Q. Sure. And so when you say that Kevin -- let's talk a little bit about his communication style.

What did you feel was -- why did you feel it was necessary? What about his communication style warned you to have that discussion with him?

A. Well, I think anytime that you're in a group setting, right, if you're not careful how you're delivering the communication, it's subject to the interpretation of everybody that is receiving information.

Q. Sure. And that could be negative, correct?

A. And sometimes people hear what they want to hear and don't necessarily hear the intent behind the message.

Q. Sure. Sure. Did anyone ever complain about

his communication style?

A. Not to me.

Q. Okay.

A. And of the four regional sales directors, I would probably place Kevin at the top.

Q. Okay. But maybe not at the top in terms of communication?

A. No. He's a great -- Kevin is a great communicator.

Q. Right.

A. I think Kevin's matured a lot from the time that he was hired into that position.

Q. Gotcha.

A. To where he's at today.

Q. Yeah. There's always some work to do, right?

A. Sure.

Q. Always growth. Okay. And you said you know Kevin pretty well, but you guys aren't friends, correct?

A. I mean, are we connected on Facebook? We're not.

Q. Yeah.

A. Right.

Q. Like, has he ever been to a barbecue at your house?

A. No, he has not.

Q. Okay. Has he ever invited you to his house?

A. No, he has not.

Q. Okay. Are you aware that Mr. Colligan made comments during his employment about his sexual conquests before he got married?

MR. LEVINE: Objection. Form.

Q. (BY MR. GASTON) You can answer.

A. Repeat the question.

Q. Do you have any knowledge of comments that Mr. Colligan made about his sexual conquests before he got married?

A. No.

Q. Okay. And no one ever reported to you that Mr. Colligan made inappropriate comments about his sexual conquests before he got married?

A. No.

Q. If I told you that Mr. Colligan testified that he made those comments during his employment, would you say that was believable?

MR. LEVINE: Objection; form.

Q. (BY MR. GASTON) You can answer.

MR. LEVINE: You can answer.

A. No.

Q. (BY MR. GASTON) Okay. But from 2018 up until the time you were separated from CEVA, you didn't work

in the same office with Mr. Colligan, did you?

A. No.

Q. So you can't testify day to day, what he was doing in that office, could you?

A. Day to day?

Q. Yeah.

A. No. But I ran that market for seven years, right. There's still a lot of the same people there.

Q. Understood.

A. It's a small industry. I think I would have heard something.

Q. Yeah.

A. Right.

Q. I mean, possibly. Possibly. But it's entirely possible that you didn't hear it, correct?

A. It's certainly possible.

Q. Okay. Did you ever have any concerns about a disproportional number of Kevin Colligan's sales -- let me ask it this way.

Did you ever have any concerns about gender discrimination going on in the office where Kevin Colligan worked?

A. Zero.

Q. And you never had any concerns about whether there was any age discrimination going on in that office

either, did you?

A. I had no concern.

Q. Because it's your testimony that you didn't understand -- that you didn't know the makeup of the teams, correct?

A. Again, I understand the makeup.

Q. Right.

A. Including several I interviewed for Kevin.

Q. Okay.

A. And some were over 60. And there were plenty of males and females, right, within those candidates. I understand the makeup of his team. If you ask me for specific ratios of the team, I could probably not give you those right off the top of my head.

Q. Right. And you probably couldn't give me the numbers of non-revenue accounts that Kevin assigned to a person, to any person, because you just don't know, correct?

A. Well, and I wouldn't need to know.

Q. Right. But I just need the answer. Is that a yes or no?

You want me to ask it again?

A. Yeah. Go ahead. Repeat the question.

Q. Okay. So you had no knowledge of the number of non-revenue accounts that Kevin assigned to any

particular rep, correct?

A. I wouldn't say I didn't have any knowledge. There's a report, a territory report that shows when a rep is leaving, right, accounts that need to have reassignment. So the number accounts, no. But visibility to the accounts, sure.

Did I spend a lot of time on those, no.

Q. And you would only see the reports after the person was actually assigned because he made the decisions, correct?

A. Correct. On the non-revenue accounts, yes.

Q. Correct.

MR. GASTON: That's all I have for now.

EXAMINATION

BY MR. LEVINE:

Q. Question. Can you define non-revenue account?

A. It means they're not currently trading with the organization. We're not invoicing them for any services within the organization. It's a prospect account. It's been identified within our CRM system, right, Salesforce, that there's not -- there's potential opportunity within this particular company, but we're not doing any business with them yet.

Q. Meaning, a non-revenue account is not a current customer of CEVA?

A. That's probably a better way to put it, yeah. Yes.

MR. LEVINE: That's all the questions I have.

FURTHER EXAMINATION

BY MR. GASTON:

Q. And then the last question that I have is, when a non-revenue account is assigned to a person, there is an expectation or hope at least, that the person will be able to generate some revenue from it, correct?

A. Well, they have to first qualify for the account.

Q. Right. But I'm just saying --

A. It could be in the CRM system as a company somebody had called on.

Q. Sure.

A. Right. But there may not be any potential opportunities within that organization. But they may just be doing all partial business with UPS or Fed-Ex. There's no opportunity for CEVA. Their job would be, then, for them to qualify.

Q. Right. But there is some hope, like -- there is some hope that there's going to be some revenue down the road, correct?

A. No. I wouldn't say hope. There's an

understanding that they're going to qualify.

Q. Okay.

A. And then if there's an opportunity to then pursue, right, those leads.

Q. Okay.

MR. GASTON: That's all I have.

MR. LEVINE: No further questions. Thank you for your time.

THE WITNESS: You bet.

(Proceedings concluded at 10:59 p.m.)

REPORTER'S CERTIFICATION

THE STATE OF TEXAS :

COUNTY OF HARRIS :

I, DONNA QUALLS, Shorthand Reporter and Notary Public in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, STEVE WALTER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and the same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

That the amount of time used by each party at the deposition is as follows:

Page 54

MR. ANDRE P. GASTON........00 HOUR(S) :52 MINUTE(S)

MR. MARK L. LEVINE.........00 HOUR(S) :01 MINUTE(S)


             GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

this, the 28th day of August, 2019.


_____

DONNA QUALLS
Notary Public in and for
The State of Texas
My Commission expires 11/02/2022
U.S. LEGAL SUPPORT
Firm Registration No. 122
16825 Northchase Drive, Suite 800
Houston, Texas 77060