PLAINTIFF'S
EXHIBIT
E

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY CAMPISE,                    )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )  No. 1:18-cv-6534
                                 )
CEVA LOGISTICS,                  )
                                 )
                Defendant.       )

The deposition of SARA MARCONI, called by the Plaintiff for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before Valerie Calabria, CSR, RPR, taken at 1901 North Roselle Road, Suite 800, Schaumburg, Illinois, on August 12, 2019, at 12:59 p.m.

APPEARANCES:

    THE LAW OFFICE OF ANDRE P. GASTON, P.C.
    BY:   MR. ANDRE P. GASTON
          1901 North Roselle Road, Suite 800
          Schaumburg, Illinois 60195
          630.560.3692
          andre.gaston@agastonlaw.com

                    appeared on behalf of the Plaintiff;

    WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
    BY:   MR. MARK J. LEVINE
          11 East Greenway Plaza, Suite 1400
          Houston, Texas 77046
          713.961.9045
          mlevine@wkpz.com

                    appeared on behalf of the Defendant.


                    *   *   *   *   *


Reported By:  Valerie M. Calabria, CSR, RPR

Sara Marconi                                    Mary Campise v Ceva Logistics

                              INDEX

WITNESS                                     EXAMINATION

SARA MARCONI

    BY MR. GASTON                                4

    BY MR. LEVINE                               35

    BY MR. GASTON  (Further)                    46

    BY MR. LEVINE  (Further)                    49


                    DEPOSITION EXHIBITS

NUMBER/DESCRIPTION                          IDENTIFIED

Plaintiff's Deposition Exhibit

    Exhibit 1                                   15

    Exhibit 2                                   21

Marconi Deposition Exhibit

    Exhibit 3                                   39

(Plaintiff's Exhibits 1 and 2

were marked for

identification.)

(Witness duly sworn.)

SARA MARCONI,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

EXAMINATION

BY MR. GASTON:

Q.     All right.   Sara, I just need you to
state your name for the record.

A.     Sara Marconi.

Q.     As you know, my name is Andre Gaston.
I'm the attorney for Mary Campise, and I represent
her in her claim against CEVA Logistics.   CEVA
Logistics is the defendant in this matter.   I'll be
taking your deposition today.

Let me explain the deposition process
to you.   I'll be asking you a series of questions.
The court reporter will transcribe, that is, type
down my questions and your answers.

Do you understand that?

A.     Yes.

Q.     And your answers will be given under

oath subject to the penalties of perjury, the same as if you were testifying in a courtroom.

Do you understand that?

A. Yes.

Q. And your testimony may be used later in this proceeding and at trial as evidence.

Do you understand that?

A. Yes.

Q. If at any time you today you don't understand one of my questions in whole or in part, please tell me and I'll explain to you or rephrase the question. If you answer my question without asking for clarification, I will take that to mean that you understood it.

Do you understand that?

A. Yes.

Q. If at any time you don't hear one of my questions in whole or in part or for some reason you become distracted, let me know and I'll repeat the question. If you answer my question without me repeating it, I'll take that to mean you heard it clearly.

Do you understand that?

A. Yes.

Q.     There will be times today that in the middle of one of my questions you may feel that you know what I'm going to say.  Just please wait, and then once I finish the question, you can answer it for the benefit of the court reporter.

Will you do that for me?

A.     Yes.

Q.     If at any time I start to ask you a question and you are not finished with your answer to the last question, please tell me and I'll allow you to finish it.  If you permit me to move on to another question without telling me that you have more to say, I will take that to mean that you were finished with your answer to my previous question.

Do you understand that?

A.     Yes.

Q.     And your testimony today is based on your personal knowledge.  If you don't know the answer to one of my questions, please let me know that you don't know.  You're not here to guess, speculate, or offer conjecture.

Do you understand that?

A.     Yes.

Q.     Have you spoken to any attorneys from

CEVA Logistics?

A.    I have not.

Q.    Have you spoken to any representatives from CEVA regarding this deposition?

A.    No.

Q.    And so from time to time CEVA's attorney may object to the form of one of my questions. Give him an opportunity to make that objection, and then once the objection is made, you can proceed to answer the question.  Okay?

A.    Yes.

Q.    And if you need to take a break during the deposition, go to the bathroom, get some water, whatever, please let me know.  I'll be more than happy to accommodate you.

A.    Thank you.

Q.    Is there any mental or physical reasons today why you would not be able to give accurate and truthful answers to my questions?

A.    No.

Q.    Have you been prescribed any medications?

A.    No.

Q.    Are you taking any medications today

that would prevent you from being able to give truthful testimony?

A.    No.

Q.    And keep in mind that the court reporter is recording words.  So please refrain from head nodding without a verbal response, so the use of uh-huhs.  Word responses will be appropriate.

A.    Yes.

Q.    And, Sara, it's my understanding that you're married; is that correct?

A.    Correct.

Q.    How long have you been married?

A.    28 years.

Q.    And what's your husband's name?

A.    Joe Marconi.

Q.    And have you discussed this case or the deposition with your husband?

A.    Yes.

Q.    And how about any other family members?

A.    No.

Q.    Have you discussed this case with anyone else?

A.    Mary.

Q.    Mary.  Okay.  And any of your other

former colleagues at CEVA?

A. Yes.

Q. And could you tell me who those people are?

A. Just one. Lori Serafini.

Q. And do you know whether or not Lori Serafini is still employed at CEVA?

A. She is not.

Q. What's your highest level of education?

A. I graduated from University of Wisconsin.

Q. And when did you graduate?

A. '85, 1985.

Q. And what was your major when you went to the University of Wisconsin?

A. Consumer science.

Q. And did you attend any other colleges or vocational schools?

A. I did not.

Q. Any other certifications at any other university, college, or other place?

A. No.

Q. I want to discuss a little bit about your employment history. So after you graduated

from the University of Wisconsin, where did you start working?

A.    It was an HVAC company.  I can't even think of it.  North American.

Q.    If you don't remember the name, that's fine.

A.    It was in Madison.

Q.    And when you started working at that HVAC company, were you in sales there?

A.    Yes.

Q.    And did you sell HVAC units?

A.    Yes.

Q.    And did you have to reach out, or did people actually walk into a storefront?

A.    They called in for estimates, and then I returned the call and went out.

Q.    All right.  Do you remember how long you worked there?

A.    Maybe a year, year and a half.

Q.    And so after you worked at the HVAC company, do you remember where you worked at after that?

A.    I went to Chicago.  It was called I think Talent Tree.  It was a temporary service.  I

worked for the company.

Q.    And were you in sales there?

A.    Eventually I was in sales.

Q.    And do you remember how long you worked there?

A.    I'm guessing three years.

Q.    And so -- all right.  And so I'll just ask you, just kind of fast forwarding after that, do you remember where you worked after that?

A.    Not exactly.  I think possibly at Sears.

Q.    And were you in sales at Sears?

A.    Yes.

Q.    And do you remember how long you worked there?

A.    Not exactly.

Q.    Just a guesstimate.

A.    Two years.

Q.    Okay.  Two years.

So needless to say, it's fair to say you worked at a series of places and the bulk of your career experience has been in sales?

A.    Correct.

Q.    Let me ask you this.  Have you ever been terminated from an employer?

A.    No, I have not.

Q.    I'm going to ask you a little bit about your experience with CEVA, the defendant.  How many times have you worked for CEVA?

A.    One time.

Q.    Only one time, right?

And when you worked for CEVA that one time, do you remember when you started there?

A.    June of '09, I believe.

Q.    So you started in June of '09, and how long did you work there?

A.    It was eight years.  I think it was April.

Q.    So you worked -- you worked to some point up until 2018?

MR. LEVINE:  Objection; form.

THE WITNESS:  Or was it '17?

BY MR. GASTON:

Q.    Pardon me?

A.    I thought it was '17.

Q.    So it's your testimony that you worked there at some point in 2017?

A.    Mm-hmm.

Q.    And when you worked at CEVA, what was

Sara Marconi                                    Mary Campise v Ceva Logistics

your position there?

A.    Sales exec.  I'm not sure what the title was, but business development.

Q.    So when you started working there, what was your annual salary, approximately?

A.    I'm going to estimate 65.

Q.    And when you worked there as a sales representative, how many -- were you on a team?

A.    Yes.

Q.    And do you remember how many people were on your team, approximately?

A.    It averaged -- I think there were six and then it dropped and then it was back.  So it fluctuated, but four to six.

Q.    And do you remember how you ended up getting that job with CEVA?

A.    I applied and interviewed.

Q.    But you didn't have like a lead?  There was no one who reached out to you from CEVA, was there?

A.    I'm trying to think.  Someone may have gotten my name.

Q.    And maybe contacted you?

A.    Yes.

Sara Marconi                                                    Mary Campise v Ceva Logistics

Q.    And you don't remember -- do you remember who that person was?

A.    I know that I was speaking with and interviewing with Rich Antonacci.

Q.    And was he still with the company at the time that you left?

A.    No.

Q.    All right.  And so your testimony is that you worked there for eight years, correct?

A.    Mm-hmm.

Q.    And during those eight years, were you ever placed on a performance improvement plan?

A.    I was not.

Q.    Would you say by and large you had a good experience working at CEVA?

A.    I did.

Q.    I want to fast-forward in time while you were working at CEVA.  Around September 8th, 2017, you contacted my office regarding some concerns that you had about your employment with CEVA; is that correct?

A.    Yes.

Q.    And can you explain for the record what some of those concerns were?

A.     Unfair treatment.

Q.     And so what I'm going to do is I'm going to hand you what's been marked as Plaintiff's Exhibit No. 1, and what I want you to do is -- do you recognize what this document is?

A.     Yes.

Q.     And so what I want you to do is I want you to read that second sentence.  It's in the first line, but it's the second sentence.

A.     "I have agreed to represent you in connection with your claims of unlawful termination and age/gender discrimination."

Q.     Right.  Would you say that's an accurate characterization of what your concerns were while you were at CEVA?

A.     No.

Q.     Well, why don't you tell me what your concerns were while you were at CEVA.

MR. LEVINE:  Objection; form.

BY MR. GASTON:

Q.     You may proceed.

A.     What was the question?

Q.     My question is you've testified that you reached out to my office about unlawful treatment,

Case: 1:18-cv-06534 Document #: 24-5 Filed: 10/21/19 Page 16 of 51 PageID #:547

correct?

A.     Mm-hmm.

Q.     So why do you think that you were being treated unlawfully?

MR. LEVINE:  Objection; form.

BY MR. GASTON:

Q.     You can answer.

A.     There were some accounts that were removed from me that I felt were unfair.

Q.     And when you say that they were removed from you, who were they given to?

A.     Other team members.

Q.     And were those team members males?

A.     No.  Both.  One male, one female.

Q.     But when you contacted me around September of 2017, you remember during our conversation that you expressed that you felt like you were being discriminated against based on gender; is that correct?

MR. LEVINE:  I have to call time out. Objection; form.  And I don't know how to state this, but I do have to state this on the record that you're waiving the attorney-client privilege, I think your counsel, and it's her privilege to

waive.

MR. GASTON: Only with respect to this document I can ask that question.

MR. LEVINE: Yeah, that's true. But I'm going to say to the witness on the record that she doesn't have to disclose to me or anyone what she said to you because it's her privilege that she established with you at the time.

MR. GASTON: But I'm asking the question. So she can communicate that question to me.

MR. LEVINE: No. But you have an absolute -- the witness has an absolute right to say, no, I'm not going to disclose the contents of our conversation. That absolutely is the case. I think that question is terribly inappropriate. So I'm going on the record to say that at least.

MR. GASTON: Right. Are you stating an objection?

MR. LEVINE: Yeah. I just want to make sure the witness understands that she doesn't have to answer that last question. That's really problematic.

MR. GASTON: Well, is that a speaking objection, or is that a form objection?

MR. LEVINE: Well, it's a speaking objection because I think what you just did was an ethics violation, honestly, Andre. You can't make your client or former client, I don't know which she was now, but you can't have -- I can't sit here and allow a witness to think she's obligated to answer in a deposition what she said to you in a privileged communication.

MR. GASTON: I'll move beyond --

MR. LEVINE: There's a different way to approach it, but that question is wrong.

MR. GASTON: I'll move beyond that question, but I think that -- I don't think that you have standing to be able to make that objection if you're not representing Mrs. Marconi.

MR. LEVINE: I don't represent her, but it's wrong to ask that question the way you did.

MR. GASTON: And, again, I'll move beyond --

MR. LEVINE: We need to move on.

MR. GASTON: I'll move on, but let me tell you what I have a problem with, stating for the record. You can't dictate her testimony either. So if you don't have standing to make that objection, you're impeding the nature of the deposition which is

totally improper.

MR. LEVINE: And I'm so okay with calling the judge on this one because that one, Andre, that question is wrong. There are other ways of going about your questioning, and that way is wrong.

MR. GASTON: I know that you don't want her to answer that question in a way because it hurts your client.

MR. LEVINE: No, I don't think so at all.

MR. GASTON: But wait a second. But hold up. I'm going to move on so we're not -- I'll tell you that I do have a problem with you making a speaking objection about -- with respect -- making an objection to a question that I have with respect to a person that you don't represent. She's simply a witness. She's not a party in this case. And you don't have standing to be able to make that objection.

MR. LEVINE: I think I have an obligation as a lawyer to go on the record to let the witness know about that.

MR. GASTON: If you're impeding the testimony during this deposition --

MR. LEVINE: I'm not.

MR. GASTON: We're going to move forward with this, but, obviously, you and I, we can have an off-the-record discussion about this at some point.

MR. LEVINE: Sure.

BY MR. GASTON:

Q. So can you state for the record again what your concerns were about your employment at CEVA Logistics?

A. I'm not sure because I know I came to you with concerns, but after I settled down, it was like, no, this is -- I'm not going to --

Q. Well, I understand.

A. So my concerns were not really -- at that time it was like --

Q. It's true that you decided that you didn't want to move forward with the case, correct?

A. Right. It wasn't -- I was too emotional and under pressure. I just --

Q. Right. But I'm not asking you about your emotion. I'm asking you about what your concerns were while you worked at CEVA. And you expressed those -- let me ask you another question.

Did you on occasion speak to anyone from the EEOC? Do you remember that? From the

Equal Employment Opportunity Commission regarding your matter, a phone interview?

A.     No, I don't remember getting to that point.  Did it?

Q.     Let me hand you --

A.     I thought it was scheduled, but I thought I canceled it.

Q.     So let me hand you what's marked as Exhibit 2.  And I want you to go to the body of the -- if you go down and you'll see the bold writing, it says "the particulars."

A.     Okay.

Q.     And what I want you to do is I want you to go to the second line where it says "during my employment."  Do you see that the second --

A.     "During my employment," yes.

Q.     I'd like for you to read that sentence?

A.     "During my employment, I received less help and support to grow, develop, and achieve my book of business while my younger male coworkers were not similarly treated.  Subsequently, I was constructively discharged on April 12, 2017."

Q.     Right.  And can you read the next sentence, too, out loud, please?

A.    "I believe I have been discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964 as amended."

Q.    So it's your testimony today that you don't remember going to the -- you don't remember having a conversation with someone from the EEOC?

A.    I honestly do not.  I thought it was scheduled and I canceled it, that I didn't go through with it.

Q.    Right.  That you didn't go through -- that you didn't go through with the -- so do you have any reason to believe that the investigator from the EEOC typed this information and just made this up?

MR. LEVINE:  Objection; form.

BY MR. GASTON:

Q.    You can answer.

A.    No.  So this is saying I did talk with them?

Q.    No.  I'm simply asking you do you believe -- do you have any reason to believe that the investigator from the EEOC made this information up on this piece of paper?

A.     No, no.

Q.     Would you say that the information that you just read from this document is an accurate characterization of what your concerns were while you worked at CEVA?

A.     No.  Only towards the end did I get worked up.

Q.     Well, I'm just asking you is it a yes or no?

MR. LEVINE:  Objection; form.

THE WITNESS:  So what was the question?

BY MR. GASTON:

Q.     The question is that after reading this document from the EEOC, is it your testimony today that this is not an accurate characterization of what your concerns were?

A.     It is not accurate today how I --

Q.     I'm asking you if it was accurate at the time.

A.     It's a little stretched.

Q.     So when you say "a little stretched," tell me what you mean by that.

A.     I had -- I think I got caught up and influenced and wanted to jump on the bandwagon.

Sara Marconi                                                    Mary Campise v Ceva Logistics

Q.    And you decided to leave CEVA, correct?

A.    I did.

Q.    Did they terminate you?

A.    No.

Q.    So why did you decide to leave?

A.    I was offered a position with more money.

Q.    And so -- and let me give you this disclaimer too.  At the beginning of this deposition I read you some instructions, correct?

A.    Yes.

Q.    And one of the instructions was that your testimony today has to be truthful, correct?

A.    Correct.

Q.    And that your testimony is subject to the penalties of perjury?

A.    Correct.

Q.    So you understand that when I ask you a question, it's your obligation to answer the questions truthfully, correct?

A.    Yes.

Q.    And so you testified earlier during the deposition that you discussed your employment with other people at CEVA Logistics, correct?

MR. LEVINE:  Objection; form.

THE WITNESS:  I discussed my employment?

BY MR. GASTON:

Q.    Did you ever discuss any of your concerns about your employment at CEVA with anyone else?

A.    Yes.

Q.    And so when you had those discussions, who did you discuss your concerns with from CEVA?

A.    Probably two of the team members.

Q.    So why don't you tell me -- can you identify those team members by name?

A.    Mary Campise and Lori Serafini.

Q.    When you had that conversation with Mary Campise, what did you tell her your concerns were?

A.    I was -- gosh, I don't remember this stuff, but frustrated that the accounts had been taken from me.

Q.    And is it your testimony today that you -- did you ever tell Mary Campise that you felt you were being discriminated against based on gender?  That's a yes or no question.

A.    I just want to make sure if I used those exact words.  Pos- -- yes.

Sara Marconi                                    Mary Campise v Ceva Logistics

Q.    And so -- and when you told her that you felt like you were being discriminated based on gender, was it because the accounts were being given to male employees?  Yes or no?

A.    Yes.

Q.    And what are the names of some of the people that the accounts were -- what are the names of the male employees whom the accounts were given to?

A.    Joe Stupak.

Q.    Anyone else?

A.    Kim McCloud.

Q.    Was there another male?

A.    There's another male, but he didn't get any.

Q.    Do you remember who was responsible for giving those accounts?

A.    Kevin Colligan.

Q.    And do you remember what Mr. Colligan's title was?

A.    Regional sales manager, I think.

Q.    And he was your boss?

A.    Yes.

Q.    And was Mr. Colligan responsible for the

assigning of accounts and territories?

A.    Yes.

Q.    So he was your boss.  You had to answer to him?

A.    Yes.

Q.    And so is it your testimony that you had a problem with the way that Kevin Colligan was distributing those accounts?

A.    Yes.

Q.    Did Mr. Colligan ever tell you -- did he ever explain to you why he was giving the accounts to certain male employees?

A.    Yes.

Q.    Why did he -- what did he tell you?

A.    He wanted different representation on it.

Q.    So he just wanted different representation on those accounts?

A.    See if they could get more business out of it.

Q.    And so Mr. Colligan essentially chose who he wanted to have those accounts, correct?

A.    Mm-hmm.

Q.    Is that a yes or a no?

A.    Yes.  Sorry.

Q.    So he was ultimately the person responsible for making the decisions on who got what accounts, correct?

A.    Correct.

Q.    And you're not aware that CEVA had a policy on how they would assign accounts, are you?

A.    No.

Q.    You never saw anything in writing that CEVA had in terms of how they would distribute accounts, did you?

A.    No.

Q.    And to this day, you're not aware that they had any policy, are you --

A.    No.

Q.    -- about how to assign accounts?

A.    No.

Q.    So it's your understanding that based on your employment there that Mr. Colligan was the person solely responsible for making the decisions on who got which accounts, correct?

A.    Yes.

Q.    Do you have knowledge -- do you have any knowledge that Mr. Colligan had personal

friendships with the male employees who worked on your team?

A. Yes.

Q. And how did you know that he had personal relationships with these male employees?

A. Because one of the males was -- stood up in his wedding as a groomsman.

Q. And was that male ever placed on a performance improvement plan?

A. No.

Q. Was that male given preferential treatment as far as the giving of accounts was concerned?

A. No.

Q. No. How do you know?

A. Not that I witnessed.

Q. So did Mr. Colligan ever explain to you what accounts he gave to this individual who stood -- first of all, give me the name of the person who stood up in his wedding.

A. Ben Vaughn.

Q. And so have you ever on any occasion had a conversation with Mr. Colligan about what accounts he was giving Ben Vaughn?

A.    No.

Q.    Because that's not something Mr. Colligan would have done?  He wouldn't have discussed with you why he was giving an account to Ben, correct?

A.    Correct.

Q.    So you can't testify one way or the other why Mr. Colligan gave Ben a certain account, can you?

A.    No, I cannot.

Q.    So you testified that ultimately you decided that you wanted to leave CEVA for a better opportunity at your new employer, correct?

A.    Yes.

Q.    And you testified that you were going to be paid more money, correct?

A.    Yes.

Q.    What's the name of your current employer?

A.    Damco.

Q.    And you're in sales at this company, correct?

A.    Yes.

Q.    Have you ever had -- have you had any

Sara Marconi                                                    Mary Campisc v Ceva Logistics

complaints or concerns about gender discrimination at this company?

A.     No.

Q.     And do you have a direct report who assigns your accounts to you?

A.     Yes.

Q.     Is that a male or a female?

A.     Male.

Q.     And at this company, is there a policy that you know of on how accounts are assigned to the salespeople?

A.     No.

Q.     So the -- your supervisor essentially is in charge of making those decisions, correct?

A.     Yes.

Q.     So your supervisor could decide to give you three accounts that are favorable accounts and give someone else one account, correct?

A.     Yes.

Q.     Much the same way that Mr. Colligan could decide that he wanted to give accounts to his male friends and not females, correct?

MR. LEVINE:  Objection; form.

BY MR. GASTON:

Q.     You can answer.  Let me help you.

Mr. Colligan had the discretion to assign the accounts to whomever he wanted to, correct?

A.     Correct.

Q.     He could assign them to males if he wanted to, correct?

A.     Correct.

Q.     Or he could assign them to females, correct?

A.     Correct.

Q.     So if he assigned the majority of the accounts to males, you couldn't question Mr. Colligan's decision, could you?

A.     No.

Q.     Because he unilaterally made the decisions, correct?

A.     May I take that back?  You could debate him.  He would want to hear your argument.

Q.     Right.  But he ultimately made the decision?

A.     Correct.

Q.     Was there anyone else in the

Sara Marconi                                    Mary Campise v Ceva Logistics

organization who made the decision about how the

accounts were assigned?

A.      I would say his boss could get involved.

Q.      And who was his boss?

A.      I was afraid you'd ask.  I think at the

time it was Dan Stahl.

Q.      Dan Stahl.  And do you remember what

Mr. Stahl's title was?

A.      No, but that position changed a lot too.

Q.      Are you familiar with an individual

named Steve Walter?

A.      Yes.

Q.      How are you familiar with Mr. Walter?

A.      He was managing director, and I forget

his other titles.  He moved up, but he was also the

gentleman I went to work for when I left CEVA.

Q.      Where was he working?

A.      It was a company called Aries.

Q.      Did you ever have a conversation with

Mr. Walter about your complaints or concerns while

you worked at CEVA?

A.      No.

Q.      Did you ever have a conversation with

your husband about the concerns that you had while

Sara Marconi                                    Mary Campise v Ceva Logistics

you worked at CEVA?

A.     Yes.

Q.     And you had conversations with Mary Campise about your concerns while you worked at CEVA, correct?

A.     Yes.

Q.     And those concerns had to do with Mr. Colligan giving those accounts to male employees, correct?

A.     Yes.

Q.     Mrs. Marconi, you don't have any personal animus against anyone at CEVA Logistics, do you?

A.     I do not.

Q.     And this is probably not the place where you want to be today, is it?

A.     Not at all.

Q.     Right.  And you don't want any deposition testimony to be construed as you trying to get back at anyone at CEVA?

A.     Correct.

Q.     And you're only here because you were subpoenaed to be here, correct?

A.     Correct.

Q.     And there's no reason why you wouldn't be in here telling the truth, is there?

A.     Wait.  There's no -- I'm here to tell the truth.

Q.     You are here to tell the truth, correct?

A.     Correct.

Q.     And your testimony has been truthful?

A.     Correct.

Q.     And you have testified that -- and your testimony is that accounts were being given to male employees over female employees; is that correct?

MR. LEVINE:  Objection; form.

MR. GASTON:  You can strike that question. That's all I have.

                    EXAMINATION

BY MR. LEVINE:

Q.     Ms. Marconi, my name is Mark Levine.  I represent CEVA Logistics, the defendant in this case.  And just for the record, we met for the first time when you walked in the room, correct?

A.     Correct.

Q.     We've never spoken before?

A.     I don't believe so.

Q.     No, we wouldn't have.  I mean, I can

Sara Marconi                                                    Mary Campise v Ceva Logistics

tell you that too.

I want to take a look quickly at Exhibit 1 there. I have a copy. That was a badly phrased question. Would you mind taking a look at Exhibit 1. I notice it doesn't appear you executed Exhibit 1. Do you recall if you ever signed an engagement letter with Mr. Gaston?

A.    I do not recall.

Q.    And then on Exhibit 2, this document here in front of you that's called "Charge of Discrimination," did you type up any of the information in this document? Do you know if you typed it?

A.    I didn't type this.

Q.    And then I notice it's not signed by anybody at the bottom, correct?

A.    Correct.

Q.    That's all I wanted to ask about those two real quick.

And when you go second in a deposition, sometimes it's asking questions based on things I heard that I wanted clarity. So I may be jumping all around the board, so I apologize for that.

Sara Marconi                                             Mary Campise v Ceva Logistics

One of the things I don't think we have talked about today is what were your job duties at CEVA Logistics as what I think you described it was a sales executive or some sort of job title like that?  What did you do before leaving?

A.    You went out, hunted for new business, cold call, try to find customers, follow up on leads.  Basically, bring in customers.

Q.    Was it your responsibility to go get the new business?

A.    Yes.

Q.    And then service accounts that you brought in?

A.    Yes.

Q.    That's basically what the job was. Because there was a lot of discussion about assigning accounts to people.  So during your time with CEVA, how much of the clients that you worked with or brought in were given to you by Kevin Colligan, who I guess for a period of time was your boss, versus accounts that you just brought in yourself, as a percentage?

A.    What's the percentage?

Sara Marconi                                                    Mary Campise v Ceva Logistics

Q.    Yeah.  Do you have an idea?

A.    Minimal.  Maybe 10 percent were assigned to you at the most.

Q.    To you personally or generally?

A.    To the reps.

Q.    Do most of the sales team get their business by going and getting it on their own?

A.    Yes.

Q.    It wasn't related to assignments that Kevin made?  It was mostly on their own?

A.    Mostly on their own.

Q.    Do you -- was Kevin Colligan at CEVA when you joined the company?

A.    He was not.

Q.    You and Mr. Colligan had worked together in the past?

A.    Yes.

Q.    And what was the name of the company you and him had worked at in the past?

A.    BAX.

Q.    And how is that spelled?

A.    B-A-X.

Q.    What years, if you recall, did you work with Kevin at BAX?

Sara Marconi                                                        Mary Campise v Ceva Logistics

A.    I'm guessing '93 to '95.

Q.    A long time ago?

A.    Yeah.

Q.    Did you and Kevin Colligan work together again between BAX and him showing up at CEVA Logistics?

A.    Possibly.  I'm not sure.  There was -- gosh, my years are all messed up.  Was it in '99 did I work for EGL, E-G-L, and we may have -- I wasn't even there a full year.

Q.    And do you have some understanding that EGL was later acquired by CEVA Logistics?

A.    Yes.

Q.    But were you at -- when you came to CEVA, was it already CEVA?  It was post the acquisition of EGL?

A.    Correct.

Q.    Did you -- I'm going to mark Exhibit 3 to your deposition.

(Marconi Deposition Exhibit 3 was marked for identification.)

BY MR. LEVINE:

Q.    I'll hand you this document.  It's Exhibit 3.  Does that look like a true and correct

copy of your resignation letter?

A.    That is correct.

Q.    And you -- this reflects that you resigned on April 12th, 2017, correct?

A.    Correct.

Q.    And you resigned to Kevin, Kevin Colligan?

A.    Correct.

Q.    When you resigned, did you have the new job lined up?

A.    Yes.

Q.    And a new job with a competitor in the logistics industry?

A.    Yes.

Q.    That was offering you more money than CEVA was paying you?

A.    Yes.

Q.    Fair enough.  Had you resigned in the past from CEVA?

A.    Yes.

Q.    Tendered a resignation but didn't go through with it?

A.    Yes.

Q.    Fair to say Kevin talked you out of it?

Sara Marconi                                    Mary Campise v Ceva Logistics

A.    Yes.

Q.    Did you think Kevin had good intentions when he was talking you out of resigning?

A.    Yes.

Q.    You're originally from Wisconsin?

A.    Yes.

Q.    And did Kevin at a time assign you accounts in Wisconsin?

A.    Yes.

Q.    Were you happy to take those accounts?

A.    Very.

Q.    And why?

A.    Because it allowed me to travel and be in Wisconsin.

Q.    At some point in time, did Kevin talk to you about an opportunity to work in Wisconsin?  Do you remember anything about that?

A.    Yes.

Q.    Do you think that Kevin had good intentions towards you in assigning those accounts to you in Wisconsin and talking with you about a potential of working in Wisconsin?

A.    Yes.

Q.    Had you shared with Kevin you wanted to

Sara Marconi                                          Mary Campise v Ceva Logistics

do work in Wisconsin?

A.    Yes.

Q.    And shared with him the idea that you'd like to move back there if you could?

A.    Yes.

Q.    Where in Wisconsin, by the way, are you from?

A.    Madison.

Q.    I've heard it's nice.

Kim McCloud is a woman, correct?

A.    Yes.

Q.    Sounds like a weird question but Kim could be a male name.

A.    I know.

Q.    I've made that mistake.

I think you mentioned earlier -- did an account get transferred or maybe given to Kim that you thought should have been given to you?

A.    Possibly.  I don't remember.

Q.    Okay.  You talked about some accounts that were given to Joe and Kim earlier.

A.    Yes.

Q.    Was there -- do you remember the name of the account that was given to Joe?

Sara Marconi                                                    Mary Campise v Ceva Logistics

A.    I don't.

Q.    Was it more than one that you were talking about in your earlier testimony?

A.    Gosh, I don't remember.

Q.    Okay.  With Kim McCloud, was it more than one account that was given to Kim that you thought maybe you should have been given?

A.    Can I just explain?

Q.    Sure.

A.    So there's -- there was a list of accounts under my name, many of whom I hadn't even met with yet, but they were -- it had my sales code to it.  And Kevin went through and reassigned the list.

Q.    And so these were accounts that you hadn't made contact with?

A.    Correct.

Q.    Like were they prospects or just businesses that could be a prospect?

A.    Prospects, old clients that had shipped in the past.

Q.    Got it.  People who weren't current customers?

A.    Correct.

Sara Marconi                                           Mary Campise v Ceva Logistics

Q.     But might be if you solicited them?

A.     Correct.

Q.     I understand.

       How much of a book of business did Kevin Colligan give you or assign to you in Wisconsin?

A.     Large.  I was the only representative at the time.

Q.     Was there somebody -- how was it that there was -- was there any other representative in Wisconsin?

A.     Yes.  There was Jessica Peltier.

Q.     Had she left?

A.     She went back -- she didn't leave the company, but she went back to her position in brokerage.

Q.     Did this create an opportunity for Kevin to decide who to give the accounts to?

A.     Yes.

Q.     And he gave them to you?

A.     Yes.

Q.     Did that result you in becoming commissionable, or were you already getting commissions; do you know?

Sara Marconi                                                    Mary Campise v Ceva Logistics

A.    It made me commissionable.

Q.    Which means you met your quota and then started earning commissions?

A.    Yes.

Q.    Did you ever -- well, did Steve Walter ever work with you directly during your employment with CEVA?

A.    Yes.

Q.    Where was he working when you were at CEVA?

A.    So he was -- I think the title was managing director, and he worked directly with me with an account.

Q.    Okay.  Do you remember how long ago, when?

A.    It was when Rich was still there, so back in '09.

Q.    So it was before Kevin Colligan came to the company?

A.    Yes.

Q.    Did you work at CEVA at a time when Steve was Kevin's boss?

A.    Yes.

Q.    Do you remember when?

A.     It was when Kevin joined CEVA.

Q.     And then did Steve move out of that position of being Kevin's boss?

A.     Yeah.  Eventually then -- you're going to ask me when, but Steve moved to Texas.  He was VP of operations I think for the energy division.

Q.     So he moved out of the sales group?

A.     Yes.

Q.     I don't know if you know when that was.

A.     Let's see.  If I left in '17, I would guess it was around '15, '16.

Q.     So fair to say in the last few years of your employment Steve was not Kevin's boss?

A.     That would sound right.

Q.     Let me just flip through my notes real quick.

       Where did you go to work immediately after CEVA?

A.     Aries Worldwide.

MR. LEVINE:  I pass the witness.

                    FURTHER EXAMINATION

BY MR. GASTON:

Q.     So just a couple questions real quick, Sara.

Have you ever had a conversation with any of the representatives that were on your team at CEVA about the number of accounts that Kevin Colligan would have assigned them?

A.    Would have assigned them?

Q.    Sure.

A.    No.

Q.    So you don't know how many accounts Kevin assigned to any other representative other than yourself, do you?

A.    True.

Q.    So if you don't know the number of accounts that he would have assigned, you can't testify that you know the percentage of accounts that he assigned to any other representative either, do you?

MR. LEVINE:  Objection; form.

THE WITNESS:  I guess that's correct.

BY MR. GASTON:

Q.    You can only testify to the number of accounts that Kevin Colligan assigned to you, correct?

A.    Yes, correct.

Q.    When you were in Wisconsin, you

testified -- is it your testimony that you were the only representative in Wisconsin at the time?

A.    There was a period.

Q.    Where you were the only representative, correct?

A.    Correct.

Q.    And so there was no one else that Mr. Colligan could have given those accounts to anyway, is there?

A.    The Wisconsin accounts?

Q.    Correct.

A.    Correct.

Q.    So you were the only one, correct?

A.    Correct.

Q.    So there was no male employee that could have serviced those accounts in Wisconsin, correct?

A.    Correct.

Q.    And is it your testimony that another CEVA employee moved to Wisconsin?

A.    She lived in Wisconsin, was hired.

Q.    It's your testimony that Mr. Colligan assigned some accounts to her that were in Wisconsin, correct?

A.    Yes.

Q.    And Mr. Colligan essentially had no other choice but to give those accounts to you and the other representative who lived in Wisconsin, correct?

MR. LEVINE:  Objection; form.

BY MR. GASTON:

Q.    You can answer.

A.    Yes.

MR. GASTON:  That's all I have.

FURTHER EXAMINATION

BY MR. LEVINE:

Q.    I wasn't sure where you lived.  So at the time you were with CEVA, did you reside in Illinois?

A.    Yes.

Q.    Have you -- when is the last time you lived in Wisconsin?

A.    When I was 24.

Q.    Which is a while ago?

A.    It's a while ago.  '85, '86.

Q.    So on those last few questions, you have family in Wisconsin, right?

A.    I do.

Q.    But when you were servicing these

accounts in Wisconsin, you were doing it from here in the Chicago area?

A.    Yes.

Q.    And there were other Chicago account managers here?

A.    Yes.

MR. LEVINE:  That's all the questions I have.

MR. GASTON:  That's it.

FURTHER DEPONENT SAITH NAUGHT

(Proceedings concluded at

1:52 p.m.)

Sara Marconi                                                    Mary Campise v Ceva Logistics

STATE OF ILLINOIS        )
                         )  SS:
COUNTY OF COOK           )


            I, Valerie M. Calabria, CSR, RPR, do hereby certify that SARA MARCONI was duly sworn by me to testify the whole truth, and that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

            I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

            IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of August, A.D. 2019.




                    Valerie Calabria

            Valerie M. Calabria, CSR, RPR
            Illinois CSR License 084-003928