UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY CAMPISE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:18 CV 6534 |
| ) | Hon. Marvin E. Aspen |
| CEVA LOGISTICS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

We have before us Defendant CEVA Logistics' ("CEVA") motion for summary judgment as to all counts of the complaint. (Dkt. No. 19.) CEVA submitted its statement of material facts in accordance with Local Rule 56.1 (Dkt. No. 26.), in addition to a memorandum of law in support of its motion for summary judgment. (Dkt. No. 25.) Plaintiff submitted a memorandum of law in response to the motion that included a general statement of facts but no Rule 56.1 statement. (Dkt. No. 24.) For the foregoing reasons, we grant Defendant's motion for summary judgment in its entirety.

**BACKGROUND**

Mary Campise is a citizen of Illinois whom CEVA logistics previously employed as a sales executive. (Pl.'s Resp. Mem. to Def. Mot. for Summary Judgement ("Pl. Resp. Mem.") (Dkt. No. 24.) at 1.) Campise began working for CEVA in 2015. (*Id.*) CEVA terminated her employment in May of 2017. (*Id.* at 4.) Campise failed to meet her sales quota every quarter she worked for CEVA. (Campise Dep. 70:21–24, 71:9–16.) CEVA placed Campise on a performance improvement plan in early 2017. (*Id.*) Campise never received a sales commission

during her time at CEVA. (*Id.* 71:17–72:2.) She admits not receiving a commission means she had not met her quota in any quarter during her employment with CEVA. (*Id.*) Campise claims CEVA did not track sales data correctly. (*Id.* 74:13–23.) CEVA denies this and states that Campise simply did not meet her sales quota. (Colligan Decl. ¶ 21.)

CEVA Logistics employs Kevin Colligan as its Regional Vice President for the Midwest team. (*Id.*) Colligan ran the Chicago office and oversaw the Midwest sales team. (*Id.*) Colligan oversaw the sales team Campise worked on. (Def.'s Resp. to Pl.'s Statement of Facts ("Def. SOF Resp.") (Dkt. No. 26) at 9.) Colligan worked for CEVA for over eight years. (*Id.*) Colligan was responsible for and had discretion to assign non-revenue accounts. (*Id.*; Pl. Resp. Mem. at 2.) Colligan was also responsible for driving sales and providing support to his sales team. (Def. SOF Resp. at 10.) Colligan would "ride" with a member of his sales team, meaning join them to meet a client or potential client. (Pl. Resp. Mem. Ex. C ("Colligan Dep.") (Dkt. No. 26–C) 27:1–16.) Colligan testified that it was in his sole discretion who he would ride with and there was no written policy on the matter. (Def. SOF Resp. at 10.) Colligan also said the majority of the time he would ride with an employee when he was asked to ride with them. (Colligan Dep. 27:1–20.) Colligan admitted his broad discretion could allow him to assign accounts to men but stated he had not considered gender when assigning accounts. (Colligan Dep. 33:21–35:16.)

Steve Walter was Kevin Colligan's immediate supervisor beginning in September of 2018. (Def. SOF Resp. at 5; Pl.'s Mem. in Opposition to Summary Judgment Ex. D ("Walter Dep.") (Dkt. No. 24–D) 10:18–11:3.) Walter worked out of Houston, Texas when he was rehired in 2018. (Walter Dep. 14:17–15:6.) Walter was not sure whether there was a human resources representative in the Chicago office. Colligan, however, stated there was an HR representative in

Chicago the whole time Campise was employed at CEVA. (Def. SOF Resp. at 10; Colligan Dep. 22:5–23.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record. . . ." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Litigants in the Northern District of Illinois are required to comply with local rules designed to effectuate these Federal Rules of Civil Procedure:

> Each party opposing a motion filed pursuant to Fed.R.Civ.P. 56 shall serve and file--
> (1) any opposing affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
> (2) a supporting memorandum of law; and
> (3) a concise response to the movant's statement that shall contain:
> (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and
> (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
> (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N.D. Ill. L.R. 56.1(b). "Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, [the Seventh Circuit has] consistently upheld the district court's discretion to require strict compliance with those rules." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). District courts have "no obligation to construe [a party's statements] as compliant." *Id.* at 634.

"The district court is not obliged to scour the record looking for factual disputes." *Id.* (quotation omitted).

A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party may not rest upon the mere allegations or denials of the adverse party's pleading, but rather must set forth specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

We initially note Plaintiff's failure to conform to the dictates of Local Rule 56.1. First, she did not file a statement of facts consisting of short numbered paragraphs citing to the record requiring denial of summary judgment. N.D. Ill. L.R. 56.1(b)(3)(B). Second, she did not file a response to the Defendant's statement of material facts including specific references to the record or other supporting materials. N.D. Ill. L.R. 56.1(b)(3)(C). Thus, procedurally, the Court is within its rights to consider Plaintiff's response to Defendant's motion as disputing *no* factual allegations. *Bay Area*, 423 F.3d at 633. Nevertheless, we attempt to glean the facts Plaintiff impliedly asserts and cross-reference the exhibits Plaintiff submitted ourselves to determine

4

whether there was any support for her version of events in the record. In addition, we still construe all facts in the Defendant's Rule 56.1 statement in the light most favorable to the Plaintiff. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. We conclude that Plaintiff has failed to raise a genuine issue of material fact on each count of her complaint, and thus grant the Defendants summary judgment motion in its entirety.

I. **Sex Discrimination Claims**

Title VII prohibits employers from retaliating against employees for testifying, assisting, or otherwise participating in a sex discrimination investigation. 42 U.S.C. § 2000e–3(a). Retaliation and discrimination can both be proven under a direct or indirect method. *Coleman*, 667 F.3d at 859. To prove retaliation or discrimination under the direct method, plaintiff must show that: (1) she engaged in protected activity or was a member of a protected class, (2) she suffered a materially adverse employment action, and (3) there was a causal link between her protected activity or protected class membership and the adverse action. *Harden v. Marion Cty. Sheriffs Dept.*, 799 F.3d 857, 861–62 (7th Cir. 2015); *Coleman*, 667 F.3d at 845. To prove retaliation under the indirect method, the plaintiff must show that: (1) she engaged in protected activity or was a member of a protected group, (2) she suffered a materially adverse employment action, (3) she was meeting his employer's legitimate expectations, and (4) she was treated less favorably than similarly-situated employees who did not engage in protected activity or was not a member of a protected group. *Id.* at 862. "Once the plaintiff establishes a prima facie case under the indirect method, a presumption of retaliation is triggered and the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action." *Id.* (quotation omitted). "When the employer does so, the burden shifts back to the plaintiff, who must present

evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (citing *Coleman*, 667 F.3d at 845).

Plaintiff makes three arguments in her sex discrimination claim: (1) she was subject to sexist statements; (2) she faced biased treatment; (3) she was fired in retaliation for her complaints about sexism in the workplace. We address each of these categories of argument in turn.

### A. Sexist Statements

Campise alleges she faced persistent sexist statements and abuse from her colleagues, but points to only a single concrete instance of such conduct.[1] Colligan made a statement about the music he listened to while having sex, which is clearly inappropriate sexually explicit conduct at a work event. Nevertheless, Colligan's statement was not directed *at* Campise, nor was it designed to target her indirectly. (Campise Dep. 62:14–22.) Instead, Campise's argument amounts to a complaint that Colligan's explicit statement created a hostile work environment. Such a claim requires significantly more: Campise would need to show evidence of a pattern of sexist comments, rather than a single inappropriate statement at a company dinner. (*Id.*) Finally, it is not clear what Plaintiff believes the relationship between the Colligan statement and Campise's ultimate termination is: the two appear to be completely unrelated, even in her

---

[1] Campise mentions broadly that she believed the men in her workplace were talking about her or her female co-workers in sexist ways. (Campise Dep. 60:24–61:14.) She also generally asserts that they would make sexist comments, but without any examples of such a comment or pointing to any particular incident, save the one with Colligan. (Campise Dep. 62:23–63:9.) As a result, her characterization of events appears to solely reflect either speculation or her subjective feeling at the time. But without more detail or documented complaints, we cannot credit her bare conclusory assertion that she was subject to repeated sexist remarks. *Hosick v. Chi. State Univ. Bd. of Trustees*, 924 F. Supp.3d 956, 968–69, 977 (N.D. Ill. 2013); *ExxonMobil Oil Corp. v. Amex Const. Co., Inc.*, 702 F. Supp.2d 942, 971 (N.D. Ill. 2010). Thus, we focus on the single specific incident Campise points to in the record before us.

6

recounting of events. Campise says she contemporaneously complained about the comment, but does not tie her complaint in any way to her retaliation argument. (Campise Dep. 91:16–92:3.) Finally, while hostile language raises the specter of sexual harassment, Campise *explicitly* disclaimed that theory when asked "[y]ou are not bringing a sexual harassment case to this lawsuit, correct?" she replied "No, correct." (Campise Dep. 94:12–17.) Thus, Campise's proffered evidence of a single incident of sexually inappropriate workplace discussion is merely weak evidence suggesting Colligan's gender bias or lack of attention to gender issues in his office, rather than direct evidence of sexual harassment. If, for example, Campise's supervisor made statements suggesting he viewed women as worse salespeople than men generally, that would be strongly probative of her claim. Frankly, nothing about Colligan's comment about the music he once had sex to suggests he would not assign sales accounts to women. In fact, Campise herself points to Colligan's alleged favoritism *in favor* of Kim McCloud at her expense, suggesting any gendered bias is relatively muted at best. (Campise Dep. 67:1–16.)

### B. Biased Treatment

While we view the facts in the light most favorable to the Plaintiff on a motion for summary judgment, conclusory assertions, speculation, and statements of subjective belief, standing alone, do not create a genuine issue of material fact for a jury. *Hosick v. Chi. State Univ. Bd. of Trustees*, 924 F. Supp.3d 956, 968–69, 977 (N.D. Ill. 2013); *ExxonMobil Oil Corp. v. Amex Const. Co., Inc.*, 702 F. Supp.2d 942, 971 (N.D. Ill. 2010); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation . . . .").

Plaintiff fails to raise a genuine issue of material fact that women were subjected to biased treatment in the assignment of accounts. She cannot point to contemporaneous statements

suggesting she lost accounts because of her gender (or age). (*See* Campise Dep. 94:18–97:17.) She does not know how many accounts are given to men versus the number given to women. (Campise Dep. 89:13–90:7.) She cites no statistical evidence in support of her claim that men receive favorable treatment. She cannot say for sure whether the men given the accounts tend to close the accounts with greater frequency than she does. She cannot even rule out the plausible explanation that Colligan simply thought she was not good at her job. (*See* Colligan Dep. 51:15–52:2.) The sole putative corroborating witness, Sara Marconi, *declined* to corroborate Campise's testimony. (Marconi Dep. 23:2–24.) Far from corroborating Campise's claims that CEVA's environment was sexist, Marconi says she was worked up and angry because "[t]here were some accounts that were removed from me that I felt were unfair." (*Id.* 16:8–9.) Her accounts were also *not* reassigned only to men, but instead to "Both. One male, one female." (*Id.* 16:14.) Marconi says she would characterize the claims of sexism as "a little stretched" and that she "think[s she] got caught up and influenced and wanted to jump on the bandwagon." (*Id.* 23:18–24.) In other words, Campise points to no concrete and non-conclusory evidence of gender bias in assignment distribution, and her sole witness to corroborate her sweeping account of CEVA's bias declined to support her story.

On a motion for summary judgment, we do not credit generalized, subjective accounts steeped in speculation, assertion and innuendo, particularly where those accounts are not corroborated. *Hosick v. Chi. State Univ. Bd. of Trustees*, 924 F. Supp.2d 956, 968–69, 977 (N.D. Ill. 2013); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (describing personal knowledge and allegation of specific facts as sufficient to raise a genuine factual issue, but declining to find such an issue existed). Thus, Campise fails to raise evidence sufficient for a reasonable jury to find for her as to the existence of gender bias in account assignments.

Therefore, Campise's claim fails because she cannot prove she would have met her employer's legitimate expectations "but for" her employer's discrimination. Put another way, CEVA reasonably terminated Campise because she failed to meet her sales quotas for over two years (Campise Dep. 71:9–73:9); Campise could not show her failure to meet quota was a result of discrimination.

### C. Retaliation

To prove retaliation under the direct method, the plaintiff must show that: (1) she engaged in a protected activity, (2) she suffered a materially adverse employment action, and (3) there was a causal link between her protected activity and the adverse action. *Harden*, 799 F.3d at 862. To show a causal link, the plaintiff must present sufficient evidence that her protected activity "was a substantial or motivating factor in [her] termination." *Id.* Plaintiffs may rely on direct or circumstantial evidence to establish causation. *Id.* "[E]ven if no single piece of evidence amounts to a smoking gun, [Plaintiff] may establish retaliation by assembling a number of pieces of evidence none meaningful in itself. . . ." *Id.* (internal quotation marks omitted). The Seventh Circuit recognizes three categories of circumstantial evidence: "suspicious timing, ambiguous statements, and 'other bits and pieces from which an inference of [retaliatory] intent might be drawn;' evidence that similarly-situated employees were treated differently; and evidence that the employer's stated reason for the decision was pretext." *Id.* (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 647 (7th Cir. 2013)). "Temporal proximity between an employee's protected activity and an adverse employment action is rarely enough to show causation." *Harden*, 799 F.3d at 862. Short timeframe between reporting and adverse consequences can be enough where there is "corroborating evidence of retaliatory motive," but not without such evidence. *Id.* at 863 (quoting *Coleman*, 667 F.3d at 861).

Plaintiff's timing evidence is thin even construing all available evidence in her favor. Campise herself characterized her complaint as primarily about "giving accounts to Ben and Joe that are in our territory," rather than gender or age discrimination specifically. (Campise Dep. 94:23–24.) Plaintiff offers no specific complaint based on gender or age discrimination from which one could infer retaliatory intent. (Campise Dep. 94:22–95:21.) Instead, she claims vaguely that at one point she made a complaint to her supervisor about conditions that she believed related to age and gender discrimination. (*Id.*) The parties dispute, and nothing more than assertions support, the content of those complaints. (Campise Dep. 94:18–95:4; Def. SOF Resp. at 3.) Given the lack of clarity about the point at which the purported protected activity occurred, it is hard to say the timing of Plaintiff's termination was suspicious. On the other hand, the timing of her termination also occurred in the quarter after she was issued a formal warning for failing to meet her sales quotas for eight straight performance quarters. (Campise Dep. 73:24–74:8.) The timing of Plaintiff's firing appears to more closely align with CEVA's account of events, even assuming the truth of Plaintiff's account of events. Given the weak timing evidence, Plaintiff needs some corroborating evidence of retaliatory motive. *Harden*, 799 F.3d at 862–63. If, for example, her evidence for the underlying gender or age discrimination claims were particularly strong that might show her employers were attempting to guard themselves against the claim. *Id.* As explained above in our evaluation of the evidence on discrimination, Campise's underlying claim is weak and largely speculative. As a result, her supervisors' motivation to terminate her to guard against her claim is similarly weak and speculative at best. Absent any other corroborating evidence of motivation to retaliate, Campise's timing evidence cannot alone allow her retaliation claim to survive summary judgment.

Campise also argues CEVA's rationale for terminating her was pretextual. To establish whether a proffered rationale for termination is pretextual, we do not evaluate "whether the stated reason 'was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harden*, 799 F.3d at 864 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). "A pretextual decision, then, involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Harden*, 799 F.3d at 864 (internal quotation marks omitted).

Plaintiff offers no evidence from which we can conclude her termination was pretextual. CEVA's stated reason for Campise's discharge is, at worst, mistaken. Plaintiff admits she had not met her sales quota for eleven straight quarters, at least the way CEVA was recording the sales. (Campise Dep. 72:7–16.) Although Plaintiff challenges Defendants' method of calculating and recording sales as mistaken, such a mistake does not establish pretext. Plaintiff needs to show that the mistaken calculation was *specifically designed* to give employer a reason to terminate her employment to make out her pretext argument. *Harden*, 799 F.3d at 864. Nothing on this record supports that claim. To the contrary, CEVA appears to have calculated sales quotas the same way the entire time Campise worked for the company. (Campise Dep. 73:16–74:21.) In other words, nothing changed in their calculation before or after Campise made her complaint. If anything, the sales quota policy is circumstantial evidence demonstrating the *lack* of pretextual reasoning behind Plaintiff's termination.

Further, even if Plaintiff could establish a causal connection between her termination and her complaints, her complaints were not a statutorily protected activity. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or

some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997); *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)). For example, in *Tomanovich*, the Plaintiff claimed he was terminated because of his complaint about sexual and national origin harassment, without significant specific allegations regarding either form of discrimination. 457 F.3d at 664. The Court determined his complaints were too general and referenced too little actual evidence of either discrimination at the time they were made to constitute a statutorily protected activity. *Id.*

Plaintiff cannot turn a complaint about sales into a qualifying protected activity after the fact. Plaintiff adduces no evidence to demonstrate that she lodged a complaint about gender or age discrimination. In fact, she has no evidence supporting she even *mentioned* age or gender discrimination when she complained to Colligan. Much like *Tomanovich*, Plaintiff can point to nothing beyond her own deposition to support her claim she complained about sex or age discrimination. *See id.* Even then, her deposition testimony is conclusory and vague on the content of her complaint. Finally, her complaint was not even of the official variety at issue in *Tomanovich*, it was an unofficial statement to her direct supervisor. *Id.*; (Campise Dep. 91:16–96:7.) Thus, even if Plaintiff's complaints were causally related to her termination, they were too general to be statutorily protected activity.

## II. Age Discrimination Claims

The Age Discrimination in Employment Act of 1967 ("ADEA") outlaws discharge of any individual or discrimination against any individual because of her age. 29 U.S.C. § 623(a)(1). In

order to prove disparate treatment because of age, plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343 (2009).

Plaintiff adduces zero evidence to survive summary judgment on her age discrimination claim. Plaintiff's *sole* factual statement describing age discrimination cannot even muster a citation to the record. Campise's own deposition contains no specific claim, incident, or even comment that suggests even a hint of age discrimination. When asked whether her supervisor ever made "any age bias[ed] remarks in your presence?" Campise responded "No." (Campise Dep. 61:18–20.) Similarly, Plaintiff's response to Defendant's summary judgment memo contains a single reference to a fact in the section about age discrimination: "Campise is over 40 years of age . . . Plaintiff was terminated and individuals who less [sic] than 40 years of age were treated more favorable [sic]." (Pl. Mem. at 11.) The only other claim Plaintiff or her counsel makes is that "younger workers were given accounts and set up to succeed while older workers were excluded." (*Id.* at 10.) No specific factual evidence in the record supports this claim beyond this bare assertion.

Plaintiff's proof of age discrimination is entirely speculative, which we cannot consider at the summary judgment stage. The Court must "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *ExxonMobil Oil Corp. v. Amex Const. Co., Inc.*, 702 F. Supp.2d 942, 961 (N.D. Ill. 2010) (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000)). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter; rather it requires affidavits that cite *specific concrete facts* establishing the existence of the matter asserted." *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.

13

1998) (emphasis added); *c.f. ExxonMobil*, 702 F. Supp.2d at 962. "Mere speculation cannot create questions of fact and opinions expressing a mere possibility with regard to a hypothetical situation are insufficient to establish a genuine issue of material fact." *ExxonMobil*, 702 F. Supp.2d at 962 (quotation omitted).

The only mentions of younger workers getting preferential treatment are speculative and we therefore cannot consider them on summary judgment. The Plaintiff's sole identified fact related to age discrimination in her Rule 56.1 statement is: "younger workers were given accounts and set up to succeed while older workers were excluded." Plaintiff does not even cite to the record following this statement, much less provide non-speculative and non-conclusory evidence to support it. Searching the record ourselves, it is clear why: the only mentions of age discrimination in any of the Plaintiff's submission in response to this motion were speculative or conclusory assertions in Plaintiff's own deposition. (Campise Dep. 24:11–25:23, 80:3–14, 85:20–86:1, 98:14–15.) Plaintiff has failed to meet her initial burden of proof, so no genuine issue of material fact exists for trial on her age discrimination claims.

### III.  Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress has three elements in Illinois: (1) the conduct must be extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; (3) the conduct must cause severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (quoting *McGrath v. Fahey*, 544 N.E.2d 806, 809 (Ill. 1988)).

Conduct is not extreme or outrageous if it is "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *McGrath*, 544 N.E.2d at 809. "[T]o qualify

14

as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83. "The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *McGrath*, 544 N.E.2d at 90. "The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *Id.* at 86–87. The reasonable belief that one is using his power for legitimate means is a substantial factor in evaluating the outrageousness of his conduct. *Id.* at 88. For example, the Court in *Gibson v. Chemical Card Services Corp.* held an employer's investigation into theft of credit cards was not outrageous conduct, because his desire to solve prior thefts and prevent future thefts was an objectively legitimate end. 510 N.E.2d 37, 42 (Ill. 1987). Indeed, Illinois Courts have hesitated to rule employers' conduct outrageous, because "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 742 N.E.2d 858, 867 (Ill. 2000). "Recognizing this high threshold . . . federal courts applying Illinois law have denied recovery to plaintiffs who alleged that their employers subjected them to a continuous series of intentionally discriminatory acts." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 568 (7th Cir. 1997). Thus, Illinois courts "have limited recovery to cases in which the employer's conduct has been truly egregious." *Id.* Finally, "the fact that an employer's conduct might cause an employee embarrassment or distress will not convert otherwise unactionable insults or indignities such as the ones that the plaintiffs suffered into the extreme and outrageous conduct." *Id.*

Plaintiff fails to identify any case or fact that supports her claim that she experienced outrageous conduct. When asked which of Defendant's conduct was outrageous, she said "showing favoritism toward the men, showing favoritism toward younger women. . . And not following up . . . not completing [his approval] in a timely fashion." (Campise Dep. 98:14–23.) She also referenced reprimands in e-mails co-workers were copied on. (*Id.* 99:9–15.) Sexism in the workplace is a serious concern, and can certainly be outrageous in some circumstances, but the bare assertion of favoritism falls far short of previous cases finding outrageous conduct. For instance, sexual assault, battery, or extreme verbal abuse of a gendered nature give rise to liability for intentional infliction of emotional distress. *See, e.g.*, *Feltmeier*, 798 N.E.3d at 83 (holding that more than a decade of verbal insults, humiliation, and abuse were outrageous conduct). Similarly, forcing a pregnant woman to engage in physical labor and intentionally increasing her assigned duties, while berating her in public for failing to meet the increased burden, was sufficiently outrageous under Illinois law. *Naeem v. McKesson Drug Co*, 444 F.3d 593, 606 (7th Cir. 2006). Plaintiff's claims simply do not rise to this level. Instead, her claim is "basically saying because [Colligan] did not perform his job well with respect to [her], he intentionally inflicted emotional distress upon [her]." (Campise Dep. 98:24–99:4.) In other words, she suffered the basic indignity many workers suffer: the reality that a manager may at times direct them poorly. *See Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017) (rejecting a similar claim that also included *ad hominem* attacks on the plaintiff). This may be unfortunate, but it is not outrageous.

Even if we concluded Colligan's conduct was outrageous, he did not have the requisite intent to inflict emotional distress. To establish intentional infliction of emotional distress the Plaintiff must show the Defendant either intended to inflict or knew that his conduct was likely

16

to inflict severe emotional distress on the Plaintiff. *Fletmeier*, 798 N.E.2d at 83. For example, in *Feltmeier* the Illinois Supreme Court held an abusive husband should have known his decade-long pattern of verbal and physical abuse of his wife would cause severe emotional distress. *Id.* Similarly, in *Naeem* the Seventh Circuit held statements that the employer took action "to 'send [Plaintiff] a message" and "affect [her] mental processes" met the intent requirement. 444 F.3d at 606.

Campise's deposition itself shows that she fails to meet the intent requirement here. Rather than intentionally engage in abusive conduct, Colligan simply failed to effectively perform his duties. (Campise Dep. 98:24–99:4.) Similarly, Campise charges Colligan with not following up on her accounts and requests; this is at best negligence, but hardly of the sort an employer knows will cause severe emotional distress. (Campise Dep. 98:14–23.) While favoritism could be intentional, the record does not show any specific facts showing Colligan consciously engaged in gender-biased favoritism. Finally, a reasonable person would not expect assigning accounts to one employee over another to result in *severe* emotional distress, even if done before the entire sales team. Similarly, vulgar language can be distressing when it is part of a habitual pattern of degradation and personal abuse, but Campise alleges only indelicacy on the part of factory workers, rather than *ad hominem* abuse. (Campise Dep. 102:11–103:12.) While some emotional distress may be expected, most people would not expect distress "so severe that no reasonable [person] could be expected to endure it" to result. *Feltmeier*, 798 N.E.2d at 84. Thus, we grant Defendants' summary judgment on the emotional distress claim because: (1) as a matter of law, Plaintiff's claim falls short of showing outrageous conduct; (2) Plaintiff failed to produce evidence such that a reasonable jury could find that Defendant intended to inflict *severe* emotional distress, even if Defendant's actions were outrageous.

Finally, Plaintiff must prove she suffered severe emotional distress to prevail on her claim. "There is no fixed threshold of severity that purely emotional or psychological distress must cross in order to make the defendant's conduct actionable." *Bristow v. Drake Street Inc.*, 41 F.3d 345, 349 (7th Cir. 1994). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* (quotation omitted). There is no bright line test for severity. *Id.* The Seventh Circuit has not held there were severe reactions in cases where the Plaintiff experienced sleepless nights and nightmares. *Swanson v. Swanson*, 121 Ill.App.2d 182, 257 N.E.2d 194, 196 (1970). On the other hand, the Circuit Court has held severe emotional reactions exist when a Plaintiff provides evidence of a number of symptoms, such as experience of depression, stomach pains and vomiting, constant crying, and low function. *Bristow*, 41 F.3d at 349–50; *Naeem*, 444 F.3d at 606–07. Duration of therapy can also provide "added support for the severity of the distress." *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 247, 561 N.E.2d 1245, 1252 (1st 1990).

Plaintiff has not suffered a severe emotional reaction. Although Plaintiff did suffer from embarrassment and lost sleep, she alleges no other physical symptoms. (Campise Dep. 17:2–20:24.) Lost sleep and embarrassment were not enough to establish severe distress in *Swanson*, and are similarly not enough standing alone to establish severe distress. 121 Ill. App.2d, 257 N.E.2d at 196. Plaintiff also claims she was depressed and still suffers from depression. (Campise Dep. 20:18–24.) She only asserts this in a conclusory manner and cites no evidence besides a previous prescription for antidepressants. (Campise Dep. 18:12–19:22.) A single prescription she took for "a few weeks" and did not even refill does not alone substitute for the lack of symptoms of severe emotional reactions. In other cases finding severe emotional distress, the Plaintiff either suffered a number of clear physical symptoms like pain, vomiting, loss of

motivation, and constant crying, *Bristow* 41 F.3d at 349–50, or had an expert testify about the need for continuing psychotherapy to treat ongoing symptoms. *See Naeem*, 444 F.3d at 607. Finally, unlike the *Pavilon* plaintiff who underwent longstanding psychotherapy, Campise has not continued to see a medical provider for her issues. (Campise Dep. 20:21–24.) While she does speak to her sister, there is not enough evidence on the record to suggest that her sister is performing duties of the kind and scope Pavilon received from her therapist for years. *Compare Pavilon*, 204 Ill. App. 3d at 247, 561 N.E.2d at 1252 *with* (Campise Dep. 17:19–19:12.) Thus, there is insufficient evidence on the record to conclude there is a genuine issue of material fact about the severity of Campise's emotional reaction. Therefore, judgment as a matter of law is appropriate for Defendant as to all three elements of Plaintiff's claim for intentional infliction of emotional distress.

## CONCLUSION

The Defendant's motion for summary judgment (Dkt. No. 19) is granted in its entirety. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: November 26, 2019
       Chicago, Illinois